UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

CHRISTOPHER BROWN                          )
          Plaintiff                      )   Civil Action No.
v.                                         )
DESKPOP ENTERTAINMENT LLC,                 )
BRIDGESTONE MULTIMEDIA GROUP LLC,          )
ARCHER ENTERTAINMENT LLC, ALAN             )
JACOBS and SCOTT ALVAREZ                   ) COMPLAINT
          Defendants                     )
_____)

## JURISDICTION

1.    This Court has jurisdiction pursuant to federal question and the diversity of citizenship. The amount in controversy exceeds One Million Dollars ($1,000,000.00).

## PARTIES

2.    Christopher Brown ("Brown") is a Massachusetts resident with a business address of 100 State Street, Suite 900, Boston, MA 02109.

3.    Deskpop Entertainment LLC ("Deskpop") is a Delware entity with offices located at 25008 S. 125TH PL, CHANDLER, AZ 85249, USA. Deskpop's agent for service of process is CORPORATION SERVICES COMPANY, 251 LITTLE FALLS DRIVE, WILMINGTON, DE, 19808, USA. Deskpop does business in Massachuetts and distrubites film at Walmart, Best Buy, Amazon, Apple TV, Google Play, Fuse TV, Youtube and other internet/download/TV channels. Deskpop distributes multiple films. Home - Official Deskpop Entertainment Deskpop conducts business in New York.

4.    Bridgestone Multimedia Group, LLC ("Bridgestone"), a Delaware company, doing business at 1204 East Baseline Road, Suite 103, Tempe, Arizona 85283. Deskpop and Bridgestone operate as one entity ans shall be referred to as "Deskpop". Bridgestone conducts business in New York.

5.     Archer Entertainment LLC ("Archer") is a New York entity with an address at 500 E. 85th Street, New York, NY 10028. The registered agent for Archer is NORTHWEST REGISTERED AGENT LLC, 418 BROADWAY, STE N, ALBANY, NY, UNITED STATES, 12207.

6.     Alan Jacobs ("Jacobs") is a New York resident with an address at 500 E. 85th Street, New York, NY 10028.

7.     Scott Alvarez ("Alvarez") is a resident of California with an address at 2290 Waltonia Drive, Apt. 1 Montrose, CA 91020.

## FACTS

8.     Brown and several others were the Plaintiffs ("BP1") in the California Superior court action, Los Angeles Superior Court case number BC 609628, Setari et al, v. Xenon Pictures, Viva Pictures, et al ("Xenon") in 2017.  See Exhibit 1 ("Lawsuit 1"). The lawsuit claimed negligence against Xenon, relating to the failure to release the film "Down For Life" ("D4L").  BP1 were some of the creditors relating to the film D4L.

9.      Prior to Lawsuit 1, Por Vida Productions LLC and Xenon were in litigation about D4L, in approximately 2011. Por Vida Productions LLC was the original entity that produced the film D4L. Por Vida Productions LLC and Xenon reached a settlement, however, Pro Vida Productions LLC failed to purchase the rights to the film back from Xenon to D4L. After Por Vida Productions LLC failed to complete the purchase of the distribution rights, in 2013, Xenon recorded its Mortgage and Assignment in the United States Copyright Office. Por Vida Productions LLC was the original entity that produced the film D4L.

10.    A settlement was reached in  Lawsuit 1 in 2016 between BP1 and Xenon. BP1, including Brown, received the distrubiton rights to the film D4L from Xenon.   Exhibit 2. D4L had  a star-studded cast consisting of international stars Danny Glover, Snoop Dogg, Laz Alonso and others. The film cost over Three Million ($3,000,000.00) to complete.

11.    Xenon assigned all of its rights, including its United States Copyright Mortgage and Assignment register in the United States Copyright Office,

Exhibit 3, to BP1 in the Lawsuit 1 settlement of 2016. Xenon's contract for the acquisition of D4L was with DFL Releasing LLC and Por Vida Productions, LLC. Hence, BP1 controls the copyright and distribution rights to D4L.

12.     DFL Releasing LLC and Por Vida Productions, LLC were both dissolved and/or suspended by the state of California on or before 2015. Neither entity had the right to transact business after 2015. Once it is suspended, a California enitity is prohibited from taking any action, including execution of contracts. See Gar-Lo, Inc. v. Prudential Sav. & Loan Assn. (1974) 41 Cal.App.3d 242. Neither entity has the ability to operate.

13.     Brown received Power Of Attorney from all the BP1 Plaintiffs for the distribution rights of D4L. The Power of Attorney is governed by New York Law. The Defendants are fully aware of the Power of Attorney. See Exhibit 4.

14.     Xenon could not deliver the film clearances to Brown due to the action of the producers of the film Por Vida Productions LLC[1] DFL Releasing LLC[2], and LATS Holdings LLC[3], owned by Scott Alverez ("Alvarez") and/or Alan Jacobs ("Jacobs").

15.     In December 2017, Brown Alvarez and Weathervane Productions Inc. signed a deal for the distribution of D4L and clear the film. See Exhibit 5. Weathervane Productions Inc. breached the agreement in 2018 and never distributed the film. In the contract, Alvarez admits that Brown represented the owners of the film. (See Brown signature block at Exhibit 5).

16.     Brown has requested clear chain of title and deliverables from Alvarez, however Alvarez has never provided clearances for the film, music, the New York Times and clearance from labor unions that placed liens on the film. Alvarez never provided the clearances.

17.     From 2018 through 2022, Brown, Alvarez and Alan Jacobs (the director of D4L), communicated in attempts to distribute the film and a television show based on D4L. Alvarez indicated multiple times that he was working on clearing the rights necessary from the New York Times, labor unions and music that was in the film.

18.     In May 2023, Brown contacted Alvarez seeking an update on the clearances.  Alvarez informed Brown that he and Jacobs signed a contract with Deskpop  for the release of  D4L and used advanced money from Deskpop to clear all the issues. Deskpop is an entity related to Bridgestone. The contract was executed in 2021.

19.     Brown was furious with Alvarez as Alvarez was keenly aware of Brown's rights.

20.     Upon information and belief, Archer signed the contract with Deskpop for the release of D4L.  Archer is owned by Jacobs and was created in New York in 2021. Archer has no right to enter into any agreement for the distribution of D4L.

21.     Only Brown  and/or BP1 had the legal right to enter into any contract with Deskpop relating to D4L.

22.     In August 2023, Brown went to Deskpop's website which confirmed the company's involvement in the distribution of D4L.



23.    On August 5, 2023, Brown sent an email to Deskpop informing
Deskpop of Brown's rights.



24.    Deskpop  responded to Brown. From March 2023 through
September 2023, Deskpop distributed the film but it appears that
Deskpop/Bridgestone has curtailed or ceased the distribution of the film.


### COUNT I
### COPYRIGHT INFRINGEMENT
### 17 U.S.C. § 501, 502, 504 and 505
### <u>BROWN AGAINST DEFENDANTS</u>

25.    Plaintiff repeats and realleges each of the preceding paragraphs 1-24
above.

26.    Plaintiff and BP1 through Lawsuit 1, obtained the (1)
Copyright Mortgage and Assignment and (2) distribution rights  to
the film D4L.

27.     Defendants without the consent of Brown and BP1, posted the film on its social media, streamed and distributed the film D4L in violation of Plaintiff's rights. The infringement was willful and reckless.

28.     Defendants have distributed D4L through various channels including but not limited to, Amazon, Best Buy, Walmart, Google and others.



29.    The Defendants have violated Plaintiff's rights pursuant to the United States Copyright Act and harmed Plaintiff in his business.

30.    Plaintiff seeks to (1) enjoin the activity of the Defendants, (2) statutory damages and actual daamges  and (3) Attorney fees relating to Defendants' actions.

## COUNT II
## CONVERSION
## <u>BROWN AGAINST DEFENDANTS</u>

31.    Plaintiff repeats and realleges each of the preceding paragraphs 1-30 above.

32.    Defendants have distrubted the film D4L without Plaitniff's consent in violaotion of the rights of Brown.

33.    Conversion claims are predicated upon a Defendant's wrongful dominion over a plaintiff's tangible or intangible personal property. <u>Thyroff v. Nationwide Mutual Ins. Co.</u>, 864 N.E.2d 1272, 1278 (N.Y. 2007).

34.    To establish a cause of action in conversion, the Plaintiff must show (i) legal ownership or an immediate superior right of possession to specific identifiable personal property, and (ii) the defendant exercised an unauthorized dominion over the property in question to the exclusion of the plaintiff's rights. <u>Korangy Publishing, Inc. v. Miceli</u>, 2009 WL 586131, at *4 (N.Y. Sup. 2009); <u>Five Star Bank v. CNH Capital America, LLC</u>, 865 N.Y.S.2d 190, 192 (App. Div. 4 Dept. 2008).

35.    Plaintiff has a superior right to distruibte D4L and Defendants excerised dominion over the property. Due to the actions of Defendants, Brown has been damaged and  Defendants have converted the rights of Brown.

## COUNT III
## <u>PERMANENT INJUNCTION</u>

36.    Plaintiff realleges paragraphs 1-35 above.

37.    Plaintiff is entitled to an injunction against the Defendant.

38.    *Grounds.*
        Plaintiff will suffer immediate and irreparable injury, loss, or damage if
        Defendants' conduct described above is not enjoined for these reasons:  (1)
        the Defendants are infringing on the distribution rights of the Plaintiff
        relating to D4L (2) the Defendants are entering into contracts with various
        entities including, Google, Walmart, Itunes, Tubi and others for the
        distribution of the film (3) the Defendants are aware of Brown's right yet it
        continued to utilize D4L in bad faith (4) Archer had no right to license D4L
        to Deskpop/Bridgestone and (5) Deskpop/Bridgestone knew or should have
        known Archer had no rights upon their own search of the United States
        Copyright Office and by conducting a chain of title search.

39.    Plaintiff does not have an adequate remedy at law.  Plaintiff has exercised
        due diligence in prosecuting this claim.  The injury to Plaintiff if the
        Defendant continue the conduct described above would outweigh any injury
        the restraining order and injunction might cause the  Defendant. An issuance
        of the restraining order and injunction would not disserve the public interest.

40.    Plaintiff has a likelihood of success on the merits.

41.    Plaintiff seeks a temporary restraining order restraining the Defendants,
        their officers, agents, servants, and employees from directly or indirectly
        promoting, advertising, marketing or  distributing D4L.

**COUNT IV**
**DEFAMATION OF CHARACTER-SLANDER**
**BROWN AGAINST ARCHER, ALVAREZ AND JACOBS  UNDER**
**MASSACHUSETTS LAW**


**DEFAMATION OF CHARACTER**
**LEGAL DEFAMATION STANDARDS**

42.    Massachusetts defamation law defines defamation as a term for a legal
        claim arising from harm to a person's reputation, which is caused by a false

statement of fact communicated to a third-party without privilege. Defamation includes both libel (written defamation) and slander (spoken defamation). <u>Langadinos v. Bd. Of Trustees of Univ. of Massachusetts</u>, 2013 U.S. Dist. LEXIS 141341, 2013 WL 5507042 (D. Mass. Sept. 30, 2013). In Massachusetts, defamation generally requires a plaintiff to show that the false statement was "capable of damaging his or her reputation in the community and either caused economic loss or is actionable without proof of economic loss." <u>White v. Blue Cross & Blue Shield of Mass., Inc.</u>, 809 N.E.2d 1034, 1036 (Mass 2004). Furthermore, Massachusetts courts have noted, "Defamation is the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt." <u>Correllas v. Viveiros</u>, 572 N.E.2d 7, 10 (1991), citing <u>Merrill v. Post Publishing Co.</u>, 197 Mass. 185, 191-192 (1908).

43. In order for Massachusetts defamation plaintiffs to succeed in their libel or slander claim, they must prove the following five (5) elements:

- A defamatory statement
- About the plaintiff
- Published without privilege to a third-party
- With fault of at least negligence on the part of the defendant
- The statement either caused the plaintiff economic loss or was of the type that is actionable without proof of economic loss (defamation per se). <u>Oberg v. City of Taunton</u>, 972 F.Supp.2d 174, 205 (D. Mass. 2013).

44. Massachusetts recognizes defamation per se in cases involving prejudice to plaintiff's business. <u>Ravnikar v. Bogojavlensky</u>, 438 Mass. 627 (Mass. 2003). The statement either caused the plaintiff economic loss (traditionally referred to as "special damages" or "special harm"), or is actionable without proof of economic loss. See *Restatement (Second) of Torts*, supra at § 558(d), § 575 comment b. Four types of statements are actionable without proof of economic loss: (1) **statements that constitute libel**, see <u>Shafir v. Steele</u>, 431 Mass. 365, 373 (2000); (2) statements that charge the plaintiff with a crime; (3) statements that allege that the plaintiff has certain diseases; and (4) **statements that may prejudice the plaintiff's profession or business**. See <u>Lynch v. Lyons</u>, 303 Mass. 116, 118-119 (1939). If the statement comes within one of these four exceptions, a plaintiff may recover noneconomic losses, including emotional injury and damage to reputation. See <u>Shafir v. Steele</u>, supra; *Restatement (Second) of Torts*, supra at § 622 comment b, § 623 comment a.

45.   In August 2023, Jacobs, Alvarez and Archer became angry with Brown due to Brown's request to Deskpop to cease the distribution of D4L.

46.   Archer, Alvarez and Jacobs, contacted Robert Setari ("Setari") and falsely informed him that Brown was about to sue Setari and/or make claims against Setari. Brown never made any claims against Setari and Brown never intended to make claims against Setari. Archer, Jacobs and Alvarez attempted to use Setari, as it was Setari's funds/property that was utilized to payment the settlement in Lawsuit 1 once specific performance was demanded from Xenon in a separate enforcement action.

47.   Based on the false statements made to Setari by Archer, Alvarez and Jacobs, in August 2023, Setari hired legal counsel, Attorney James Sadigh to threaten Brown with a legal letter ("Sadigh Letter").

48.   Archer, Alvarez and Jacobs also wanted to discredit Brown with Deskpop/Bridgestone and provided the Sadigh Letter to Deskpop/Bridgestone hoping to resurrect Archer's dying distribution agreement with Deskpop/Bridgestone. Archer, Alvarez and Jacobs provided the Sadigh Letter to Deskpop/Bridgestone in hopes of harming Brown's reputation.

49.   Archer, Alvarez and Jacobs organized the attack on Brown and used Setari as a pawn with Deskpop/Bridgestone by providing false statements to Setari.

50.   Archer, Alvarez and Jacobs have engaged in reckless behavior and disregard for the truth. Their statements defamed Brown and is prejudicial to his business. Archer, Alvarez and Jacobs have harmed Brown in his overall business.


**COUNT V**
**DEFAMATION OF CHARACTER-LIBEL**
**BROWN AGAINST ARCHER ALVAREZ AND JACOBS UNDER**
**MASSACHUSETTS LAW**

51.   Brown repeats and realleges each of the preceding paragraphs 1-54.

52.   Archer, Alvarez and Jacobs have published derogatory comments about Brown.

53. Archer, Alvarez and Jacobs statements are untrue and false.

54. The actions of Archer, Alvarez and Jacobs have damaged the reputation of Brown.

55. The actions of the Defendants were designed to harm Brown.

56. The actions of the Defendants were done with malice and disregard for the truth.

57. The Defendants have engaged in reckless behavior and disregard for the truth.

58. Defendants actions have damaged Brown in his business.


PLAINTIFF DEMANDS TRIAL BY JURY AND,

-judgment on all
 counts;
-punitive damages
-injunction;
-costs;
-interest; and,
-all just remedies

CHRISTOPHER BROWN-Pro Se

Christopher Brown, BBO 642688
100 State Street, Suite 900
Boston, MA 02109
617-728-9111
cbrown@brownrosen.com

Dated: December 9, 2023

# EXHIBIT 1

1   MONICA A. BLUT, ESQ. (CSB#162360)
    SIMON RESNIK HAYES LLP
2   15233 Ventura Blvd., Suite 250
    Sherman Oaks, CA 91403
3   Telephone (818)783-6251
    Facsimile   (818)783-6253
4

5   Attorney for Plaintiffs,
    ROBERT SETARI, DOUG VANCE, MICHAEL LEVINE, MARC NOVAK, CHRIS
6   BROWN, PAUL STEWART, NEELY DINKINS DBA COSTARS MUSIC, VITO
    COLAPIETRO DBA COSTARS MUSIC, GREGORY FLORES DBA SAN DIEGO GRIP &
7   CRAFT SERVICES and RUBEN CORTEZ

8

9                     SUPERIOR COURT FOR THE STATE OF CALIFORNIA

10                         FOR THE COUNTY OF LOS ANGELES

11
    ROBERT SETARI, an individual; DOUG        CASE NO.     BC609628
12  VANCE, an individual; MICHAEL
    LEVINE, an individual; MARC NOVAK, an     **FIRST AMENDED COMPLAINT FOR:**
13  individual; CHRIS BROWN, an individual;
    PAUL STEWART, an individual;  NEELY         **1.   NEGLIGENT INTERFERENCE**
14  DINKINS, an individual, DBA COSTARS      **WITH PROSPECTIVE ECONOMIC**
    MUSIC; VITO COLAPIETRO, an              **RELATIONS;**
15  individual, DBA COSTARS MUSIC,            **2.   INTENTIONAL**
    GREGORY FLORES, an individual, DBA      **INTERFERENCE WITH CONTRACT;**
16  SAN DIEGO GRIP & CRAFT SERVICES           **3.   FRAUD;**
    and RUBEN CORTEZ, an individual,          **4.   NEGLIGENT**
17                                            **MISREPRESENTATION; AND**
18          Plaintiffs,                       **5.   INTENTIONAL**
                                            **MISREPRESENTATION**
19          vs.

20
    XENON PICTURES, LLC, VIVA
21  PICTURES, LLC, and DOES 1-50, inclusive

22
            Defendants.
23

24

25      Plaintiffs ROBERT SETARI, DOUG VANCE, MICHAEL LEVINE, MARC NOVAK,

26  CHRIS BROWN, PAUL STEWART, NEELY DINKINS, DBA COSTARS MUSIC, VITO

27  COLAPIETRO, DBA COSTARS MUSIC, GREGORY FLORES DBA SAN DIEGO GRIP &

28

                                    1

CRAFT SERVICES and RUBEN CORTEZ (hereinafter referred to collectively as "plaintiffs"), allege as follows:

## PARTIES

1.     Plaintiff ROBERT SETARI, (hereinafter "Setari") is an individual residing and working in Los Angeles, California.

2.     Plaintiff DOUG VANCE, (hereinafter "Vance") is an individual residing and working in Minatare, Nebraska.

3.     Plaintiff, MICHAEL LEVINE, (hereinafter "Levine") is an individual residing and working in Los Angeles, California.

4.     Plaintiff MARC NOVAK, (hereinafter "Novak") is an individual residing and working in Los Angeles, California.

5.     Plaintiff, CHRIS BROWN, (hereinafter "Brown") is an individual residing and working in Boston, Massachusetts.

6.     Plaintiff, PAUL STEWART, (hereinafter "Stewart") is an individual residing and working in Los Angeles, California.

7.     Plaintiff NEELY DINKINS DBA COSTARS MUSIC, (hereinafter "Dinkins") is an individual residing and working in Los Angeles, California.

8.     Plaintiff VITO COLAPIETRO DBA COSTARS MUSIC (hereinafter "Colapietro") is an individual residing and working in Los Angeles, California.

9.     Plaintiff, GREGORY FLORES DBA SAN DIEGO GRIP & CRAFT SERVICES, (hereinafter "Flores") is an individual residing and working in San Diego, California.

10.     Plaintiff, RUBEN CORTEZ, (hereinafter "Cortez") is an individual residing and working in Los Angeles, California.

11.     Plaintiffs are informed and believe and based thereon allege that Defendant Viva Pictures, LLC, is a business entity, form unknown, doing business in Los Angeles, California with a physical business address of 1539 Westwood Blvd., Los Angeles, CA 90024.

**FIRST AMENDED COMPLAINT**

1    12.    Plaintiffs are informed and believe and based thereon alleges that Defendant

2    Xenon Pictures, LLC, is a business entity, form unknown, doing business in Los Angeles,

3    California with a physical business address of 1440 Ninth Street, Santa Monica, CA 90401.

4    13.    Plaintiffs are unaware of the true names and capacities of defendants sued herein

5    as DOES 1 through 50, inclusive, and, therefore, Plaintiffs sue those defendants by such fictitious

6    names. Plaintiffs will amend this complaint to allege their true names and capacities when the

7    same have been ascertained. Plaintiffs are informed and believe and on that ground allege that

8    each of the fictitiously named defendants is responsible in some manner for the occurrences as

9    herein alleged and that Plaintiffs' losses as herein alleged were proximately caused by such

10    conduct.

11    14.    Plaintiffs are informed and believe and based thereon allege that, at all times

12    herein mentioned, each of the defendants was acting as an agent and/or servant and/or employee

13    and/or representative of his or her co-defendants herein, and, in doing the things herein alleged,

14    was acting within the course and scope of such agency, service, employment, representation and

15    with the permission and consent of the other defendants.

16

17    **<u>JURISDICTION AND VENUE</u>**

18    15.    This Court has jurisdiction over Defendants and each of them insofar as each is a

19    resident, business entity or corporation, that has sufficient minimum contacts in California or are

20    otherwise intentionally availing themselves of the benefits of the California consumer market, or

21    otherwise are citizens or business entities of the State of California.

22    16.    Venue is appropriate in the County of Los Angeles as all of the agreements were

23    entered into in the County of Los Angeles, each of the parties' principal place of business is in

24    the County of Los Angeles, and/or because the factual circumstances giving rise to the causes of

25    action as alleged herein arose and/or occurred in the County of Los Angeles.

26

27

28

**STATEMENT OF FACTS**

17.     SETARI: On or about October 8, 2007, Plaintiff Setari invested $125,000.00 in the production of a motion picture known as "Down for Life" (the "Picture"), through a convertible debt subscription agreement (CDSA) with Por Vida Productions, LLC, the producers of the picture ("Producers"), which investment is to be repaid from the proceeds of the film.  A copy of the agreement is attached hereto as Exhibit "A".

18.     VANCE: On or about June 12, 2009, Plaintiff Doug Vance, invested $65,000.00 in the production of a motion picture known as "Down for Life" (the "Picture"), through a short-term loan  agreement with Por Vida Productions, LLC, the producers of the picture ("Producers"), which investment is to be repaid from the proceeds of the film.  A copy of the agreement is attached hereto as Exhibit "B".

19.     LEVINE: On or about July 18, 2007, Plaintiff Michael Levine invested $62,500.00 in the production of a motion picture known as "Down for Life" (the "Picture"), through a convertible debt subscription agreement (CDSA) with Por Vida Productions, LLC, the producers of the picture ("Producers"), which investment is to repaid from the proceeds of the film. A copy of the agreement is attached herein as Exhibit "C".

20.     NOVAK: On or about August 19, 2009, Plaintiff Mark Novak, invested $15,000.00 in the production of a motion picture known as "Down for Life" (the "Picture"), through a short-term loan agreement with Por Vida Productions, LLC, the producers of the picture ("Producers"), which investment is to be repaid from the proceeds of the film.  (A copy of the agreement is attached hereto as Exhibit "D").

21.     BROWN: From on or about December, 2013 to May, 2015, Plaintiff Chris Brown, provided $17,500.00 in legal services to Por Vida Productions, LLC, the producers of the picture ("Producers"), which fees are to be paid from the proceeds of the film.  (A copy of the billing is attached hereto as Exhibit "E").

22.     STEWART: Paul Stewart is the Music Supervisor on the film.  He completed his services on or about February 2, 2006, and was to be paid $18,500.00 upon commencement of principal photography.  His fees are to be paid prior to the release of the film. (See option

4

**FIRST AMENDED COMPLAINT**

1    agreement attached hereto as Exhibit "F").

2        23.    DINKINS: Neely Dinkins is the composer on the film.  He completed his services

3    on or about February 2, 2006, and was to be paid $18,500.00 upon commencement of principal

4    photography.  His fees are to be paid prior to the release of the film. (See option agreement

5    attached hereto as Exhibit "G").

6        24.    COLAPIETRO: Vito Colapietro is the composer on the film.  He completed his

7    services on or about February 2, 2006, and was to be paid $18,500.00 upon commencement of

8    principal photography.  His fees are to be paid prior to the release of the film. (See option

9    agreement attached hereto as Exhibit "H").

10       25.    FLORES: Gregory Flores is the credited Key Grip on the film. In addition to

11   providing grip services, he also provided Grip Truck equipment rental to the movie production

12   during principal photography on or about June 2007, in the amount of $3,000.00. His fees are to

13   be paid from net receipts derived from distribution of the film. (See invoice and deferred

14   compensation agreement attached hereto collectively as Exhibit "I").

15       26.    CORTEZ: On or about June and July 2007, Plaintiff Ruben Cortez, provided

16   $14,602.00 in security services for the production of a motion picture known as "Down for Life"

17   (the "Picture"), which services are to be paid for from the proceeds of the film. A copy of the

18   agreements and billing invoices are attached hereto collectively as Exhibit "J".

19       27.    Plaintiffs are informed and believe, and based on such information and belief

20   allege, that at all times relevant herein, Defendant Viva (acting by and through its legal

21   representative, Victor Elizalde, who had authority to speak on its behalf) and Defendant Xenon

22   (acting by and through its legal representative, Leigh Savidge, who had authority to speak on its

23   behalf) were and are partners in a business entity, form unknown, created for the purpose of

24   distributing the subject film, whereby each was and is legally authorized to act for and on behalf of

25   the other, in a legally binding manner, incurring joint and several liability for the acts and/or

26   omissions of the other, relative to the distribution of the subject film.

27       28.    On or about October 5, 2010, Defendant Viva (acting by and through its legal

28   representative, Victor Elizalde, and binding both Defendants Viva and Xenon, entered into a

1   written agreement with Producers whereby they agreed to distribute the picture throughout North

2   America, and to assume the financial obligations necessary to do so, in the amount of

3   $315,000.00. (See, written agreement attached hereto as Exhibit "K"). Plaintiffs are informed and

4   believe, and based on such information and belief allege, that as of October 5, 2010, Defendant

5   Viva (acting by and through its legal representative, Victor Elizalde) and Defendant Xenon (acting

6   by and through its legal representative, Leigh Savidge) were and are partners in a business entity,

7   form unknown, created for the purpose of distributing the subject film, whereby each was and is

8   legally authorized to act for and on behalf of the other, in a legally binding manner, incurring joint

9   and several liability for the acts and/or omissions of the other, relative to the distribution of the

10  subject film. At that time and at all times thereafter, Defendant Viva (acting by and through its

11  legal representative, Victor Elizalde, and binding both Defendants Viva and Xenon, were aware

12  of, or reasonably should have been aware of, plaintiffs' investments and contractual agreements

13  with the producers of the picture. Moreover, at that time and at all times thereafter, Defendant

14  Viva (acting by and through its legal representative, Victor Elizalde, and binding both Defendants

15  Viva and Xenon), knew, or should have known, that they did not have the financial means to meet

16  the obligations outlined in the aforementioned agreement.

17      29.     On or about 2011, Defendant Viva (acting by and through its legal representative,

18  Victor Elizalde, and binding both Defendants Viva and Xenon),    initiated litigation against the

19  producers of the picture. A settlement of said dispute was reached on May 3, 2012, whereby

20  Defendant Viva (acting by and through its legal representative, Victor Elizalde, and binding both

21  Defendants Viva and Xenon), acquired sole and exclusive rights to market and distribute the

22  picture. (See, Settlement Agreement attached hereto as Exhibit "L").

23      30.     On or about 12/19/2014, Defendants were presented with an offer by E1 to

24  distribute the picture, which they failed and refused to accept. (See, Motion Picture Distribution

25  Agreement attached hereto as Exhibit "M").

26      31.     Despite Plaintiffs' demands for distribution of the picture by Defendants, and

27  despite the submission of reasonable offers presented to defendants to distribute the picture by

28  third parties, Defendants have refused to distribute the picture themselves, or to enter into

6

**FIRST AMENDED COMPLAINT**

1  reasonable agreements to allow others to do so.

2      32.    Defendants have knowingly, willingly, and intentionally deprived plaintiffs of their

3  right to recoup and profit from their investment in and or services rendered for the production of

4  the picture by failing and refusing to distribute the picture.

5      33.    At the time of acquiring the rights to distribute the picture, defendants knowingly,

6  willingly and intentionally misrepresented their intention to, and financial ability to, distribute the

7  picture.  To this date the picture has not been marketed or distributed.

8      34.    At the time of acquiring the rights to distribute the picture, and at all times

9  thereafter, Defendants were aware of, or reasonably should have been aware of, Plaintiffs'

10  investments in and or claims to production of the picture, and that failure to distribute the picture

11  would result in financial harm to plaintiffs.

12

13                    **FIRST CAUSE OF ACTION**

14                    **NEGLIGENT INTERFERENCE**

15          **WITH PROSPECTIVE ECONOMIC RELATIONS**

16                    **(Against All Defendants)**

17      35.    Plaintiffs herein incorporate by reference the allegations contained in paragraphs 1

18  through 72 and each and every part thereof, with the same force and effect as though set out at

19  length herein.

20      36.    Plaintiffs and the producers of the picture were in an economic relationship that

21  probably would have resulted in a future economic benefit to Plaintiffs.

22      37.    Defendants Viva and Xenon knew or should have known of this relationship.

23      38.    Defendants Viva and Xenon knew or should have known that this relationship

24  would be disrupted if they failed to act with reasonable care regarding their distribution of the

25  picture.

26      39.    Defendants Viva and Xenon failed to act with reasonable care regarding their

27  distribution of the picture.

28      40.    Defendants Viva and Xenon engaged in wrongful conduct through fraud and

1  misrepresentation pertaining to their financial ability and intention to properly distribute the

2  picture.

3      41.    The relationship between Plaintiffs and Producers was disrupted as a result of

4  defendants' failure to distribute the picture.

5      42.    Plaintiffs were financially harmed as a result of defendants' failure to distribute the

6  picture; and

7      43.    Defendants Viva and Xenon's wrongful conduct was a substantial factor in causing

8  Plaintiffs' harm.

9                          **SECOND CAUSE OF ACTION**

10               **INTENTIONAL INTERFERENCE WITH CONTRACT**

11                            **(Against All Defendants)**

12     44.    Plaintiffs herein incorporate by reference the allegations contained in paragraphs 1

13  through 72 and each and every part thereof, with the same force and effect as though set out at

14  length herein.

15     45.    There was a contractual agreement between Plaintiffs and Producers in the form of

16  the CDSA agreement, short-term loan agreement, or other agreement between them, as previously

17  described herein and/or attached hereto.

18     46.    Defendants Viva and Xenon knew, or reasonably should have known of, the

19  aforementioned contracts and/or agreements.

20     47.    Defendants Viva and Xenon intended to disrupt the performance of these contracts

21  and/or agreements.

22     48.    Defendants Viva and Xenon's conduct in failing to distribute the picture or allow

23  for its distribution by third parties prevented performance or made performance of said contracts

24  and/or agreements between plaintiffs and producers more expensive or difficult.

25     49.    Plaintiffs were financially harmed as a result; and

26     50.    Defendants Viva and Xenon's wrongful conduct in failing to distribute the picture

27  or allow for its distribution by third parties was a substantial factor in causing Plaintiffs' harm.

28

8

**FIRST AMENDED COMPLAINT**

1

## THIRD CAUSE OF ACTION

2

## FRAUD

3

### (Against All Defendants)

4       51.   Plaintiffs herein incorporate by reference the allegations contained in paragraphs 1

5   through 72 and each and every part thereof, with the same force and effect as though set out at

6   length herein.

7       52.       Defendants Viva and Xenon made a misrepresentation to Plaintiffs in the form of a

8   false representation, concealment, or non-disclosure with regard to their financial inability or lack

9   of intention to distribute the picture.  Specifically, on October 5, 2010, Victor Elizalde, on behalf

10  of Viva and Xenon, entered into a written agreement wherein he stated in writing that he would

11  distribute the film throughout North America, and that he had the financial means to do so.  (See,

12  written agreement attached hereto as Exhibit "K").  In so doing, he falsely represented his intent

13  and financial means, concealed his true intentions not to distribute, and failed to disclose his

14  inability to meet the financial obligations required of him to do so.  In addition, on May 3, 2012,

15  Victor Elizalde, on behalf of Viva, and Leigh Savidge on behalf of Xenon, entered into a

16  settlement agreement wherein each stated in writing that they received sole and exclusive rights to

17  market the subject film. (See, settlement agreement attached hereto as Exhibit "L").  In so doing,

18  they once again falsely represented their intent to distribute the film;

19      53.    Defendant's knew their representations in that regard were not true;

20      54.    Defendant's intended to defraud Plaintiffs with their misrepresentation;

21      55.    Plaintiffs justifiably relied on the misrepresentation;

22      56.    Plaintiffs were financially damaged as a result.

23

24

## FOURTH CAUSE OF ACTION

25

## NEGLIGENT MISREPRESENTATION

26

### (Against All Defendants)

27      57.     Plaintiffs herein incorporate by reference the allegations contained in paragraphs 1

28  through 72 and each and every part thereof, with the same force and effect as though set out at

9

**FIRST AMENDED COMPLAINT**

1   length herein.

2      58.    Defendants Viva and Xenon represented to Plaintiffs that an important fact was

3   true, namely, that they had the financial wherewithal and intention to distribute the picture.

4   Specifically, on October 5, 2010, Victor Elizalde, on behalf of Viva and Xenon, entered into a

5   written agreement wherein he stated in writing that he would distribute the film throughout North

6   America, and that he had the financial means to do so.  (See, written agreement attached hereto as

7   Exhibit "K").  In so doing, he falsely represented his intent and financial means, concealed his true

8   intentions not to distribute, and failed to disclose his inability to meet the financial obligations

9   required of him to do so.  In addition, on May 3, 2012, Victor Elizalde, on behalf of Viva, and

10  Leigh Savidge on behalf of Xenon, entered into a settlement agreement wherein each stated in

11  writing that they received sole and exclusive rights to market the subject film. (See, settlement

12  agreement attached hereto as Exhibit "L").  In so doing, they once again falsely represented their

13  intent to distribute the film;

14     59.    Defendants' representations in this regard were not true;

15     60.    Although Defendants may reasonably have believed that their representations were

16  true, Defendants had no reasonable grounds for believing the representation was true when

17  defendants made it;

18     61.    Defendant's intended that Plaintiffs rely on their misrepresentations;

19     62.    Plaintiffs then reasonably relied on the misrepresentations;

20     63.    Plaintiffs were financially harmed as a result;

21     64.    Plaintiffs' reliance on defendants' representation was a substantial factor in causing

22  their harm.

23                    **FIFTH CAUSE OF ACTION**

24                 **INTENTIONAL MISREPRESENTATION**

25                      **(Against All Defendants)**

26     65.    Plaintiffs herein incorporate by reference the allegations contained in paragraphs 1

27  through 72 and each and every part thereof, with the same force and effect as though set out at

28  length herein.

66.     Defendants Viva and Xenon represented to Plaintiffs that important facts were true, namely, that they had the financial wherewithal to distribute the picture, and that their intent was to do so. Specifically, on October 5, 2010, Victor Elizalde, on behalf of Viva and Xenon, entered into a written agreement wherein he stated in writing that he would distribute the film throughout North America, and that he had the financial means to do so. (See, written agreement attached hereto as Exhibit "K"). In so doing, he falsely represented his intent and financial means, concealed his true intentions not to distribute, and failed to disclose his inability to meet the financial obligations required of him to do so. In addition, on May 3, 2012, Victor Elizalde, on behalf of Viva, and Leigh Savidge on behalf of Xenon, entered into a settlement agreement wherein each stated in writing that they received sole and exclusive rights to market the subject film. (See, settlement agreement attached hereto as Exhibit "L"). In so doing, they once again falsely represented their intent to distribute the film;

67.     Defendants' representations were not true;

68.     Defendants knew that the representations were false when they made them, or made the representations recklessly and without regard for their truth;

69.     Defendant's intended that Plaintiffs rely on their misrepresentations;

70.     Plaintiffs reasonably relied on the misrepresentations;

71.     Plaintiffs were financially harmed as a result;

72.     Plaintiffs' reliance on defendants' representations was a substantial factor in causing their harm.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants XENON PICTURES, LLC, and VIVA PICTURES, LLC, as follows:

### FIRST CAUSE OF ACTION

1.     For compensatory damages, according to proof;

2.     For interest on the damages according to law;

3.     For prejudgment interest;

4.     For costs incurred in this action; and

FIRST AMENDED COMPLAINT

1    5.    For any other and further relief that the court considers just and proper.

2

**SECOND CAUSE OF ACTION**

3    1.    For compensatory damages, according to proof;

4    2.    For interest on the damages according to law;

5    3.    For prejudgment interest;

6    4.    For costs incurred in this action; and

7    5.    For any other and further relief that the court considers just and proper.

8

**THIRD CAUSE OF ACTION**

9    1.    For compensatory damages, according to proof;

10    2.    For interest on the damages according to law;

11    3.    For prejudgment interest;

12    4.    For costs incurred in this action; and

13    5.    For any other and further relief that the court considers just and proper.

14

**FOURTH CAUSE OF ACTION**

15    1.    For compensatory damages, according to proof;

16    2.    For interest on the damages according to law;

17    3.    For prejudgment interest;

18    4.    For costs incurred in this action; and

19    5.    For any other and further relief that the court considers just and proper.

20

21

22

**FIFTH CAUSE OF ACTION**

23    1.    For compensatory damages, according to proof;

24    2.    For interest on the damages according to law;

25    3.    For prejudgment interest;

26    4.    For costs incurred in this action; and

27    5.    For any other and further relief that the court considers just and proper.

28

12

**FIRST AMENDED COMPLAINT**

1    DATED: 5/16/16                         SIMON RESNIK HAYES LLP

2

3                                     By:_____
                                          Monica A. Blut, Esq.
4                                         Attorney for Plaintiffs
                                          ROBERT SETARI, DOUG VANCE,
5                                         MICHAEL LEVINE, MARC
                                          NOVAK, CHRIS BROWN, PAUL
6                                         STEWART, NEELY DINKINS DBA
                                          COSTARS MUSIC, VITO
7                                         COLAPIETRO DBA COSTARS
                                          MUSIC, GREGORY FLORES DBA
8                                         SAN DIEGO GRIP & CRAFT
                                          SERVICES and RUBEN CORTEZ
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    13

Exhibit A

October 8, 2007
Page 1

## POR VIDA PRODUCTIONS, LLC
### SHORT-FORM CONVERTIBLE DEBENTURE SUBSCRIPTION AGREEMENT
### FOR THE MOTION PICTURE ENTITLED "POR VIDA"

**Parties Involved in Agreement**
This Short-Form Convertible Debenture Subscription Agreement (the "Agreement"), dated as of October 8, 2007, is by and among Por Vida Productions, LLC, a California Limited Liability Company, having offices at 23679 Calabasas Road, Suite 380, Calabasas, CA 91302 (the "Borrower") and Setari Enterprises, Inc. (Robert Setari, President), having offices at 3625 Wrightwood Drive, Studio City, CA 91604 (the "Lender").

**The Purchase Agreement**
Therefore, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1. **Purchase of Convertible Debenture**

    **1. a. Interest-Bearing Debenture**
    The Borrower shall sell, and the Lender shall purchase, an interest-bearing convertible debenture (the "Debenture") in the original principal amount of One Hundred and Twenty-Five Thousand Dollars ($125,000). The Debenture shall accrue interest at ten percent (10.0%) per annum, calculated daily, maturing on January 16, 2008 (the "Maturing").

    **1. b. Debenture Repayment**
    Upon Maturing, principal plus interest shall be due in full to the Lender. The Borrower shall repay the Lender principal plus interest no later than thirty (30) days after the Maturing. Collectively, debenture holders, including the Lender, shall not be subordinate to any other creditors. The Borrower shall repay debenture holders, including the Lender, in order of maturity date.

    **1. c. Convertible Debenture**
    At any time prior to January 16, 2008, upon the Lender signing a Membership Unit Purchase Agreement and having delivered to the Borrower a total of One Hundred and Twenty-Five Thousand Dollars ($125,000), the Debenture shall convert into One-Half (1/2) Membership Unit of Por Vida Productions, LLC. The Membership Unit(s) shall be in accordance with and governed by the Por Vida Operating Agreement dated June 27, 2007.

2. **Closing of the Purchase**

    **2. a. Closing Date**
    The purchase and sale of the Debenture shall take place on or about October 8, 2007 (the "Closing"). At the Closing, the Lender shall deliver to the Borrower a wire transfer in the

October 8, 2007
Page 2

amount of Twenty-Five Thousand Dollars ($25,000), and the
Borrower shall deliver to the Lender this fully-executed
Agreement. Thereafter, until the Lender has delivered to the
Borrower a total of One Hundred and Twenty-Five Thousand
Dollars ($125,000), the Lender shall deliver to the Borrower
additional wire transfers on a weekly basis in the minimum
amount of Five Thousand Dollars ($5,000) each.

**2. b. Wiring Instructions**
Funds shall be wired to: Por Vida Productions, LLC
                         Wells Fargo Bank
                         Account Number: 88879-14433
                         Wire Routing Number: 121000248

**3. Use of Debenture**

**3. a. Motion Picture Production**
The Borrower shall use the Debenture solely for the production
of the motion picture entitled "Por Vida", including hiring
cast and crew; purchasing motion picture film; renting camera
and lighting equipment, transportation, production offices,
and filming locations; securing necessary union agreements,
insurance policies, and completion bonds; and purchasing
necessary permits and authorizations. The consent of the
Borrower shall be required in order to use the Debenture for
any purpose other than described herein.

**Signatures of Agreeing Parties**
Whereas each of the following parties hereby agree that this
Agreement shall be governed, construed, and enforced in
accordance with the laws of the State of California;

In witness whereof, each of the following parties hereby executes
this Agreement:

BORROWER:

Por Vida Productions, LLC
23679 Calabasas Road, Suite 380
Calabasas, CA 91302
By: Alan Jacobs, Managing Member

LENDER:

Signature

Setari Enterprises, Inc.
3625 Wrightwood Drive
Studio City, CA 91604
By: Robert Setari, President
EIN# 95-489-0054

Exhibit B

# POR VIDA PRODUCTIONS

June 12, 2009

Mr. Doug Vance
105 Avenue C
Minatare, NE 69356

RE: "DOWN FOR LIFE (POR VIDA)" -- SHORT-TERM LOAN

Dear Mr. Vance,

On behalf of Por Vida Productions, LLC (the "Company"), this letter shall confirm the terms of our short-term loan in connection with the above-referenced theatrical motion picture ("Picture"), as follows:

| | |
|---|---|
| AMOUNT: | Sixty-five Thousand ($65,000) |
| TERM: | 45 Days |
| INTEREST: | 3.0% for the term of the loan (24.3% APR)<br>Example: $1,950 interest on a $65,000 loan for 45 days |
| WIRING FEES: | Wiring fees shall be paid by the Company (estimated at $15) |
| FUNDING DATE: | June 12, 2008 |
| REPAYMENT DATE: | July 27, 2005 |
| WIRING INSTRUCTIONS: | Please wire the funds to:<br>Por Vida Productions, LLC<br>Bank Name: Wells Fargo<br>Address: Wells Fargo Downtown L.A. Branch<br>1200 Wilshire Blvd.<br>Los Angeles, CA 90017<br>Account Number: 88879-14433<br>Wire Routing Number: 121000248 |

All other terms and conditions shall be negotiated in good faith within the Company's customary parameters. If you have any questions, please don't hesitate to call.

Best regards

Scott William Alvarez
Producer, Down For Life (Por Vida)

Agreed to:        By _Doug Vance_
                     MR. DOUG VANCE

                  Date: 6/12/09

25479 CALABASAS ROAD #380   CALABASAS   CA   91302   TEL 818-389-0330

818/286-9596 Fax

Exhibit C

**POR VIDA PRODUCTIONS, LLC**
**SHORT-FORM CONVERTIBLE DEBENTURE SUBSCRIPTION AGREEMENT**
**FOR THE MOTION PICTURE ENTITLED "POR VIDA"**

**Parties Involved in Agreement**
This Short-Form Convertible Debenture Subscription Agreement (the "Agreement"), dated as of July 18, 2007, is by and among Por Vida Productions, LLC, a California Limited Liability Company, having offices at 23679 Calabasas Road, Suite 380, Calabasas, CA 91302 (the "Borrower") and ~~███████~~ (the "Lender"), residing at ~~███████~~, Encino, CA 91436.

**The Purchase Agreement**
Therefore, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1. **Purchase of Convertible Debenture**

   **1. a. Interest-Bearing Debenture**

   The Borrower shall sell, and the Lender shall purchase, an interest-bearing convertible debenture (the "Debenture") in the original principal amount of Sixty-Two Thousand and Five Hundred Dollars ($62,500). The Debenture shall accrue interest at a rate of ten percent (10.0%) per annum, calculated daily, maturing on October 20, 2007 (the "Maturing").

   **1. b. Convertible Debenture**

   At any time prior to Maturing, and upon execution by the Lender of a Membership Unit Purchase Agreement, the Debenture shall convert into One-Quarter (1/4) Membership Unit of Por Vida Productions, LLC, a California Limited Liability Company, having headquarters at 23679 Calabasas Road, Suite 380, Calabasas, CA 91302.

   **1. c. Option to Extend Maturing**

   At any time prior to Maturing, and upon notification by the Lender in writing via letter, fax, or email, the Maturing shall be extended to January 20, 2007. Should the Lender opt to extend Maturing, the Debenture shall continue to accrue interest at a rate of ten percent (10.0%) per annum, calculated daily, Maturing on January 20, 2007, as extended.

«offerdate»
Page 2

## 2. Closing of the Purchase

### 2. a. Closing Date

The purchase and sale of the Debenture shall take place on or about July 20, 2007 (the "Closing"). At the Closing, the Lender shall deliver to the Borrower a check or wire transfer in the amount of Sixty-Two Thousand and Five Hundred Dollars ($62,500), and the Borrower shall deliver to the Lender this fully-executed Agreement.

## 3. Use of Debenture

### 3. a. Motion Picture Production

The Borrower shall use the Debenture solely for the production of the motion picture entitled "Por Vida", including hiring cast and crew; purchasing motion picture film; renting camera and lighting equipment, transportation, production offices, and filming locations; securing necessary union agreements, insurance policies, and completion bonds; and purchasing necessary permits and authorizations. The consent of the Borrower shall be required in order to use the Debenture for any purpose other than described herein.

**Signatures of Agreeing Parties**

Whereas each of the following parties hereby agree that this Agreement shall be governed, construed, and enforced in accordance with the laws of the State of California;

In witness whereof, each of the following parties hereby executes this Agreement:

BORROWER:

Por Vida Productions, LLC
23679 Calabasas Road, Suite 380
Calabasas, CA 91302
By: Alan Jacobs, Managing Member

LENDER:

Signature

Encino, CA 91436

Exhibit D

# POR VIDA PRODUCTIONS

August 19, 2009

Mr. Marc Novak
10824 Lindbrook Drive #315
Los Angeles, CA  90024

RE:  "DOWN FOR LIFE (POR VIDA)" – SHORT-TERM LOAN

Dear Mr. Novak,

On behalf of Por Vida Productions, LLC (the "Company"), this letter shall confirm the terms of our short-term loan in connection with the above-referenced theatrical motion picture ("Picture"), as follows:

| | |
|---|---|
| AMOUNT: | Fifteen Thousand Dollars ($15,000) |
| TERM: | 60 Days |
| INTEREST: | 10.0% APR |
| WIRING FEES: | Wiring fees shall be paid by the Company (estimated at $20) |
| FUNDING DATE: | August 13, 2009 |
| REPAYMENT DATE: | October 13, 2009 |
| WIRING INSTRUCTIONS: | Please wire the funds to:<br>Por Vida Productions, LLC<br>Bank Name: Wells Fargo<br>Address: Wells Fargo Downtown L.A. Branch<br>1200 Wilshire Blvd.<br>Los Angeles, CA  90017<br>Account Number: 88879-14433<br>Wire Routing Number: 121000248 |

All other terms and conditions shall be negotiated in good faith within the Company's customary parameters. If you have any questions, please don't hesitate to call.

Best regards,

Scott William Alvarez
Producer, *Down For Life (Por Vida)*

Agreed to:          By _____
                          MR. MARC NOVAK

                    Date: _____

23679 CALABASAS ROAD #380  CALABASAS  CA  91302  TEL 818-389-0330

November 12, 2009

Mr. Marc Novak
10824 Lindbrook Drive #315
Los Angeles, CA 90024

RE: "DOWN FOR LIFE (POR VIDA)" – SHORT-TERM LOAN

Dear Mr. Novak,

On behalf of Por Vida Productions, LLC (the "Company"), this letter shall confirm the terms of
our short-term loan in connection with the above-referenced theatrical motion picture ("Picture"),
as follows:

| | |
|---|---|
| **AMOUNT:** | Ten Thousand Dollars ($10,000) |
| **TERM:** | 60 Days |
| **INTEREST:** | 10.0% APR |
| **WIRING FEES:** | Wiring fees shall be paid by the Company (estimated at $20) |
| **FUNDING DATE:** | November 9, 2009 |
| **REPAYMENT DATE:** | January 9, 2009 |
| **WIRING INSTRUCTIONS:** | Please wire the funds to:<br>Por Vida Productions, LLC<br>Bank Name: Wells Fargo<br>Address: Wells Fargo Downtown L.A. Branch<br>1200 Wilshire Blvd.<br>Los Angeles, CA 90017<br>Account Number: 88879-14433<br>Wire Routing Number: 121000248 |

All other terms and conditions shall be negotiated in good faith within the Company's customary
parameters. If you have any questions, please don't hesitate to call.

Best regards,

Scott William Alvarez
Producer, *Down For Life (Por Vida)*

Agreed to:      By _____
                          MR. MARC NOVAK

                     Date: _____

23679 CALABASAS ROAD #380 CALABASAS CA 91302 TEL 818-389-0330

Exhibit E

# BROWN & ROSEN LLC

Attorneys At Law
100 State Street, Suite 900
Boston, MA 02109
617-728-9111 (T)
617-695-3202 (F)
www.brownrosen.com

May 30, 2015

Down For Life
Por Vida
c/o Alan Jacobs
Managing Director
Archer Entertainment Group
1431 7th Street Suite 206
Santa Monica, CA 90401

Down For Life-Film
----------------------------------------------------------------------------------------

Reduced Fee For services
December 2013-May 2015                                $17,500.00


              **Fee:**                               **$17,500.00**


Thank you for allowing Brown & Rosen LLC to service your needs.

                                    Sincerely,



                                    Christopher Brown

1

Exhibit F

APR-28-2009  10:05                                                    P.002

# POR VIDA PRODUCTIONS

April 27, 2009

Mr. Paul Stewart
1236 ½ Cloverdale Avenue
Los Angeles, CA 90019
p@next-thing.com
(978) 394-6798 cell

| | | |
|---|---|---|
| Re: | Music Supervisor: | Paul Stewart |
| | Project Title: | *"Dawn For Life (Por Vida)"* |
| | Production Company: | Por Vida Productions, LLC |
| | | 23679 Calabasas Road #380 |
| | | Calabasas, CA 91302 |
| | Writer/Director: | Alan Jacobs |
| | Producer: | Scott William Alvarez |
| | Phone: | 818-389-0330 |
| | Fax: | 818-286-9596 |

Dear Mr. Stewart,

As discussed, set forth below are the deal points for you to serve as Music Supervisor, Associate Producer, and Soundtrack Executive Producer on the above-referenced project.

**Services:**   Mr. Stewart shall serve as Music Supervisor, Associate Producer, and Soundtrack Executive Producer on the project, as the terms are customarily understood in the entertainment industry. Mr. Stewart shall perform all necessary services relating to associate producing, music supervising, and soundtrack executive producing through the completion of the project and the project's soundtrack.

**Dates:**   April 21, 2009, through completion of the project and the project's soundtrack.

**Compensation:**   Mr. Stewart shall receive a Music Supervisor's fee of five thousand dollars ($5,000), payable as follows: one thousand dollars ($1,000) due upon signing this agreement; one thousand dollars ($1,000) due upon signing a deal with Terrace Martin or another mutually agreed-upon composer; and three thousand dollars ($3,000) due upon delivery of the licensed score and source music for the project.

Upon completion of his duties as Associate Producer, Mr. Stewart shall receive a deferred Associate Producer's fee of five thousand dollars ($5,000), deferred until after the project's financing sources recoup their investment, interest, and preferential returns but before net profits are split. This deferred fee shall be paid pari-passu, pro-rata, on a most-favored nations basis with the project's other deferred producers' fees.

If the project receives financing for a soundtrack, and upon completion of his duties as Soundtrack Executive Producer, Mr. Stewart shall receive a Soundtrack Executive Producer's fee of five thousand dollars ($5,000).

**Finder's Fee:**   On any soundtrack financing he delivers to the project, Mr. Stewart shall receive a financing finder's fee of five percent (5%), split among any third-party or intermediary finders Mr. Stewart brings in order to deliver the financing.

23679 CALABASAS ROAD #380  CALABASAS  CA  91302
TEL: 818-389-0330  FAX: 818-286-9596  EMAIL: SWA@CINEMAREVIVAL.COM

APR-28-2009  10:05                                                              P.003

| | |
|---|---|
| Credit: | Upon completion of his duties as Associate Producer, Mr. Stewart shall receive an "Associate Producer" credit in the main titles of the picture on a shared card. The size, type, and placement shall be at the producers' discretion but will be in accordance with standard industry practices and on a most-favored nations basis with the project's other Associate Producers. |
| | Upon completion of his duties as music supervisor, Mr. Stewart also shall receive a "Music Supervisor" credit in the end titles. |
| | If the project receives financing for a soundtrack, and upon completion of his duties as Soundtrack Executive Producer, Mr. Stewart shall receive an "Executive Producer" credit on the project's soundtrack. The size, type, and placement shall be at the producers' discretion but will be in accordance with standard industry practices and on a most-favored nations basis with the other soundtrack Executive Producers. |
| Expenses: | Each party to this agreement shall pay for their own expenses—legal, office, telephone and otherwise—related to the closing of the financing of the picture |
| Employment: | Mr. Stewart shall be paid as an independent contractor on the production and shall complete any requisite W-9 forms necessary to effect payment. |
| Payment: | All fee payments are to be forwarded to: |

> Mr. Paul Stewart
> 1236 ½ Cloverdale Avenue
> Los Angeles, CA  90019

Not withstanding the foregoing, until such time, if ever, as such more formal agreement is concluded, this deal memo when signed by the parties shall constitute a legal, valid and binding obligation of the parties.

A fax, email, or other electronic copy of this agreement that includes an electronic signature shall constitute a legal and binding agreement that is equivalent to a hand-written signature on original paper.

AGREED TO AND ACCEPTED BY:

_____ Date: 4-28-09        _____ Date: 04/21/09
Mr. Paul Stewart                      Scott William Alvarez, Producer
                                      Por Vida Productions, LLC

                                      _____ Date: 04/21/09
                                      Alan Jacobs, Managing Member
                                      Por Vida Productions, LLC

Exhibit G & H

Viva Pictures, LLC
1539 Westwood Blvd
Los Angeles, CA 90024
310-709-1175

October 5, 2010

Re: **"Down For Life" (the "Picture")**

Dear Alan & Scott ("Producers"),

This letter shall confirm the principal terms of an offer for the acquisition by VIVA PICTURES, LLC. (VIVA) of certain exclusive distribution rights in and to "Down for Life" in accordance with the material terms and conditions set forth below.

PICTURE:        Down for Life

MEDIA:          All Media, excluding Theatrical

TERM:           10 Years

TERRITORY:      North America (U.S. and Canada)

DISTRIBUTOR ASSUMPTION OF PRODUCERS' OBLIGATIONS:

Subject to written confirmation by the entities listed below, VIVA will assume full responsibility for Producers' obligations necessary to release the picture, up to the amount of Three Hundred Thousand Dollars ($300,000), plus Fifteen Thousand Dollars ($15,000) commission to Paradigm Talent Agency to be paid within ten (10) days of full delivery to VIVA of all elements. Amounts paid to the entities listed below (or for any other of Producers' obligations paid by VIVA) shall be recouped from Producers' net revenues.

The following entities shall be paid by VIVA following acceptance of this offer by Producers:

NY Times          $50,000.00    Upon signature
Co-Stars Music    $25,000.00    Within ten (10) days of signature
SolidLA Post      $25,000.00    Within ten (10) days of signature

Obligations to the following entities shall be assumed by VIVA up to $200,000 in aggregate, and shall be paid from proceeds derived from exploitation of the picture.

SAG          $200,000.00
WGA          $ 20,000.00
Local 399    $ 70,000.00
IATSE        $170,000.00
DGA          $ 22,000.00

In addition an escrow account will be established for the benefit of the preceding creditors in order to achieve their full cooperation in the distribution of the film.

NET REVENUES:   Producer shall receive 100% of the Net Revenues based upon the following definitions of Net Revenues, Gross Receipts, Distribution Fees and Distribution Expenses:

a.  "Gross Receipts" shall be defined as all revenues, sums, compensations, monies and other forms of consideration actually received by VIVA through exploitation of the Picture.

b.  "Distribution Fee": VIVA's Distribution fee shall be Thirty Percent (30%) of Gross Receipts, inclusive of all third-party sub-distribution fees, if any. In the event that Producers effectuate a theatrical release with North American gross box office receipts (as reported by a reputable source) in excess of one million dollars, the Distribution Fee shall be Twenty Five Percent (25%), inclusive of all third-party distribution fees, if any. Similarly, in the event that North American gross box office

receipts are in excess of five million dollars, the Distribution Fee shall be Twenty Percent (20%), inclusive of all third-party distribution fees, if any.

c. "Distribution Expenses" means VIVA's actual out-of-pocket costs for exploitation of the Picture, including, without limitation, advertising; manufacturing; packaging; shipping (unless paid for by exhibitor or licensee); handling, storage, insurance and customs; dubbing, closed-captioning and subtitles; format conversion and editing; censorship; copyright registration and all required insurance premiums, including, without limitation, distributor's E&O insurance; licenses and clearances which VIVA may be required to pay, if any.

d. "Net Receipts" consists of that portion of Gross Receipts remaining after VIVA deducts its Distribution Fee and receives and recoups on a cumulative basis the Distribution Expenses.

This offer assumes that that there exist no outstanding clearances, obligations and the like (e.g. for music, footage, talent releases, guild/union payments, etc.) that would impede VIVA's ability to release (other than those described above).

If VIVA does not perform as specified above under "DISTRIBUTOR ASSUMPTION OF PRODUCERS' OBLIGATIONS", this offer and the acquisition of "Down for Life" by VIVA PICTURES, LLC. (VIVA) shall be null and void, and all of the aforementioned distribution rights in and to "Down for Life" shall revert back to Producers.  However, VIVA shall have the right to cure any alleged breech or obligation within 10 business days of written notification from Producers.

A more detailed agreement will be prepared containing the foregoing and other provisions customary in the U.S. motion picture industry for distribution agreements, including without limitation, representations and warranties, indemnification, delivery requirements, notice and cure provision and so forth.  Such agreement shall be subject to good faith negotiation and shall contain the essential terms agreed to herein.

Delivery of the Picture shall be made within ten (10) days of this agreement in accordance with VIVA's standard schedule of delivery requirements, including without limitation, delivery of all available materials and elements necessary for VIVA to effectively market and distribute the Picture.

The film shall be allowed by Producers to be exploited by VIVA for VOD no later than January 2011 and on DVD no later than February 2011.

Accountings will be provided on quarterly basis within sixty (60) days after the end of each calendar quarter.

Sincerely,

Victor Elizalde
President, Viva Pictures, LLC

Agreed upon this 5th day of October, 2010 on behalf of:

VIVA PICTURES, LLC                          DFL RELEASING, LLC

_____                    _____

Victor Elizalde, President                  Alan Jacobs, Managing Member

Exhibit I

Sep 08 08 06:41a       Greg & Annette Flores       619 65  9024                    p.1

# POR VIDA PRODUCTIONS

Greg Flores
San Diego Grip & Craft Service
1174 Nacion Avenue
Chula Vista, CA 91911
mexigrip@yahoo.com

September 3, 2008

Re: "Por Vida" (the Picture)

Dear Greg,

Por Vida Productions, LLC has secured an international distributor willing to provide sufficient production financing in the form of a production loan to complete the Picture. The Distributor has asked to provide assurance that you agree that all monies owed to you will be deferred until Distributor has recouped its cost of sales, residuals, minimum guarantee and any finance costs associate with the provision of a loan against those items.

Please sign in the space provided below indicating your agreement to the following terms and conditions:

1. You hereby agree that you are owed the sum of $3,000 and to defer the payment of this amount to the Net Receipts derived from the Picture.
2. Net Receipts are defined as Distributor's Gross Receipts less (in the following order): Cost of sales including distribution fee and distribution expenses; production finance provided by Distributor including finance cost; any residuals.
3. We currently estimate that the picture will need to earn approximately $1 million in gross receipts before we are able to pay vendor obligations.
4. Any amount payable to you will be payable along with the amounts owed to any other Vendors on a pro-rata basis. We currently estimate that the total of outstanding vendor obligations to be under $400,000.

_____
Signature

GREG FLORES
Print Name

KEY GRIP "SAN DIEGO GRIP & CRAFT SERVICES" INC.
Title

9/8/08
Date

23679 CALABASAS ROAD #380  CALABASAS  CA  91302  TEL 213-718-2281

# S.D. GRIP & CRAFT SERVICES INC.

*Invoice*

| | | |
|---|---|---|
| Invoice No: | 10 | |
| Date: | June 1, 2007 | 1174 Nacion Ave |
| Terms: | NET 30 | Chula Vista Ca 91911 |
| Due Date: | July 1, 2007 | (619)279-7413 |

Bill To:     Por Vida Productions

| Description | Amount |
|---|---|
| Grip Equipment Rental<br>June-July 2007 | $3,000.00 |
| | |
| Total | $3,000.00 |
| Paid | $0.00 |
| **BALANCE DUE** | **$3,000.00** |

Exhibit J



*(Invoices NOT Yet Entered)*

Showbiz Security

*(Checks Cut / NOT Released)*

Showbiz Security

$20,776.00  Grand Total

$22,636.00  OVERALL TOTAL

P. 1

Por Vida Productions, Inc.     "Por Vida"
VENDOR:  0000000102     SHOWBIZ SECURITY     72879 Calabasas Road 5360, Calabasas, CA, 91302     3204

| OUR REF NO. | YOUR INV NO | INVOICE DATE | DESCRIPTION | INVOICE AMOUNT |
|---|---|---|---|---|
| 771 | CRO70507 | 07/05/07 | DEPOSIT AGAINST PAST DUE SCURITY | 12,000.00 |

Amount subject to 1099 tax.     0.00
*** Check Totals: ***     12,000.00



p.2

Por Vida Productions, Inc.        "Por Vida"              23879 Calabasas Road #380, Calabasas, CA, 91302
VENDOR:    0000000102    SHOWBIZ SECURITY                                                      3172

| OUR REF NO. | YOUR INV. NO. | INVOICE DATE | DESCRIPTION | INVOICE AMOUNT |
|---|---|---|---|---|
| 634 | 2 | 06/23/07 | 6/17-23 SECURITY SERVICES | 16,366.00 |

Amount subject to 1099 tax.        0.00
*** Check Totals: ***      16,366.00

Por Vida Productions, Inc.        "Por Vida"              23879 Calabasas Road #380, Calabasas, CA, 91302
ENDOR:    0000000102    SHOWBIZ SECURITY                                                      3116

| OUR REF NO. | YOUR INV. NO. | INVOICE DATE | DESCRIPTION | INVOICE AMOUNT |
|---|---|---|---|---|
| 438 | 1 | 06/16/07 | 6/10-16 SECURITY | 5,863.50 |

Scott
Nancy
213 718-2281



**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE. H
RIALTO CA. 92377

(909) 873-1332

INVOICE # :        1

## INVOICE

DATE:        06/16/07

| F R O M | SHOWBIZ SECURITY RUBEN CORTEZ 1285 N. FITZGERALD STREET STE H RIALTO              CA    92377 | T O | C.C. & ERIC LOCATIONS POR VIDA 1201 W. 5TH ST. SUITE F-370 LOS ANGELES          CA    90017 |
|---|---|---|---|

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
|  |  |  |  | $0.00 |
| 1 | SECURITY SUPERVISOR | @ $15.50 AN HOUR TOTAL MAN HOURS WORKED ARE 52 HRS. FOR WEEKENDING 6/16/07. | $806.00 | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
| 13 | SECURITY GUARDS | @ $14.50 AN HOUR. TOTAL MAN HOURS WORKED ARE 335 HRS. FOR WEEKENDING 6/16/07 | $4,857.50 | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  | NOTE: | LOCATIONS COVERD CHURCH,RASCALS BASE CAMP,MERIDIAN HOUSE |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |

PLEASE MAKE CHECK PAYABLE TO SHOWBIZ
SECURITY. EIN # 33-0950105. PAYMENT IS DUE
NO LATER THAN THE 7TH DAY UPON RECEIVING
THIS INVOICE.        THANK YOU,

NOTES

| SUB-TOTAL | $0.00 |
|---|---|
| TAX | $0.00 |
|  | $5,663.50 |
| TOTAL DUE | $5,663.50 |

SHOWBIZ SECURITY
1285 N. FITZGERALD AVE. STE. H
RIALTO CA. 92377

(909) 873-1332

| INVOICE #: | 2 | **INVOICE** | | DATE: | 06/23/07 |
|---|---|---|---|---|---|

| F | SHOWBIZ SECURITY | | C.C. & ERIC LOCATIONS | |
|---|---|---|---|---|
| R | RUBEN CORTEZ | T | POR VIDA | |
| O | 1285 N. FITZGERALD STREET STE H | O | 1201 W. 5TH ST. SUITE F-370 | |
| M | RIALTO          CA      92377 | | LOS ANGELES          CA      90017 | |

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| 1 | SECURITY | @ $15.50 AN HOUR TOTAL MAN HOURS | | $0.00 |
| | SUPERVISOR | WORKED ARE 97 HRS. FOR WEEKENDING | $1,503.50 | $0.00 |
| | | 6/23/07 | | $0.00 |
| 18 | SECURITY | @ $14.50 AN HOUR. TOTAL MAN HOURS | | $0.00 |
| | GUARDS | WORKED ARE 1025 HRS. FOR WEEKENDING | $14,862.50 | $0.00 |
| | | 6/23/07 | | $0.00 |
| | | | | $0.00 |
| | NOTE: | LOCATIONS COVERD  RASCALS HOUSE | | $0.00 |
| | | BASE CAMP,MERIDIAN HOUSE, TACO STORE | | $0.00 |
| | | LAUNDRY MAT, VIP PARKING. | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |

PLEASE MAKE CHECK PAYABLE TO SHOWBIZ
SECURITY. EIN # 33-0950105. PAYMENT IS DUE
NO LATER THAN THE 7TH DAY UPON RECEIVING
THIS INVOICE.     THANK YOU,

NOTES

| SUB-TOTAL | $0.00 |
|---|---|
| TAX | $0.00 |
| | $16,366.00 |
| TOTAL DUE | $16,366.00 |

**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE. H
RIALTO CA. 92377

(909) 873-1332

| INVOICE # :   3 | **INVOICE** | DATE:   06/30/07 |
|---|---|---|

| F | SHOWBIZ SECURITY | | T | C.C. & ERIC LOCATIONS |
|---|---|---|---|---|
| R | RUBEN CORTEZ | | | POR VIDA |
| O | 1285 N. FITZGERALD STREET STE H | | O | 1201 W. 5TH ST. SUITE F-370 |
| M | RIALTO          CA      92377 | | | LOS ANGELES          CA      90017 |

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| 1 | SECURITY | @ $15.50 AN HOUR TOTAL MAN HOURS | | $0.00 |
| | SUPERVISOR | WORKED ARE 88 HRS. FOR WEEKENDING | $1,364.00 | $0.00 |
| | | 6/30/07 | | $0.00 |
| 21 | SECURITY | @ $14.50 AN HOUR. TOTAL MAN HOURS | | $0.00 |
| | GUARDS | WORKED ARE 959 HRS. FOR WEEKENDING | $13,905.50 | $0.00 |
| | | 6/30/07 | | $0.00 |
| | | | | $0.00 |
| | NOTE: | LOCATIONS COVERD  C.H.S | | $0.00 |
| | | BASE CAMP, CAMERA, MANNYS, WT | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |

PLEASE MAKE CHECK PAYABLE TO SHOWBIZ
SECURITY. EIN # 33-0950105. PAYMENT IS DUE
NO LATER THAN THE 7TH DAY UPON RECEIVING
THIS INVOICE.     THANK YOU,

| SUB-TOTAL | $0.00 |
|---|---|
| TAX | $0.00 |
| | $15,269.50 |
| TOTAL DUE | $15,269.50 |

p. 1

**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE H
RIALTO CA. 92377

(951) 733-5517

## INVOICE

| INVOICE # : | 3 | | DATE: | 06/30/07 |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| **F** | SHOWBIZ SECURITY | **T** | SCOTT ALVEREZ | |
| **R** | RUBEN CORTEZ / HENRY VASQUEZ | **O** | POR VIDA | |
| **O** | 1285 N. FITZGERALD STE H | | 23679 CALABASAS ROAD# 380 | |
| **M** | RIALTO        CA    92377 | | CALABASAS        CA    91302 | |

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | SECURITY SUPERVISOR | @ $ 15.50 AN HOUR TOTAL MAN HOURS WORKED ARE 88 HRS. FOR WEEKENDING 6/30/07 | $1,364.00 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| 21 | SECURITY GUARDS | @ $ 14.50 AN HOUR TOTAL MAN HOURS WORKED ARE 959 HRS. FOR WEEKENDING 6/30/07 | $13,905.50 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | NOTE: | SHOWBIZ SECURITY RECEIVED A DEPOSIT $12,000.00 TOWARD BILL. POR VIDA PRODUCTIONS NOW OWES $3,269.50 WICH IS THE REMAINDER FOR INVOICE #3. | −$12,000.00 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |

| | | |
|---|---|---|
| SUB-TOTAL | | $0.00 |
| TAX | | $0.00 |
| | | $3,269.50 |
| TOTAL DUE | | $3,269.50 |

**NOTES:**
Please make check payable to Showbiz Security EIN # 33-0950105. Payment is due immediately Thank You,

P. 2

**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE. H
RIALTO CA. 92377

(909) 873-1332

## INVOICE

| | | | DATE: | 07/07/07 |

INVOICE #:   4

| | | | |
|---|---|---|---|
| **F** | SHOWBIZ SECURITY | **T** | G.C. & ERIC LOCATIONS |
| **R** | RUBEN CORTEZ | | POR VIDA |
| **O** | 1285 N. FITZGERALD STREET STE H | **O** | 1201 W. 5TH ST. SUITE F-370 |
| **M** | RIALTO          CA    92377 | | LOS ANGELES          CA    90017 |

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| | | | | $0.00 |
| 1 | SECURITY SUPERVISOR | @ $15.50 AN HOUR TOTAL MAN HOURS WORKED ARE 95 HRS. FOR WEEKENDING | $1,472.50 | $0.00 |
| | | 7/7/07 | | $0.00 |
| | | | | $0.00 |
| 20 | SECURITY GUARDS | @ $14.50 AN HOUR. TOTAL MAN HOURS WORKED ARE 680 HRS. FOR WEEKENDING | $9,860.00 | $0.00 |
| | | 7/7/07 | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | **SUB-TOTAL** | $0.00 |
| | | | **TAX** | $0.00 |
| | | | | $11,332.50 |
| | | | **TOTAL DUE** | $11,332.50 |

PLEASE MAKE CHECK PAYABLE TO SHOWBIZ
SECURITY. EIN # 33-0950105. PAYMENT IS DUE
NO LATER THAN THE 7TH DAY UPON RECEIVING
THIS INVOICE.     THANK YOU,

**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE. H
RIALTO CA. 92377

(909) 873-1332

| INVOICE #: 5 | **INVOICE** | DATE: 07/14/07 |
|---|---|---|

| | | | | |
|---|---|---|---|---|
| **F** | SHOWBIZ SECURITY | | **T** | C.C. & ERIC LOCATIONS |
| **R** | RUBEN CORTEZ | | | POR VIDA |
| **O** | 1285 N. FITZGERALD STREET STE H | | **O** | 1201 W. 5TH ST. SUITE F-370 |
| **M** | RIALTO            CA    92377 | | | LOS ANGELES        CA    90017 |

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| 1 | SECURITY | @ $15.50 AN HOUR TOTAL MAN HOURS | | $0.00 |
| | SUPERVISOR | WORKED ARE 84 HRS. FOR WEEKENDING | $1,302.00 | $0.00 |
| | | 7/14/07 | | $0.00 |
| 9 | SECURITY | @ $14.50 AN HOUR. TOTAL MAN HOURS | | $0.00 |
| | GUARDS | WORKED ARE 336 HRS. FOR WEEKENDING | $4,872.00 | $0.00 |
| | | 7/14/07 | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |

PLEASE MAKE CHECK PAYABLE TO SHOWBIZ
SECURITY. EIN # 33-0950105. PAYMENT IS DUE
NO RSLATER THAN THE 7TH DAY UPON RECEIVING
THIS INVOICE.    THANK YOU.

| | |
|---|---|
| SUB-TOTAL | $0.00 |
| TAX | $0.00 |
| | $6,174.00 |
| TOTAL DUE | $6,174.00 |

P. 1

**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE. H
RIALTO CA. 92377

(909) 873-1332

| INVOICE #: | 6 | **INVOICE** | DATE: | 07/21/07 |
|---|---|---|---|---|

| F R O M | SHOWBIZ SECURITY<br>RUBEN CORTEZ<br>1285 N. FITZGERALD STREET STE H<br>RIALTO           CA    92377 | T O | C.C. & ERIC LOCATIONS<br>POR VIDA<br>1201 W. 5TH ST. SUITE F-370<br>LOS ANGELES          CA    90017 |
|---|---|---|---|

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| | | | | $0.00 |
| 1 | SECURITY SUPERVISOR | @ $15.50 AN HOUR TOTAL MAN HOURS WORKED ARE 33 HRS. FOR WEEKENDING 7/21/07 | $511.50 | $0.00 |
| | | | | $0.00 |
| 5 | SECURITY GUARDS | @ $14.50 AN HOUR. TOTAL MAN HOURS WORKED ARE 93 HRS. FOR WEEKENDING 7/21/07 | $1,348.50 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |

| | SUB-TOTAL | $0.00 |
|---|---|---|
| | TAX | $0.00 |
| PLEASE MAKE CHECK PAYABLE TO SHOWBIZ SECURITY. EIN # 33-0950105. PAYMENT IS DUE NO LATER THAN THE 7TH DAY UPON RECEIVING THIS INVOICE.    THANK YOU, | | $1,860.00 |
| | TOTAL DUE | $1,860.00 |

p. 1

**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE H
RIALTO CA. 92377

(951) 733-5517

# INVOICE

| INVOICE # : 3 | | DATE: 06/30/07 |

| | | |
|---|---|---|
| **F R O M** | SHOWBIZ SECURITY<br>RUBEN CORTEZ / HENRY VASQUEZ<br>1285 N. FITZGERALD STE H<br>RIALTO          CA   92377 | **T O** SCOTT ALVEREZ<br>POR VIDA<br>23679 CALABASAS ROAD# 380<br>CALABASAS          CA   91302 |

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | SECURITY SUPERVISOR | @ $ 15.50 AN HOUR TOTAL MAN HOURS WORKED ARE 88 HRS. FOR WEEKENDING 6/30/07 | $1,364.00 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| 21 | SECURITY GUARDS | @ $ 14.50 AN HOUR TOTAL MAN HOURS WORKED ARE 959 HRS. FOR WEEKENDING 6/30/07 | $13,905.50 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | NOTE: | SHOWBIZ SECURITY RECEIVED A DEPOSIT $12,000.00 TOWARD BILL. POR VIDA PRODUCTIONS NOW OWES $3,269.50 WICH IS THE REMAINDER FOR INVOICE #3. | − $12,000.00 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | SUB-TOTAL | $0.00 |
| | | | TAX | $0.00 |
| | | | | $3,269.50 |
| | | | TOTAL DUE | $3,269.50 |

**NOTES:**
Please make check payable to Showbiz Security EIN # 33-0950105. Payment is due immediately Thank You,

# FAX   COVER

To: SCOTT ALVEREZ

Company: POR VIDA

Phone: (213) 718-2281          Fax: (832) 383-0330

From: RUBEN CORTEZ

Company: SHOWBIZ SECURITY.

Phone: (951) 733-5517          Fax: (909) 820-6411

Date: 10/24/07

Pages including this cover page: 4

## Notes:

SCOTT THIS IS THE TOTAL AMOUNT OWED TO SHOWBIZ SECURITY $23,766.75

I AM BREAKING THE INVOICES DOWN TO THREE INVOICES PER OUR DISCUSION

PLEASE CALL ME AND LET ME KNOW WHEN WE CAN PICK UP CHECKS  WE ARE IN

NEED OF OUR MONEY,

THANK YOU,

RUBEN CORTEZ

P. 2

SHOWBIZ SECURITY
1285 N. FITZGERALD AVE. STE H
RIALTO CA. 92377

(951) 733-5517

## INVOICE

| INVOICE # : 7 | | DATE: 10/24/07 |
|---|---|---|

| F | SHOWBIZ SECURITY | T | SCOTT ALVEREZ |
| R | RUBEN CORTEZ / HENRY VASQUEZ | O | POR VIDA |
| O | 1285 N. FITZGERALD STE H | | 23679 CALABASAS ROAD# 380 |
| M | RIALTO          CA   92377 | | CALABASAS        CA   91302 |

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | SECURITY | THIS IS FOR ONE INVOICE THEIR WILL BE | $7,922.25 | $0.00 |
| | GUARDS | MORE IN THE SAME AMOUNT | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | NOTE: | SCOTT THE TOTAL AMOUNT FOR ALL  FOUR | | $0.00 |
| | | INVOICES AMOUNT TO $ 23,766.75 I AM | | $0.00 |
| | | BREAKING THEM DOWN TO THREE | | $0.00 |
| | | IN THE SAME AMOUNTS. | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | SUB-TOTAL | $0.00 |
| | | | TAX | $0.00 |
| | | | | $7,922.25 |
| | | | TOTAL DUE | $7,922.25 |

NOTES:
Please make check payable to Showbiz Security EIN
# 33-0950105. Payment is due Immediately Thank
You,

p. 3

**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE H
RIALTO CA. 92377

(951) 733-5517

| INVOICE | DATE: | 10/24/07 |
|---|---|---|

INVOICE # :   8

| F R O M | SHOWBIZ SECURITY<br>RUBEN CORTEZ / HENRY VASQUEZ<br>1285 N. FITZGERALD STE H<br>RIALTO          CA   92377 | T O | SCOTT ALVEREZ<br>POR VIDA<br>23679 CALABASAS ROAD# 380<br>CALABASAS          CA   91302 |
|---|---|---|---|

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | SECURITY<br>GUARDS | THIS IS FOR ONE INVOICE THEIR WILL BE<br>MORE IN THE SAME AMOUNT | $7,922.25 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | NOTE: | SECOND INVOICE. | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | SUB-TOTAL | | $0.00 |
| | | TAX | | $0.00 |
| | | | | $7,922.25 |
| | | TOTAL DUE | | $7,922.25 |

NOTES:
Please make check payable to Showbiz Security EIN
# 33-0950105. Payment is due immediately Thank
You,

P. 4

**SHOWBIZ SECURITY**
1285 N. FITZGERALD AVE. STE H
RIALTO CA. 92377

(951) 733-5517

# INVOICE

INVOICE # :     9                DATE:      10/24/07

F   SHOWBIZ SECURITY                     SCOTT ALVEREZ
R   RUBEN CORTEZ / HENRY VASQUEZ     T   POR VIDA
O   1285 N. FITZGERALD STE H          O   23679 CALABASAS ROAD# 380
M   RIALTO          CA   92377           CALABASAS      CA   91302

| QTY | POST | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | SECURITY | THIS IS FOR ONE INVOICE THEIR WILL BE | $7,922.25 | $0.00 |
| | GUARDS | MORE IN THE SAME AMOUNT | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | NOTE: | THIRD AND FINAL INVOICE. | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |

| | |
|---|---|
| SUB-TOTAL | $0.00 |
| TAX | $0.00 |
| | $7,922.25 |
| TOTAL DUE | $7,922.25 |

NOTES:
Please make check payable to Showbiz Security EIN
# 33-0950105. Payment is due immediately Thank
You.

Exhibit K

Viva Pictures, LLC
1539 Westwood Blvd
Los Angeles, CA 90024
310-709-1175

October 5, 2010

Re: "Down For Life" (the "Picture")

Dear Alan & Scott ("Producers"),

This letter shall confirm the principal terms of an offer for the acquisition by VIVA
PICTURES, LLC. (VIVA) of certain exclusive distribution rights in and to "Down for Life" in
accordance with the material terms and conditions set forth below.

PICTURE:          Down for Life

MEDIA:            All Media, excluding Theatrical

TERM:             10 Years

TERRITORY:        North America (U.S. and Canada)

DISTRIBUTOR ASSUMPTION OF PRODUCERS' OBLIGATIONS:

Subject to written confirmation by the entities listed below, VIVA will
assume full responsibility for Producers' obligations necessary to release
the picture, up to the amount of Three Hundred Thousand Dollars
($300,000), plus Fifteen Thousand Dollars ($15,000) commission to Paradigm
Talent Agency to be paid within ten (10) days of full delivery to VIVA of
all elements. Amounts paid to the entities listed below (or for any other
of Producers' obligations paid by VIVA) shall be recouped from Producers'
net revenues.

The following entities shall be paid by VIVA following acceptance of this
offer by Producers:

| | | |
|---|---|---|
| NY Times | $50,000.00 | Upon signature |
| Co-Stars Music | $25,000.00 | Within ten (10) days of signature |
| SolidLA Post | $25,000.00 | Within ten (10) days of signature |

Obligations to the following entities shall be assumed by VIVA up to
$200,000 in aggregate, and shall be paid from proceeds derived from
exploitation of the picture.

| | |
|---|---|
| SAG | $200,000.00 |
| WGA | $ 20,000.00 |
| Local 399 | $ 70,000.00 |
| IATSE | $170,000.00 |
| DGA | $ 22,000.00 |

In addition an escrow account will be established for the benefit of the preceding creditors
in order to achieve their full cooperation in the distribution of the film.

NET REVENUES:     Producer shall receive 100% of the Net Revenues based upon the following
                  definitions of Net Revenues, Gross Receipts, Distribution Fees and
                  Distribution Expenses:

a.  "Gross Receipts" shall be defined as all revenues, sums,
compensations, monies and other forms of consideration actually
received by VIVA through exploitation of the Picture.

b.  "Distribution Fee": VIVA's Distribution fee shall be
Thirty Percent (30%) of Gross Receipts, inclusive of all third-
party sub-distribution fees, if any. In the event that Producers
effectuate a theatrical release with North American gross box
office receipts (as reported by a reputable source) in excess of
one million dollars, the Distribution Fee shall be Twenty Five
Percent (25%), inclusive of all third-party distribution fees, if
any. Similarly, in the event that North American gross box office

receipts are in excess of five million dollars, the Distribution Fee shall be Twenty Percent (20%), inclusive of all third-party distribution fees, if any.

c. "Distribution Expenses" means VIVA's actual out-of-pocket costs for exploitation of the Picture, including, without limitation, advertising, manufacturing; packaging, shipping (unless paid for by exhibitor or licensee); handling, storage, insurance and customs; dubbing, closed-captioning and subtitles; format conversion and editing; censorship; copyright registration and all required insurance premiums, including, without limitation, distributor's E&O insurance; licenses and clearances which VIVA may be required to pay, if any.

d. "Net Receipts" consists of that portion of Gross Receipts remaining after VIVA deducts its Distribution Fee and receives and recoups on a cumulative basis the Distribution Expenses.

This offer assumes that that there exist no outstanding clearances, obligations and the like (e.g. for music, footage, talent releases, guild/union payments, etc.) that would impede VIVA's ability to release (other than those described above).

If VIVA does not perform as specified above under "DISTRIBUTOR ASSUMPTION OF PRODUCERS' OBLIGATIONS", this offer and the acquisition of "Down for Life" by VIVA PICTURES, LLC. (VIVA) shall be null and void, and all of the aforementioned distribution rights in and to "Down for Life" shall revert back to Producers. However, VIVA shall have the right to cure any alleged breech or obligation within 10 business days of written notification from Producers.

A more detailed agreement will be prepared containing the foregoing and other provisions customary in the U.S. motion picture industry for distribution agreements, including without limitation, representations and warranties, indemnification, delivery requirements, notice and cure provision and so forth. Such agreement shall be subject to good faith negotiation and shall contain the essential terms agreed to herein.

Delivery of the Picture shall be made within ten (10) days of this agreement in accordance with VIVA's standard schedule of delivery requirements, including without limitation, delivery of all available materials and elements necessary for VIVA to effectively market and distribute the Picture.

The film shall be allowed by Producers to be exploited by VIVA for VOD no later than January 2011 and on DVD no later than February 2011.

Accountings will be provided on quarterly basis within sixty (60) days after the end of each calendar quarter.

Sincerely,

Victor Elizalde
President, Viva Pictures, LLC

Agreed upon this 5th day of October, 2010 on behalf of:

VIVA PICTURES, LLC                          DFL RELEASING, LLC

_____                     _____

Victor Elizalde, President                  Alan Jacobs, Managing Member

Oct 12 2010 7:15AM   VIVA PICTURES LLC          815 572 9410          p.3

Viva Picture, LLC.
1539 Westwood Blvd
Los Angeles, CA. 90024
310-709-1175

October 7, 2010

Re: Amendment to the offer dated October 5, 2010 for "Down for Life"

Dear Alan & Scott ("Producers"),

This letter shall document the amended terms of the offer for the acquisition of "Down for Life" by VIVA PICTURES, LLC. (VIVA) of certain exclusive distribution rights in and to "Down for Life" in accordance with the material terms and conditions set forth below.

If the theatrical proceeds to Producers (defined as gross box office results less exhibitor share) in Rio Granda Valley, Texas exceed One Hundred Thousand Dollars ($100,000) (the "Threshold"), VIVA shall provide funding up to Seventy-Five Thousand Dollars ($75,000) no later than ten (10) business days after meeting the Threshold. Producers shall use P&A Financing to continue the theatrical release of the picture, subject to the following terms and conditions:

1.   Producers must use P&A Financing to enhance the value of the picture (e.g. create additional awareness among potential consumers of VIVA's release of the picture); and

2.   Producers must meaningfully consult VIVA as to the selection of subsequent theatrical releases; and

3.   Producers must use P&A Financing exclusively for marketing the film in markets excluding the Rio Grande Valley, Texas; and

4.   Producers shall not spend P&A Financing on any subsequent market unless the previous market yields theatrical proceeds to Producers (defined as gross box office results less exhibitor share) equal to or greater than the marketing commitment expended in that market. By way of example, if $50,000 is spent in Phoenix AZ, and Producers' proceeds in Phoenix AZ are greater than $50,000, then Producers retain the option to allocate P&A Financing for another market; and

5.   Producers understand that P&A Financing provided by VIVA shall be deducted from the funds detailed in "Distributor Assumption of Producers' Obligations" in the offer dated October 5, 2010. As detailed in "Distributor Assumption of Producers' Obligations", VIVA shall commit not less than $300,000, regardless of whether the funds are used for P&A Financing or Assumption of Producers' Obligations.

6.   If the Threshold is not met, P&A Financing shall be used for Assumption of Producers' Obligations no later than one year from the date of this agreement as detailed in "Distributor Assumption of Producers' Obligations", unless Producers and VIVA mutually agree to an alternative plan (such as AMC Theaters) to continue the theatrical release.

Agreed upon this 7th day of October, 2010 on behalf of:

VIVA PICTURES, LLC                        DFL RELEASING, LLC

_____                   _____
Victor Elizalde, President                Alan Jacobs, Managing Member

Oct 12 2010 7:16AM   VIVA PICTURES LLC      815 572 9410           p.4

# Viva Pictures, LLC
## 1539 Westwood Blvd., Los Angeles, CA 90024
### 310-709-1175

October 11, 2010

DFL Releasing, LLC
2290 Waltonia Drive #1
Montrose, CA 91020

Re: 2nd Amendment to the accepted offer dated October 5, 2010 and amended October 7, 2010 for "Down for Life" (the "Picture").

Dear Alan & Scott ("Producers"),

This letter shall document the further amended terms of the offer for the acquisition of "Down for Life" by VIVA PICTURES, LLC. (VIVA) of certain exclusive distribution rights in and to "Down for Life" in accordance with the material terms and conditions set forth below. It is hereby agreed that:

VIVA has previously arranged payment to Producers of Fifty Thousand dollars ($50,000) to be used to secure story rights from The New York Times ("Story Rights"); the Producers acknowledge receipt of this amount.

Since that time, the owners of the Story Rights have demanded further payment be made in order to grant to Story Rights to Producers.

Upon execution of this 2nd amendment, VIVA shall provide an additional Thirty Three Thousand dollars ($33,000) to be used solely for the acquisition of the Story Rights to the full extent required for VIVA's unencumbered exploitation of the Picture. Any of the $33,000 not spent shall be applied to P&A or towards other delivery costs described in the "DISTRIBUTOR ASSUMPTION OF PRODUCERS' OBLIGATIONS" section of the accepted offer dated October 5th, 2010.

In the event that the Story Rights are not acquired, Producer shall promptly refund VIVA the sum of eighty-three thousand dollars ($83,000), which is the total of $50,000 for Story Rights plus $33,000 for interest and legal fees.

This letter shall replace and supersede the October 7, 2010 amendment; VIVA shall not be obligated to provide any P&A funding for the Picture.
VIVA's obligation to make payments to "Co-Stars Music" and "SolidLA Post" described in the "DISTRIBUTOR ASSUMPTION OF PRODUCERS' OBLIGATIONS" section of the accepted offer dated October 5th, 2010 shall not be due until two (2) months from the date that the Story Rights are fully acquired to the full extent required for VIVA's unencumbered exploitation of the Picture.

Agreed upon this 11th day of October, 2010 on behalf of:

VIVA PICTURES, LLC                    DFL RELEASING, LLC

Victor Elizalde, President            Alan Jacobs, Managing Member

Exhibit L

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE (the "Settlement Agreement" or "Agreement") is made and entered into as of May 3, 2012 (the "Effective Date"), by and between Viva Pictures, LLC ("Viva"), Xenon Pictures, LLC ("Xenon") (Viva and Xenon each individually are referenced as a "Distributor Party," or collectively, as the "Distributor Parties"), Alan Jacobs ("Jacobs"), Scott Alvarez ("Alvarez"), DFL Releasing, LLC ("DFL"), and Por Vida Productions, LLC ("Por Vida") (Jacobs, Alvarez, DFL and Por Vida each individually are referenced as a "Producer Party," or collectively, as the "Producer Parties").

## RECITALS

A.      WHEREAS, on January 6, 2011, Viva filed a complaint in Los Angeles Superior Court against Jacobs, Alvarez, and DFL alleging that they, among other things, made misrepresentations of material fact to induce Viva to enter into an agreement to distribute the film "Down 4 Life," also known as "Por Vida" (the "Film"), designated Los Angeles Superior Court case number BC452585 (the "Action");

B.      WHEREAS, it is now the desire and intention of the Distributor Parties, on the one hand, and the Producer Parties, on the other hand (collectively, the "Parties"), to settle and resolve all disputes, differences and claims asserted in the Action.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and the mutual covenants, terms and conditions hereinafter set forth, it is agreed as follows:

## TERMS AND CONDITIONS

1.      The settlement is made pursuant to California Code of Civil Procedure section 664.6. The Parties hereby request that the court retain jurisdiction to enforce the terms of this Settlement Agreement. Further, the Parties agree to perform such acts as reasonably necessary to obtain a Court order to that effect.

2.      Viva will retain its rights to distribute the Film as set forth in the Distribution Agreement between DFL and Viva, as amended (the "Distribution Agreement"), unless and until DFL timely makes the payments set forth in paragraph 7 or 8 below. For the purpose of this agreement, the "Film" includes all copyrights, chain of title, and items on the attached delivery schedule in the possession or under the control of DFL, Por Vida, Jacobs, Alvarez, the immediate families of Alvarez and Jacobs, any trusts for the benefit of such persons, and all of the entities wholly owned or controlled by these people, entities or trusts (the "Defendant-Related Parties"). As set forth in more detail in paragraph 11, below, although this Agreement allows Viva to retain its rights to distribute the Film, this Agreement also provides that Viva shall not distribute the Film unless one of the events in paragraph 11 occurs and Viva's right to distribute the Film will terminate if and when DFL timely makes the payment set forth in paragraph 7, below, or timely makes the payment set forth in paragraph 8, below.

1

3.      DFL and Por Vida will agree to pay Viva $250,000, plus if DFL, Por Vida, Alvarez, and Jacobs directly or indirectly, or through a third party, distribute the Film after timely paying the amounts set forth in paragraph 7 or 8 below, 1% of any worldwide gross revenue of the Film earned from such distribution to the extent such revenue exceeds $10,000,000. (Such worldwide gross revenue will conclusively be presumed to be the worldwide gross revenue reported in: (a) Variety, if Variety publishes gross revenue for the Film, or if not, then (b) The Hollywood Reporter, if The Hollywood Reporter publishes gross revenue for the Film, or if not, then (c) Deadline Hollywood, if Deadline Hollywood publishes gross revenue for the Film, or if not, then; (d) IMDB, if IMDB publishes gross revenue for the Film, or if not, then; (e) BoxOfficeMojo, if Box OfficeMojo publishes gross revenue for the Film.)

4.      DFL and Por Vida hereby consent to the entry of the stipulation for entry of judgment attached hereto as Exhibit A.

5.      The $250,000 amount owed under the settlement will be secured by all the right, title, and interest in the Film (the "Collateral") owned by the Defendant-Related Parties. The security interest will be reflected in both a Mortgage of Copyright related to the interest granted in connection with this Settlement Agreement (attached hereto as Exhibit B) and a Mortgage of Copyright related to the interest granted in connection with the Distribution Agreement (attached hereto as Exhibit C), which promptly will be recorded in accordance with applicable law. Separately, Viva may, in accordance with applicable law, record its current interest in the distribution rights to the Film.

6.      DFL, Por Vida, Alvarez, and Jacobs hereby represent and warrant that: (a) they have transferred, encumbered, sold, loaned, pledged, or otherwise disposed of any or all of their right, title, or interest in the Film only as set forth in Exhibit D hereto since October 5, 2010; and (b) they have never transferred, encumbered, sold, loaned, pledged, or otherwise disposed of any or all of their right, title, or interest in the Film in exchange for less than reasonably equivalent value. This Settlement Agreement is subject to Viva's approval, not to be unreasonably withheld, that DFL, Por Vida, Alvarez, and Jacobs have not made fraudulent transfers of their right, title or interest in the Film.

7.      If DFL pays Viva $120,000 within 90 days of the full execution of the settlement agreement, that payment will satisfy the stipulated judgment, terminate Viva's security interest in the Film, and extinguish Viva's right to distribute the Film pursuant to the Distribution Agreement. This would not terminate the obligation to pay the 1% of any worldwide gross revenue of the Film exceeding $10,000,000 as set forth in paragraph 3.

8.      If DFL pays Viva $150,000 within 180 days of the full execution of the settlement agreement, that payment will satisfy the stipulated judgment, terminate Viva's security interest in the Film, and extinguish Viva's right to distribute the Film pursuant to the Distribution Agreement. This would not terminate the obligation to pay the 1% of any worldwide gross revenue of the Film exceeding $10,000,000 as set forth in paragraph 3.

9.      DFL, Por Vida, Alvarez, and Jacobs agree that, unless and until DFL makes the payment provided in paragraph 7 or 8 above, they will not dissipate the value of the Collateral by

2

distributing or screening the Film (or causing such distribution or screening to occur) to the general public or to anyone other than: (a) at one or more prestigious and widely publicized film festivals only upon advance written approval by Viva, with such approval not to be unreasonably withheld, (b) up to five non-commercial screenings at schools, only upon advance written approval by Viva, with such approval not to be unreasonably withheld; or (c) to a person who is a bona fide potential investor of at least $50,000 in the Film. For the sake of clarity, if the payment provided in paragraph 7 or 8 is not timely made, then DFL, Por Vida, Alvarez, and Jacobs agree to refrain from such distribution or screening of the Film at any time without the express written consent of Viva (or any successor-in-interest to Viva with respect to the right, title and interest in the Film addressed herein). Further, DFL, Por Vida, Alvarez, and Jacobs acknowledge that this settlement agreement is predicated on Viva's reliance that DFL, Por Vida, Alvarez, and Jacobs have promised to abide by this term as a precondition to this Settlement Agreement.

10.     DFL, Por Vida, Alvarez, and Jacobs represent and warrant that they will not encumber, interfere with, or diminish Viva's current rights to distribute the Film unless and until DFL makes the payment set forth in paragraph 7 or the payment set forth in paragraph 8.

11.     Viva agrees to refrain from filing the stipulated judgment, foreclosing on its security interest in the Film, or distributing the Film until the first of the following events: (a) if the Defendant-Related Parties miss the deadline in paragraph 7 to pay Viva $120,000 within 90 days and miss the deadline in paragraph 8 to pay Viva $150,000 within 180 days of the full execution of the Settlement Agreement (the failure to make both such payments shall be deemed a default under the security agreement); (b) the bankruptcy or assignment for benefit of creditors of DFL, Por Vida, or Jacobs; (c) another creditor attempts to foreclose on an interest in the Film held by one of the Defendant-Related Parties; or (d) DFL, Por Vida, Alvarez, or Jacobs violate paragraph 9 of this agreement. Further, in the event of a bankruptcy or assignment for the benefit of creditors by Alvarez, Viva may immediately file a notice of claim and pursue any available legal remedies against Alvarez or his bankruptcy estate. Viva has agreed to remove a bankruptcy or assignment for the benefit of creditors by Alvarez from the events of default listed above in this paragraph 11 based on the representation and warranty of DFL, Por Vida, Alvarez, and Jacobs that Alvarez does not have any interest in the Film other than back-end participation that can be earned only after the distribution of the Film.

12.     Viva and Xenon agree that they will not distribute or screen the Film – or announce, promote or schedule the distribution or screening of the Film – unless or until one of the events listed in paragraph 11 occurs. Further, Viva and Xenon agree that they will not initiate communications with potential retail distributors of the Film, such as Netflix, regarding any planned distribution of the Film unless or until one of the events listed in paragraph 11 occurs. Further, if a potential distributor of the Film (including without limitation anyone referred by DFL) initiates communications regarding distribution of the Film with Viva or Xenon, then Viva or Xenon will state that Viva has agreed to forego distribution of the Film during a limited time period when DFL can purchase any and all of Viva's rights to distribute the film. Alternatively or in addition, in an effort to assure any potential retail distributor of the Film that DFL is able to acquire any and all rights Viva has to distribute the Film, DFL may send a

copy of this Settlement Agreement, a summary of its terms, or a copy of the letter attached hereto as Exhibit E to such persons.

13.     If one or more of the defaults in paragraph 11 occur and Viva elects to foreclose on the Collateral, then DFL, Por Vida, Jacobs, and Alvarez grant Viva a limited power of attorney to sign documents on their behalf to affect the foreclosure.

14.     Promptly upon signature of the settlement agreement, Viva will file a dismissal with prejudice of the lawsuit as to DFL only and a dismissal without prejudice of the lawsuit as to Alvarez and Jacobs only.

15.     Pursuant to this Settlement Agreement, Viva retains any and all claims it currently has against Alvarez and/or Jacobs.  Further, the Parties hereby agree that any statute of limitations and/or any contractual limitations period(s) applicable to any contract, tort, or other cause of action the Distributor Parties may assert against the Producer Parties, or any of them, arising from the facts at issue in the Action shall be tolled from January 6, 2011 through and including 1 year after the Effective Date of this Settlement Agreement (the "Tolling Period"). This Settlement Agreement does not prevent any of the Distributor Parties from asserting the tolled claims at any time, including during the tolling period, except as otherwise provided herein.  All rights and obligations of the Parties, except as to DFL, shall be tolled and preserved and shall otherwise be the same as they were at the commencement of the Tolling Period.

16.     Except that Viva will retain the rights to distribute the Film pursuant to the Distribution Agreement, as provided in paragraph 2 above, unless and until DFL makes the payment set forth in paragraph 7 or 8 above, and except for any claim arising from a breach of the obligations in this Settlement Agreement, the Distributor Parties hereby forever discharge and release the DFL and Por Vida (the "Producer Released Parties"), from all actions, causes of action, suits, claims, demands, liens, interests, debts, contracts, obligations, liabilities, damages, losses, costs and expenses, including, without limitation, attorneys' fees and costs of any nature whatsoever, at law or in equity, presently known or unknown by reason of any matter, cause or thing whatsoever from the beginning of the world through the date hereof, including but not limited to any claims regarding the Action (the "Producer Released Claims").  This release shall not extend to any claims the Distributor Parties may later raise against the Producer Released Parties concerning any breach of this Settlement Agreement or the enforcement of this Settlement Agreement.  It is the intention of the Distributor Parties that this Settlement Agreement shall be effective as a final release of the Producer Released Claims.  In furtherance thereof the Dsitributor Parties acknowledge that they have been advised by legal counsel of their own choosing concerning, and are familiar with, the provisions of California Civil Code section 1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release which if known by him or her must have materially affected his or her settlement with the debtor.**

The Distributor Parties hereby expressly waive any and all rights under said code section and similar code sections in other jurisdictions where the Distributor Parties allege they suffered

harm. The Distributor Parties further acknowledge that facts in addition to, or different from those which are now known or believed to be true with respect to the subject matter of the Action, this Settlement Agreement and the Distributor Released Claims may later be discovered, but that notwithstanding the foregoing, it is the Distributor Parties' intention hereby to fully, completely and forever settle each and every one of the Distributor Released Claims. Therefore, in furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of the Distributor Released Claims, notwithstanding the discovery or existence of any such different or additional facts.

17.     Except for any claim arising from a breach of the obligations in this Settlement Agreement, the Producer Parties hereby forever discharge and release the Distributor Parties and each of them, and their affiliates, parent and subsidiary companies, predecessors-in-interest, successors-in-interest, together with their respective officers, directors, employees, agents, managers, consultants and attorneys (the "Distributor Released Parties"), from all actions, causes of action, suits, claims, demands, liens, interests, debts, contracts, obligations, liabilities, damages, losses, costs and expenses, including, without limitation, attorneys' fees and costs of any nature whatsoever, at law or in equity, presently known or unknown by reason of any matter, cause or thing whatsoever from the beginning of the world through the date hereof, including but not limited to any claims regarding the Action (the "Producer Released Claims"). This release shall not extend to any claims the Producer Parties may later raise against the Distributor Released Parties concerning any breach of this Settlement Agreement or the enforcement of this Settlement Agreement. It is the intention of the Producer Parties that this Settlement Agreement shall be effective as a final release of the Producer Released Claims. In furtherance thereof the Producer Parties acknowledge that they have been advised by legal counsel of their own choosing concerning, and are familiar with, the provisions of California Civil Code section 1542, which provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release which if known by him or her must have materially affected his or her settlement with the debtor.

The Producer Parties hereby expressly waive any and all rights under said code section and similar code sections in other jurisdictions where the Producer Parties allege they suffered harm. The Producer Parties further acknowledge that facts in addition to, or different from those which are now known or believed to be true with respect to the subject matter of the Action, this Settlement Agreement and the Producer Released Claims may later be discovered, but that notwithstanding the foregoing, it is the Producer Parties' intention hereby to fully, completely and forever settle each and every one of the Producer Released Claims. Therefore, in furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of the Producer Released Claims, notwithstanding the discovery or existence of any such different or additional facts.

18.     DFL, Por Vida, Jacobs, and Alvarez represent and warrant that the transactions covered by the settlement documents constitute a contemporaneous exchange of promises and obligations, and that such transactions, including the creation and perfection of the security

interests contemplated thereby, are intended to be a contemporaneous exchange of value as a "going forward" resolution of disputes between the parties and that the forbearance by Viva constitutes new value. The new value provided by Viva and Xenon includes the provision in paragraphs 11 and 12 of this Agreement that Viva and Xenon will refrain from distributing the Film and will refrain from communicating with potential retail distributors of the Film such as Netflix regarding any planned distribution of the Film unless and until one of the events listed in paragraph 11 occurs.

19.      This Agreement embodies the complete and only agreement between the parties and supersedes and cancels any and all previous understandings, agreements, negotiations, commitments and any other writings or communications pertaining to its subject matter, whether written or oral.

20.      This Agreement may not be modified or amended, nor may any right or obligation set forth herein be waived, except in a writing signed by the parties with at least the same formalities as are observed herein. A waiver as to any particular term shall not operate as a waiver as to any other terms.

21.      If any provision of this Agreement shall be held to be invalid or unenforceable in any respect or for any reason, such holding shall not impair the validity and enforceability of the remaining provisions of this Agreement, which shall continue in full force and effect.

22.      Each party to this Agreement acknowledges that it has been represented by legal counsel of its own choice throughout all the negotiations that preceded the execution of this Agreement and that it has executed this Agreement with the consent and on the advice of such legal counsel. Each party further acknowledges that it and its counsel have had adequate opportunity to make whatever investigation or inquiry they may deem necessary or desirable in connection with the subject matter of this Agreement prior to the execution hereof and the delivery and acceptance of the consideration specified herein.

23.      This Agreement shall be construed and interpreted in accordance with the laws of the State of California. The language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against either of the parties. If suit is filed by either party involving a dispute concerning the construction, interpretation, enforcement, or breach of this Agreement, the parties agree to submit to personal jurisdiction and venue of the Los Angeles Superior Court.

24.      In connection with the Action, the Parties agree to each bear the responsibility of paying their own attorneys' fees and costs and to refrain from seeking to recover such sums from any other party.

25.      This Agreement may be executed in counterparts, and transmitted by email, facsimile, or U.S. mail, which, taken together, shall constitute one and the same agreement and shall be effective as of the date first written thereon.

26.     Captions and paragraph headings used in this Agreement are for convenience and shall not be used to govern, construe, or interpret this Agreement.

27.     All payments to Viva pursuant to this Agreement will be made by means of check made payable to Freedman & Taitelman, LLP Client Trust Account and delivered to Viva c/o Freedman & Taitelman, LLP, 1901 Avenue of the Starts, Suite 500, Los Angeles, California 90067.

28.     In the event of any alleged breach of this Agreement, the party alleging the breach shall give written notice of such breach as provided in this Paragraph, and the party(s) alleged to have breached this Agreement shall have a period of five (5) business days to cure the alleged breach (if the breach is curable), during which no liability shall accrue.  Any notice required to be given under or in connection with this Agreement or the subject matter hereof, shall be sent by certified mail, postage prepaid, or by facsimile and addressed as follows:

To the Distributor Parties:

    Viva Pictures, LLC
    1539 Westwood Blvd
    Los Angeles, CA 90024
    Attn:  Victor Elizalde

    with a courtesy copy to:

    Glaser Weil Fink Jacobs Howard Avchen & Shapiro, LLP
    10250 Constellation Blvd.
    19th Floor
    Los Angeles, CA 90067


    Bryan J. Freedman, Esq.
    Steven B. Stiglitz, Esq.
    FREEDMAN & TAITELMAN, LLP
    1901 Avenue of the Stars, Suite 500
    Telephone: (310) 201-0005
    Facsimile: (212) 201-0045

To the Producer Parties:

    Blaine Greenberg, Esq.
    speak softly legal management
    3400 Red Rose Dr.
    Encino CA, 91436

    Telephone: (818) 986-8433
    Facsimile: (818) 986-8435

29.     Each of the parties to this Agreement warrants and represents to the other that it has the power to enter into this Agreement and that the person executing this Agreement on its behalf has been authorized to do so by any and all appropriate corporate bodies.  Each of the undersigned represents and warrants that he or she has the authority and capacity to act on behalf of the entity on behalf of whom he or she signed this Agreement and bind them to the terms and conditions of this Agreement.  All the terms and conditions of this Settlement Agreement shall be binding upon and inure to the benefit of the parties' respective subsidiaries, predecessors, successors, assigns, distributors, and licensees.

30.     Each of the parties to this Agreement warrants and represents to the other that it has not assigned any of the claims released herein.

31.     The provisions of this Agreement shall be binding upon the Parties, their respective heirs, members, managers, directors, officers, shareholders, employees, predecessors, affiliates, former and present successors and assigns, and all persons acting by, through, under, or in concert with any of them, including any independent contractors hired by any of them.

IN WITNESS WHEREOF, the Parties hereto have executed this Settlement Agreement and Mutual Release as of the day and year written below.

DATED: _____, 2012          VIVA PICTURES, LLC

                                     By: _____

                                     Its: _____


DATED: _____, 2012          XENON PICTURES, LLC

                                     By: _____

                                     Its: _____


DATED: July 11, 2012

                                     SCOTT ALVAREZ

DATED: __7 / 11 / 12__ 2012                    _Alan Jacobs_
                                               ALAN JACOBS

DATED: __7/11/12__ . 2012                     DFL RELEASING. LLC

                                               By: _Alan Jacobs_

                                               Its: _Managing Member_

DATED: __7/11/12__ . 2012                     POR VIDA PRODUCTIONS, LLC

                                               By: _Alan Jacobs_

                                               Its: _Managing Member_

**APPROVED AS TO FORM:**

DATED: __July 6__ . 2012

                                               _____
                                               Blaine Greenberg, Esq.
                                               Attorney for Defendants Scott Alvarez,
                                               Alan Jacobs, DFL Releasing, LLC, and
                                               Third Party Por Vida Productions, LLC

DATED: _____ . 2012                       FREEDMAN & TAITELMAN, LLC

                                               By: _____
                                               Bryan J. Freedman, Esq.
                                               Steven B. Stiglitz, Esq.
                                               Attorneys for Plaintiff Viva Pictures, LLC
                                               and Third Party Xenon Pictures, LLC

9

Exhibit A
(Stipulation for Entry of Judgment and [Proposed] Judgment)



1 | Bryan J. Freedman, Esq. (SBN 151990)
David Marmorstein, Esq. (SBN 192993)
2 | Steven B. Stiglitz, Esq. (SBN 222667)
FREEDMAN & TAITELMAN, LLP
3 | 1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
4 | Tel: (310) 201-0005
Fax: (310) 201-0045
5 |
Attorneys for Plaintiff
6 | Viva Pictures, LLC

7 |

8 | SUPERIOR COURT OF CALIFORNIA

9 | COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10 |

11 | VIVA PICTURES, LLC, a California limited )   CASE NO. BC452585
liability company,                          )   Assigned to:  Hon. Michael Johnson
12 |                                         )   Dept: 56
Plaintiff,                                  )
13 |                                         )
v.                                          )   STIPULATION FOR ENTRY OF
14 |                                         )   JUDGMENT
DFL RELEASING, LLC, a California limited )
15 | liability company; ALAN JACOBS, an      )
individual; SCOTT ALVAREZ, an individual; )
16 | and DOES 1-100,                         )   Complaint Filed:      January 6, 2011
                                            )
17 |              Defendants.                )
                                            )
18 |                                         )
                                            )
19 |                                         )
                                            )
20 |                                         )
                                            )
21 |                                         )

22 |

23 |

24 |

25 |

26 |

27 |

28 |

## STIPULATION

This Stipulation for Entry of Judgment (the "Stipulation") is entered into by and between by and between Viva Pictures, LLC ("Viva"), Xenon Pictures, LLC ("Xenon") (Viva and Xenon each individually are referenced as a "Distributor Party," or collectively, as the "Distributor Parties"), Alan Jacobs ("Jacobs"), Scott Alvarez ("Alvarez"), DFL Releasing, LLC ("DFL"), and Por Vida Productions, LLC ("Por Vida") (Jacobs, Alvarez, DFL and Por Vida each individually are referenced as a "Producer Party," or collectively, as the "Producer Parties").

WHEREAS, Plaintiff and Defendants have entered into a Settlement Agreement and Release (the "Settlement Agreement") for the purpose of resolving the above-entitled action (the "Action").

WHEREAS, as set forth in the Settlement Agreement, both before and after the dismissal of the Action, the Court in the Action shall maintain jurisdiction over the Parties pursuant to California Code of Civil Procedure section 664.6 with respect to enforcement of the terms of the Agreement.

WHEREAS, the Settlement Agreement provides that if the Producer Parties fail to pay the Distributor Parties certain amounts set forth in the Settlement Agreement, Viva shall be entitled to file, and execute upon, a judgment (the "Stipulated Judgment") in favor of Viva and jointly and severally against DFL and Por Vida in the amount and for the relief set forth herein;

IT IS HEREBY STIPULATED AND AGREED between Viva, on the one hand, and DFL and Por Vida, on the other hand, that:

1.     If the Producer Parties fail to make the payment set forth in Paragraph 7 of the Settlement Agreement and fail to make the payment set forth in Paragraph 8 of the Settlement Agreement, judgment shall be entered jointly and severally against DFL and Por Vida and in favor of Viva in the amount of Two Hundred Fifty Thousand and 00/100 dollars ($250,000.00), less any amounts already received by Plaintiff from Defendants pursuant to the Agreement.

2.     DFL and Por Vida expressly agree to the entry of the Stipulated Judgment if they fail to make the payment set forth in Paragraph 7 of the Settlement Agreement and fail to make

1   the payment set forth in Paragraph 8 of the Settlement Agreement, and agree that they shall raise
2   no defense to the entry of such judgment other than off-sets, if any, for payments made pursuant
3   to the Settlement Agreement.

4       3.     Counsel for Viva shall hold this Stipulation in trust and shall not be filed by Viva
5   with the Court except as provided for in the Settlement Agreement. If DFL and Por Vida fail to
6   make the payment set forth in Paragraph 7 of the Settlement Agreement and fail to make the
7   payment set forth in Paragraph 8 of the Settlement Agreement, Viva shall be entitled to cause
8   this Stipulation to be filed and the Stipulated Judgment to be entered by this Court upon ex parte
9   application and declaration of Viva's counsel of such events, without further notice to Por Vida
10  or DFL or any hearing to obtain judgment.

11      4.     Said Stipulated Judgment shall be entered and become final for all purposes upon
12  entry thereof and DFL and Por Vida waive any right to appeal the Stipulated Judgment.

13      5.     DFL and Por Vida acknowledge and agree that upon their failure to make the
14  payment set forth in Paragraph 7 of the Settlement Agreement and their failure to make the
15  payment set forth in Paragraph 8 of the Settlement Agreement, Viva's counsel shall file a
16  declaration of default, signed under penalty of perjury, to set forth such events and the amounts
17  due and owing under the Settlement Agreement.

18      6.     DFL and Por Vida understand that they are entitled to, but hereby waive any
19  notice of hearing and actual hearing relating to the entry of the Stipulated Judgment and
20  expressly consent that a writ of execution for money may issue without notice in favor of Viva.
21  DFL and Por Vida do not waive, and Viva agrees to provide, notice of an entry of the Stipulated
22  Judgment or writ of execution issued by the above-entitled Court.

23      7.     It is further stipulated and agreed that at all times material hereto, DFL and Por
24  Vida have been and is represented by counsel of their own choosing and counsel has advised
25  DFL and Por Vida concerning their rights with respect to the form and content of this
26  Stipulation.

27

28                                                2

8.     The above-entitled court may make and enter the [Proposed] Judgment filed concurrently herewith in accordance with the foregoing Stipulation.  A copy of the proposed Judgment is attached hereto as Exhibit "A".

DATED: _____, 2012          VIVA PICTURES, LLC

                                   By: _____

                                   Its: _____


DATED: _____, 2012          XENON PICTURES, LLC

                                   By: _____

                                   Its: _____


DATED: _July 11_, 2012             SCOTT ALVAREZ

                                   By: _____


DATED: _7/11/12_, 2012             ALAN JACOBS

                                   By: _____


DATED: _7/11/12_, 2012             DFL RELEASING, LLC

                                   By: _____

3

Its: _Managing Member_

DATED: 7/11/12 2012

POR VIDA PRODUCTIONS, LLC

By: _Alan Jacobs_

Its: _Managing Member_

APPROVED AS TO FORM:

Dated: May __, 2012          FREEDMAN & TAITELMAN, LLP

By: _____
    Bryan J. Freedman, Esq.
    Steven B. Stiglitz, Esq.
    Attorneys for Plaintiff
    Viva Pictures, LLC

Dated: ~~May __, 2012~~
       July 6, 2012

    _____
    Blaine Greenberg, Esq.
    Attorneys for Defendants DFL Releasing,
    LLC, Scott Alvarez and Alan Jacobs

4

Bryan J. Freedman, Esq. (SBN 151990)
David Marmorstein, Esq. (SBN 192993)
Steven B. Stiglitz, Esq. (SBN 222667)
FREEDMAN & TAITELMAN, LLP
1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Tel: (310) 201-0005
Fax: (310) 201-0045

Attorneys for Plaintiff
Viva Pictures, LLC

## SUPERIOR COURT OF CALIFORNIA

### COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| VIVA PICTURES, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> DFL RELEASING, LLC, a California limited liability company; ALAN JACOBS, an individual; SCOTT ALVAREZ, an individual; and DOES 1-100, <br><br> Defendants. | CASE NO. BC452585 <br> Assigned to: Hon. Michael Johnson <br> Dept: 56 <br><br> **[PROPOSED] JUDGMENT** <br><br> Complaint Filed:     January 6, 2011 |

2

1    The Ex *Parte* application of Plaintiff Viva Pictures, LLC ("Plaintiff") for the entry of a

2  stipulated judgment came on for hearing before this Court.  Having reviewed the papers and all

3  documents filed in support thereof, and based on the files and records herein, and upon hearing

4  oral argument presented by the parties, and GOOD CAUSE APPEARING, JUDGMENT IS

5  HEREBY ENTERED in favor of Plaintiff and jointly and severally against DFL Releasing, LLC

6  and Por Vida Productions, LLC ("Defendants") as follows:

7    Plaintiff shall have and recover jointly and severally from Defendants:

8    1.  Damages in the amount of $250,000 upon the causes of action set forth in the

9  complaint in this Action.

10

11

12  Dated: _____, 2012

13                                          _____
                                            Hon. Michael Johnson

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit B
(Mortgage of Copyright re: Settlement Agreement)

COPYRIGHT MORTGAGE AND ASSIGNMENT

"DOWN FOR LIFE"

COPYRIGHT MORTGAGE AND ASSIGNMENT entered into as of May 3, 2012 (the "Effective Date"), by and between DFL Releasing, LLC, a California limited liability company ("DFL"), Por Vida Productions, LLC, a California limited liability company ("Por Vida"), Alan Jacobs, individually and on behalf of DFL and Por Vida, and Scott Alvarez, individually and on behalf of DFL and Por Vida (individually and collectively, "Mortgagor"), on the one hand, and Viva Films, LLC ("Viva"), on the other hand, in order for Mortgagor to secure its obligations under that certain Settlement Agreement (the "Settlement Agreement") dated as of the Effective Date, by and between Mortgagor and Viva regarding the motion picture entitled "Down 4 Life" also known as "Por Vida" (the "Film"). All capitalized terms utilized herein and not otherwise defined shall have the same meaning as in the Settlement Agreement.

For good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.   **GRANT**:  In order to induce Viva to enter into the Settlement Agreement, and in order to secure the performance by Mortgagor of Mortgagor's obligations under the Settlement Agreement (collectively, "Secured Rights and Obligations"), Mortgagor hereby grants, conveys and transfers to Viva a continuing security interest in and copyright mortgage on all of Mortgagor's rights, title and interest of every kind and nature in and to the Film (but none of Mortgagor's obligations with respect thereto), including without limitation in and to the items described or referred to in (i) through (v), below, associated with or relating to the Film wherever located ("Collateral"), whether such Collateral is now owned or hereafter acquired or created by Mortgagor and solely to the extent necessary to secure complete performance of the Secured Rights and Obligations under the Settlement Agreement:

(i)  All of Mortgagor's rights, title and interests, present and future, in and to the Film, including without limitation all production, distribution and exploitation rights, including without limitation all of Mortgagor's agreements (whether or not in writing) relating to the production, distribution and exploitation of the Film, and any underlying rights acquired by Mortgagor in the New York Times story on which the Film is based, throughout the universe, in perpetuity.

(ii) All tangible property and physical properties of every kind or nature whatsoever of or relating to the Film and all versions thereof including, without limitation, (a) all exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including, interpositives, negatives, duplicate negatives, internegatives), trailers, soundtracks, music and effects tracks, video masters, video and

Mortgagor's rights of access to and use of the foregoing;

(iii) All rights in all agreements and understandings (whether or not evidenced in writing) with third parties relating to the Film or to any of the elements thereto, and any rights derived therefrom or related thereto, including all rights derived pursuant to security agreements and mortgages of copyright with any person or entity with respect to the Film;

(iv) The title of the Film and all marks and devices connected with or related to the Film or used or to be used in connection with the exploitation of the Film, and all rights of Mortgagor to the use of all of the foregoing, including, without limitation, rights protected pursuant to trademark, service mark, unfair competition and/or the rules and principles of law pertaining thereto or to any other applicable statutory, common law, or other rule or principle of law; and,

(v) All results, products and proceeds of any kind or character of any and all of the foregoing.

2.   **PERFECTION OF SECURITY INTEREST**: Mortgagor authorizes Viva to file UCC Financing Statements describing the Collateral and to file a copy of this Copyright Mortgage and Assignment with the U.S. Copyright Office.

3.   **PROTECTION OF COLLATERAL**: Mortgagor agrees that if any person, firm or corporation shall do or perform any acts which Viva believes to constitute a copyright infringement of the Film or constitute a plagiarism, or violate or infringe any rights of Viva or the Mortgagor therein or if any person, firm or corporation shall do or perform any acts which Viva believes to constitute an unauthorized or unlawful distribution, exhibition, or use thereof, or exercise any unauthorized control over the Collateral or any elements or materials thereof, then and in any such event, Viva may and shall have the right to take such steps and institute such suits or proceedings as Viva may deem advisable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, and to generally take such steps as may be advisable or necessary or proper for the full protection of the rights of the parties. Viva may take such steps or institute such suits or proceedings in its own name or in the names of the parties jointly.

4.   **RIGHTS OF SECURED PARTY**: Regarding the security interest granted to Viva pursuant hereto, Viva and any of its assignees shall have all rights, privileges and remedies to the maximum extent permitted by law (including without limitation) those available under provisions of the UCC and all legal, equitable, administrative and self-help rights and remedies). The foregoing are cumulative and the exercise of one shall not preclude Viva from a later or concurrent exercise of any other, and Mortgagor waives all waiveable (whether now or hereafter held to be waiveable)

procedural requirements, including notice, with respect to all of Mortgagor's rights and remedies hereunder.  No delay or omission by Viva to exercise any right or remedy accruing upon any event of default shall impair any right or remedy, waive any default or operate as an acquiescence to the event of default or affect any subsequent default of the same or of a different nature.

5.   **EXERCISE OF RIGHTS**:  Viva or any of its assignees shall be entitled to exercise the rights and remedies of a secured party under applicable law, including without limitation, those of a "Lender" under the Uniform Commercial Code of the State of California, and the rights granted hereunder with respect to the Collateral, in the event any one or more of the following events of default shall occur and remains uncured for more than ten (10) days following written notice to Mortgagor:

(i)  Mortgagor (or anyone acting on Mortgagor's behalf or in its place and stead) terminates, attempts to terminate, disaffirms or attempts to disaffirm any of the following:  (A) the Settlement Agreement, (B) this Copyright Mortgage and Assignment, and (C) any agreement entered into with Viva pursuant to or in connection with the Settlement Agreement or the Copyright Mortgage and Assignment.

(ii)  Mortgagor (or anyone acting on Mortgagor's behalf or in the place and stead of Mortgagor) defaults in the performance of any of Mortgagor's material obligations to Viva (or anyone acting on Viva's behalf or in its place and stead) under any of the following:   (A) the Settlement Agreement, (B) this Copyright Mortgage and Assignment, and (C) any agreement entered into with Viva pursuant to or in connection with the Settlement Agreement or the Copyright Mortgage and Assignment.

(iii)  Mortgagor shall become insolvent, or make a general assignment for the benefit of creditors, or admit in writing Mortgagor's inability to pay Mortgagor's debts as they become due, or commence or consent to the commencement of any proceeding to be adjudicated a bankrupt or insolvent or seeking reorganization, arrangement, adjustment, composition or other relief from creditors under applicable law, or suffer the entry of any decree or order by a court of competent jurisdiction adjudicating Mortgagor as bankrupt or insolvent or approve or imposing such relief from creditors, or seek or consent to the appointment of any receiver, liquidator, assignee, trustee, sequestrator or other similar official for all or any substantial part of its assets or properties, or in the event of the commencement of any involuntary proceeding against Mortgagor seeking adjudication of bankruptcy or insolvency or reorganization, arrangement, adjustment, composition or other relief from creditors under applicable law, or the involuntary appointment of any receiver, liquidator, assignee, trustee, sequestrator or other similar official for all or any substantial part of its assets or properties, and such involuntary proceedings or appointment is not dismissed or vacated within 60 days after the date of such commencement or appointment, or if there is an attachment, execution or levy on any of the Collateral

(iv) There is any misstatement or false statement in connection with any of Mortgagor's obligations, agreements, representation or warranties under or related to this Copyright Mortgage and Assignment or the Settlement Agreement.

6.   **DEFAULT COSTS**:  If an event of default occurs, Mortgagor will pay Viva all costs reasonably incurred by Viva for the purpose of enforcing its rights hereunder, including, without limitation, costs of foreclosure, costs of obtaining money damages and a reasonable fee for the services of outside attorneys employed by Viva for any purpose related to this Copyright Mortgage and Assignment or the Secured Rights and Obligations, including, without limitation, consultation, crafting documents, sending notices or instituting prosecution or defending litigation or arbitration.

7.   **FURTHER DOCUMENTS**:   Mortgagor hereby agrees to sign and deliver to Viva all other instruments and to take any further actions as Viva shall reasonably request and are reasonably required to perfect, protect, evidence, renew and/or continue the security interest and copyright mortgage in the Collateral and/or to effectuate the purposes and intents of this Copyright Mortgage and Assignment, to file, register and/or record the same and to pay all applicable fees relating thereto under (i) the Uniform Commercial Code, and all other similar applicable laws of the State of California and any other jurisdiction where such filing, registration and/or recordation may reasonably be required, and (ii) the United States Copyright Act.  If Mortgagor fails to sign any such document within five (5) business days of any written request by Viva to do so, Mortgagor hereby appoints Viva its irrevocable attorney-in-fact to sign any such document for Mortgage, and agrees that such appointment constitutes a power coupled with an interest and is irrevocable.  Viva shall provide Mortgagor with copies of any documents so-executed by Viva, as attorney-in-fact, upon Mortgagor's written request.

8.   **MORTGAGOR'S WARRANTIES AND REPRESENTATIONS**:   Mortgagor confirms, warrants and represents to Viva that:

(i)  Mortgagor owns the rights in the Collateral and has full power and authority to enter into this Copyright Mortgage and Assignment, to authorize the filing of Financing Statements, to authorize the filing of this Copyright Mortgage and Assignment with the U.S. Copyright Office, and to perform Mortgagor's obligations hereunder and under the Settlement Agreement.

(ii) Except for the security interest granted to Viva with respect to the Distribution Agreement for the Film (as defined in the Settlement Agreement), the liens granted to guilds in connection with the production of the Film, and the Copyright Mortgage and Assignment entered into by Por Vida Productions, LLC and Gerald Fruchtman, no other security interest has been granted by Mortgagor and, to the best of Mortgagor's knowledge, no security interest has been granted by any other party which is in conflict with or in any

this Copyright Mortgage and Assignment.

(iii) Mortgagor has no knowledge of any legal proceedings now pending, threatened or reasonably anticipated against Mortgagor which might impede performance of Mortgagor's obligations as to the Film and shall promptly notify Viva if Mortgagor hereafter learns of any such legal proceedings.

(iv) Subject to the other provisions of this Paragraph 8, no agreements, understandings or other arrangements have been made or entered into by Mortgagor which are in, or would in any way, conflict or interfere with the rights granted by Mortgagor to Viva in this Copyright Mortgage and Assignment, the Financing Statements or in the Settlement Agreement.

(v) Mortgagor's chief executive office is located in the state identified in the first paragraph of this Copyright Mortgage and Assignment, and Mortgagor's exact legal name is as set forth in the first paragraph of this Copyright Mortgage and Assignment.

9.   <u>MORTGAGOR'S COVENANTS</u>:  Mortgagor agrees that it will preserve its company existence and not, in one transaction or a series of related transactions, merge into or consolidate with any other entity, or sell all or substantially all of its assets, nor change the state where it is located and not change its corporate name without providing Viva with 30 days' prior written notice.

10.   <u>ASSIGNMENT</u>:  This Copyright Mortgage and Assignment shall bind and shall inure to the benefit of the heirs, legatees, executors, administrators, successors and assigns of Mortgagor and shall bind all persons who become bound as a debtor to this Copyright Mortgage and Assignment.   Viva does not consent to any assignment by Mortgagor except as expressly provided in this Copyright Mortgage and Assignment.  Viva may assign its rights and interest under this Copyright Mortgage and Assignment.   If an assignment is made, Mortgagor shall render performance under this Copyright Mortgage and Assignment to the assignee.

11.   <u>TERMINATION/REMOVAL OF COPYRIGHT MORTGAGE</u>:  The copyright mortgage hereby granted shall terminate when sub-clause (i) or (ii), below, has been fulfilled, subject to any then-existing obligations of Mortgagor to Viva under the Settlement Agreement and hereunder. When and if said copyright mortgage terminates, Viva shall execute such instruments as may be necessary to evidence the release and termination of the copyright mortgage.

(i) If Mortgagor pays Viva $120,000 within 90 days of the execution of the Settlement Agreement, that payment will satisfy the stipulated judgment, terminate Viva's security interest in the Film, and extinguish Viva's right to distribute the Film pursuant to the Distribution Agreement (as defined in the Settlement Agreement).   This would not terminate the obligation to pay the 1% of any worldwide gross

revenue of the Film exceeding $10,000,000 as set forth in paragraph 3 of the Settlement Agreement; or,

(ii) If Mortgagor pays Viva $150,000 within 180 days of the execution of the Settlement Agreement, that payment will satisfy the stipulated judgment, terminate Viva's security interest in the Film, and extinguish Viva's right to distribute the Film pursuant to the Distribution Agreement (as defined in the Settlement Agreement). This would not terminate the obligation to pay the 1% of any worldwide gross revenue of the Film exceeding $10,000,000 as set forth in paragraph 3 of the Settlement Agreement.

12.   <u>SEVERABILITY; SOLE AGREEMENT</u>:   If any provision of this Copyright Mortgage and Assignment should be found to be void, invalid or unenforceable by a court or panel of arbitrators of competent jurisdiction that finding shall only affect the provisions found to be void, invalid or unenforceable and shall not affect the remaining provision of this Copyright Mortgage and Assignment.  This Copyright Mortgage and Assignment is the sole agreement between the parties with respect to the subject matter hereof (except for the Settlement Agreement) and supersedes any and all other agreements or understandings, written or oral between the parties with respect thereto (except the Settlement Agreement).

13.   <u>GOVERNING LAW</u>:   This Copyright Mortgage and Assignment shall be governed by the laws of the State of California, without giving effect to the principles of conflict of laws thereof, except to the extent that the UCC provides for the application of the law of Mortgagor's state of incorporation and except to the extent that the U.S. Copyright Act applies.

14.   <u>LEGAL ACTION</u>:   Mortgagor and Viva agrees that all actions, proceedings or litigation relating to this Copyright Mortgage and Assignment shall be instituted and prosecuted solely within Los Angeles County, State of California, and Mortgagor and Viva hereby consent to the jurisdiction of the state courts of California and the federal courts located within the State of California with respect to any matter arising out of or relating to this Copyright Mortgage and Assignment.

15.   <u>NOTICES</u>:   All notices with respect to this Copyright Mortgage and Assignment shall be given in writing by mail (postage prepaid), messenger or by facsimile (if by facsimile machine, such notice shall be concurrently sent by mail) addressed as indicated below. The earlier of (a) actual receipt, (b) three (3) days after the date of mailing, or (c) the date of personal delivery or facsimile transmission shall be deemed to be the date of service.

To Mortgagor:

Alan Jacobs
DFL Releasing, LLC &

Por Vida Productions, LLC
23679 Calabasas Road
Calabasas, CA 91302

With a copy to:

Blaine Greenberg, Esq.
11601 Wilshire Drive
Sherman Oaks, CA 91423

To Viva:

Viva Pictures, LLC
1539 Westwood Blvd.
Los Angeles, CA 90024
Attn: Victor Elizalde

With a copy to:

Glaser Weil Fink Jacobs Howard Avchen & Shapiro, LLP
10250 Constellation Blvd.
19th Floor
Los Angeles, CA 90067

16.   **SUBJECT TO SETTLEMENT AGREEMENT**:  This Copyright Mortgage and Assignment is expressly made and is subject to the terms and conditions contained in the Settlement Agreement, as it may be amended, and in the case of any inconsistency between this instrument and the Settlement Agreement, the Settlement Agreement shall govern.

By signing in the spaces below, the parties hereto have agreed to all the terms and conditions of this Copyright Mortgage and Assignment.

"Mortgagor":

DFL Releasing, LLC                          Por Vida Productions, LLC

By: _____               By: _____
     Alan Jacobs                                 Alan Jacobs

By: _____               By: _____
     Scott Alvarez                               Scott Alvarez

    _____                   _____
     Alan Jacobs                                 Scott Alvarez

AGREED TO AND ACCEPTED:

"Viva"
Viva Productions, LLC

By: _____

Exhibit C
(Mortgage of Copyright re: Distribution Agreement)

COPYRIGHT MORTGAGE AND ASSIGNMENT

"DOWN FOR LIFE"

COPYRIGHT MORTGAGE AND ASSIGNMENT entered into as of May 3, 2012, by and between DFL Releasing, LLC, a California limited liability company ("Mortgagor") and Viva Films, LLC ("Viva") in order for Viva to secure its rights under that certain Distribution Agreement, as amended (the "Distribution Agreement") dated as of October 5, 2010 by and between Mortgagor and Viva regarding the motion picture entitled "Down 4 Life" also known as "Por Vida" (the "Film"). All capitalized terms utilized herein and not otherwise defined shall have the same meaning as in the Distribution Agreement.

For good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.    GRANT:  In order to induce Viva to enter into the Distribution Agreement, and in order to secure Viva's receipt of certain revenues under the Distribution Agreement, Mortgagor hereby grants, conveys and transfers to Viva a continuing security interest in and copyright mortgage on all rights to distribute and exploit the Film in all media (excluding theatrical) (the "Media") during a term of ten (10) years (the "Term") in the United States and Canada (collectively, the "Territory"), plus all revenues from the distribution and exploitation of the Film in such Media during the Term in the Territory, and to the items described or referred to in (i) through (iii), below, associated with or relating to the Film wherever located (collectively, the "Collateral"), whether such Collateral is now owned or hereafter acquired or created by Mortgagor:

(i) All of Mortgagor's agreements (whether or not in writing) relating to the production, distribution and exploitation of the Film, and any underlying rights acquired by Mortgagor in the New York Times story on which the Film is based, throughout the Territory during the Term.

(ii) All tangible property and physical properties of every kind or nature whatsoever of or relating to the Film and all versions thereof including, without limitation, (a) all exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including, interpositives, negatives, duplicate negatives, internegatives), trailers, soundtracks, music and effects tracks, video masters, video and audio recordings (b) still photography and artwork, and (c) all of Mortgagor's rights of access to and use of the foregoing; and,

(iii) All results, products and proceeds of any kind or character of any and all of the foregoing.

2.    PERFECTION OF SECURITY INTEREST:  Mortgagor authorizes Viva to

file UCC Financing Statements describing the Collateral and to file a copy of this Copyright Mortgage and Assignment with the U.S. Copyright Office.

3. **PROTECTION OF COLLATERAL:** Mortgagor agrees that if any person, firm or corporation shall do or perform any acts which Viva believes to constitute a copyright infringement of the Film or constitute a plagiarism, or violate or infringe any rights of Viva or the Mortgagor therein or if any person, firm or corporation shall do or perform any acts which Viva believes to constitute an unauthorized or unlawful distribution, exhibition, or use thereof, or exercise any unauthorized control over the Collateral or any elements or materials thereof, then and in any such event, Viva may and shall have the right to take such steps and institute such suits or proceedings as Viva may deem advisable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, and to generally take such steps as may be advisable or necessary or proper for the full protection of the rights of the parties. Viva may take such steps or institute such suits or proceedings in its own name or in the names of the parties jointly.

4. **RIGHTS OF SECURED PARTY:** Regarding the security interest granted to Viva pursuant hereto, Viva and any of its assignees shall have all rights, privileges and remedies to the maximum extent permitted by law (including without limitation) those available under provisions of the UCC and all legal, equitable, administrative and self-help rights and remedies). The foregoing are cumulative and the exercise of one shall not preclude Viva from a later or concurrent exercise of any other, and Mortgagor waives all waiveable (whether now or hereafter held to be waiveable) procedural requirements, including notice, with respect to all of Mortgagor's rights and remedies hereunder. No delay or omission by Viva to exercise any right or remedy accruing upon any event of default shall impair any right or remedy, waive any default or operate as an acquiescence to the event of default or affect any subsequent default of the same or of a different nature.

5. **EXERCISE OF RIGHTS:** Viva and/or its present and future assignees, if any, shall be entitled to exercise the rights and remedies of a secured party under applicable law, including without limitation, those of a "Lender" under the Uniform Commercial Code of the State of California, and the rights granted hereunder with respect to the Collateral, in the event any one or more of the following events of default shall occur and remains uncured for more than ten (10) days following written notice to Mortgagor:

(i) Mortgagor (or anyone acting on Mortgagor's behalf or in its place and stead) terminates, attempts to terminate, disaffirms or attempts to disaffirm any of the following: (A) the Distribution Agreement, (B) this Copyright Mortgage and Assignment, and (C) any agreement entered into with Viva pursuant to or in connection with the Distribution Agreement or the Copyright Mortgage and Assignment.

(ii) Mortgagor (or anyone acting on Mortgagor's behalf or in the place and stead of Mortgagor) defaults in the performance of any of Mortgagor's material obligations to Viva (or anyone acting on Viva's behalf or in its place and stead) under any of the following: (A) the Distribution Agreement, (B) this Copyright Mortgage and Assignment, and (C) any agreement entered into with Viva pursuant to or in connection with the Distribution Agreement or the Copyright Mortgage and Assignment.

(iii) Mortgagor shall become insolvent, or make a general assignment for the benefit of creditors, or admit in writing Mortgagor's inability to pay Mortgagor's debts as they become due, or commence or consent to the commencement of any proceeding to be adjudicated a bankrupt or insolvent or seeking reorganization, arrangement, adjustment, composition or other relief from creditors under applicable law, or suffer the entry of any decree or order by a court of competent jurisdiction adjudicating Mortgagor as bankrupt or insolvent or approve or imposing such relief from creditors, or seek or consent to the appointment of any receiver, liquidator, assignee, trustee, sequestrator or other similar official for all or any substantial part of its assets or properties, or in the event of the commencement of any involuntary proceeding against Mortgagor seeking adjudication of bankruptcy or insolvency or reorganization, arrangement, adjustment, composition or other relief from creditors under applicable law, or the involuntary appointment of any receiver, liquidator, assignee, trustee, sequestrator or other similar official for all or any substantial part of its assets or properties, and such involuntary proceedings or appointment is not dismissed or vacated within 60 days after the date of such commencement or appointment, or if there is an attachment, execution or levy on any of the Collateral.

(iv) There is any misstatement or false statement in connection with any of Mortgagor's obligations, agreements, representation or warranties under or related to this Copyright Mortgage and Assignment or the Distribution Agreement.

6. **DEFAULT COSTS**: If an event of default occurs, Mortgagor will pay Viva all costs reasonably incurred by Viva for the purpose of enforcing its rights hereunder, including, without limitation, costs of foreclosure, costs of obtaining money damages and a reasonable fee for the services of outside attorneys employed by Viva for any purpose related to this Copyright Mortgage and Assignment or the Secured Rights and Obligations, including, without limitation, consultation, crafting documents, sending notices or instituting prosecution or defending litigation or arbitration.

7. **FURTHER DOCUMENTS**: Mortgagor hereby agrees to sign and deliver to Viva all other instruments and to take any further actions as Viva shall reasonably request and are reasonably required to perfect, protect, evidence, renew and/or continue the security interest and copyright mortgage in the Collateral and/or to effectuate the purposes and intents of this Copyright Mortgage and Assignment, to file, register and/or record the same and to pay all

applicable fees relating thereto under (i) the Uniform Commercial Code, and all other similar applicable laws of the State of California and any other jurisdiction where such filing, registration and/or recordation may reasonably be required, and (ii) the United States Copyright Act.  If Mortgagor fails to sign any such document within five (5) business days of any written request by Viva to do so, Mortgagor hereby appoints Viva its irrevocable attorney-in-fact to sign any such document for Mortgage, and agrees that such appointment constitutes a power coupled with an interest and is irrevocable.  Viva shall provide Mortgagor with copies of any documents so-executed by Viva, as attorney-in-fact, upon Mortgagor's written request.

8.   <u>MORTGAGOR'S   WARRANTIES   AND   REPRESENTATIONS</u>:   Mortgagor confirms, warrants and represents to Viva that:

(i)   Mortgagor owns the rights in the Collateral and has full power and authority to enter into this Copyright Mortgage and Assignment, to authorize the filing of Financing Statements, to authorize the filing of this Copyright Mortgage and Assignment with the U.S. Copyright Office, and to perform Mortgagor's obligations hereunder and under the Distribution Agreement.

(ii) Except for the liens granted to guilds in connection with the production of the Film, and the Copyright Mortgage and Assignment entered into by Por Vida Productions, LLC with Gerald Fruchtman, no other security interest has been granted by Mortgagor and, to the best of Mortgagor's knowledge, no security interest has been granted by any other party which is in conflict with or in any way would interfere with Viva's ability to enforce its rights under this Copyright Mortgage and Assignment.

(iii) Mortgagor has no knowledge of any legal proceedings now pending, threatened or reasonably anticipated against Mortgagor which might impede performance of Mortgagor's obligations as to the Film and shall promptly notify Viva if Mortgagor hereafter learns of any such legal proceedings.

(iv)  Subject to the other provisions of this Paragraph 8, no agreements, understandings or other arrangements have been made or entered into by Mortgagor which are in, or would in any way, conflict or interfere with the rights granted by Mortgagor to Viva in this Copyright Mortgage and Assignment, the Financing Statements or in the Distribution Agreement.

(v)   Mortgagor's chief executive office is located in the state identified in the first paragraph of this Copyright Mortgage and Assignment, and Mortgagor's exact legal name is as set forth in the first paragraph of this Copyright Mortgage and Assignment.

9.   <u>MORTGAGOR'S COVENANTS</u>:  Mortgagor agrees that it will preserve its corporate existence and not, in one transaction or a series of related transactions, merge into or consolidate with any other

entity, or sell all or substantially all of its assets, nor change the state where it is located and not change its corporate name without providing Viva with 30 days' prior written notice.

10.   **ASSIGNMENT**:   This Copyright Mortgage and Assignment shall bind and shall inure to the benefit of the heirs, legatees, executors, administrators, successors and assigns of Mortgagor and shall bind all persons who become bound as a debtor to this Copyright Mortgage and Assignment.   Viva does not consent to any assignment by Mortgagor except as expressly provided in this Copyright Mortgage and Assignment.   Viva may assign its rights and interest under this Copyright Mortgage and Assignment.   If an assignment is made, Mortgagor shall render performance under this Copyright Mortgage and Assignment to the assignee.

11.   **TERMINATION/REMOVAL OF COPYRIGHT MORTGAGE**:   The copyright mortgage hereby granted shall terminate upon the last to occur of the termination or expiration of the Distribution Agreement and the collection and payment to Viva of all revenues due Viva under the Distribution Agreement.   When and if said copyright mortgage terminates, Viva shall execute such instruments as may be necessary to evidence the release and termination of the copyright mortgage.

12.   **SEVERABILITY; SOLE AGREEMENT**:   If any provision of this Copyright Mortgage and Assignment should be found to be void, invalid or unenforceable by a court or panel of arbitrators of competent jurisdiction that finding shall only affect the provisions found to be void, invalid or unenforceable and shall not affect the remaining provision of this Copyright Mortgage and Assignment.   This Copyright Mortgage and Assignment is the sole agreement between the parties with respect to the subject matter hereof (except for the Distribution Agreement) and supersedes any and all other agreements or understandings, written or oral between the parties with respect thereto (except the Distribution Agreement).

13.   **GOVERNING LAW**:   This Copyright Mortgage and Assignment shall be governed by the laws of the State of California, without giving effect to the principles of conflict of laws thereof, except to the extent that the UCC provides for the application of the law of Mortgagor's state of incorporation and except to the extent that the U.S. Copyright Act applies.

14.   **LEGAL ACTION**:   Mortgagor and Viva agrees that all actions, proceedings or litigation relating to this Copyright Mortgage and Assignment shall be instituted and prosecuted solely within Los Angeles County, State of California, and Mortgagor and Viva hereby consent to the jurisdiction of the state courts of California and the federal courts located within the State of California with respect to any matter arising out of or relating to this Copyright Mortgage and Assignment.

15.   **NOTICES**:   All notices with respect to this Copyright Mortgage and Assignment shall be given in writing by mail (postage prepaid),

messenger or by facsimile (if by facsimile machine, such notice shall be concurrently sent by mail) addressed as indicated below. The earlier of (a) actual receipt, (b) three (3) days after the date of mailing, or (c) the date of personal delivery or facsimile transmission shall be deemed to be the date of service.

To Mortgagor:

Alan Jacobs
DFL Releasing, LLC
23679 Calabasas Road
Calabasas, CA 91302

With a copy to:

Blaine Greenberg, Esq.
14940 Red Roses Drive
Sherman Oaks, CA 91423

To Viva:

Viva Pictures, LLC
1539 Westwood Blvd.
Los Angeles, CA 90024
Attn: Victor Elizalde

With a copy to:

Glaser Weil Fink Jacobs Howard Avchen & Shapiro, LLP
10250 Constellation Blvd.
19th Floor
Los Angeles, CA 90067

16.   **SUBJECT TO DISTRIBUTION AGREEMENT**:  This Copyright Mortgage and Assignment is expressly made and is subject to the terms and conditions contained in the Distribution Agreement, as it may be amended, and in the case of any inconsistency between this instrument and the Distribution Agreement, the Distribution Agreement shall govern.

By signing in the spaces below, the parties hereto have agreed to all the terms and conditions of this Copyright Mortgage and Assignment.

"Mortgagor":

DFL Releasing, LLC

By:   _Alan Jacobs_
      Alan Jacobs

By: _____
Scott Alvarez

_____
Alan Jacobs

_____
Scott Alvarez

AGREED TO AND ACCEPTED:

"Viva"

Viva Productions, LLC

By: _____

Exhibit D
(Producers' List of Transfers of Interests in the Film)

## Por Vida Productions, LLC & DFL Releasing, LLC ("Down For Life")
### Producers List of Transfers of Interests
### 6/20/2012

| Entity | Principal Amount | Type of Interest |
|---|---|---|
| Local 399 (Teamsters) | $454,460 | Judgement for stale wages, penalties, and interest |
| SAG | $210,000 | Stipulated Award for Stale Wages, Penalties, and Interest |
| DGA | $22,000 | Stipulated Award for Stale Wages, Penalties, and Interest |
| WGA | $41,000 | Stipulated Award for Stale Wages, Penalties, and Interest |
| Jerry & Peter Fruchtman | $250,000 | Secured Creditor/Production Loan |
| Scene Two, LLC (Joan Huntziker & Brendon Clarke) | $300,000 | Secured Creditor/Production Loan |
| NYTimes | $10,000 | Secured Creditor/Literary Rights |
| Co-Stars | $12,000 | Secured Creditor/Music Licenses |
| Paul Stewart | $2,000 | Secured Creditor/Music Licenses |
| CA Franchise Tax Board | $4,000 | Secured Creditor/Overdue Franchise Fees |
| SolidLA Post | $34,000 | Secured Creditor/Master Elements |
| Shelby Notkin | $500,000 | Equity Investor/11.1111% |
| Phil De Toledo | $250,000 | Equity Investor/5.5556% |
| Parcae, LLC (Joseph Nicholas) | $250,000 | Equity Investor/5.5556% |
| Don Pollard, Jr. | $250,000 | Equity Investor/5.5556% |
| GJMT, LLC (Justin Dardani) | $250,000 | Equity Investor/5.5556% |
| Jeffrey Nochimson | $125,000 | Equity Investor/2.7778% |
| Alrez, LLC (Albert Lemus & Reza Hashemiha) | $125,000 | Equity Investor/2.7778% |
| David Grumman | $125,000 | Equity Investor/2.7778% |
| Jerry & Peter Fruchtman | $75,000 | Equity Investor/1.6667% |
| Justin Dardani | $50,000 | Equity Investor/1.1111% |
| State of Eight, LLC (Alan Jacobs) | Managing Member | Equity Investor/55.5555% |
| Total | $3,339,460 | |

Exhibit E
(Letter of Victor Elizalde)

May 25, 2012

To whom it may concern,

I am the president of Viva Pictures, LLC ("Viva"). In October 2010, Viva entered into an agreement with DFL Releasing, LLC ("DFL") to distribute the film known as "Down 4 Life," a.k.a. "Por Vida" (the "Film") in certain territories (the "Distribution Agreement"). I entered into the Distribution Agreement because I believed that the Film was well-made and would be commercially successful. I still believe that. However, the Film faced obstacles in obtaining all necessary clearances to be released, which led to litigation between Viva and DFL and prevented Viva from completing the anticipated distribution. To overcome these obstacles, Viva and DFL have agreed to settle their disputes and devote their efforts to releasing the Film. Pursuant to the parties' settlement agreement, a copy of which I am attaching to this letter, Viva agreed to refrain from distributing the Film for a limited time during which DFL has an opportunity to re-purchase the rights to distribute the Film. If DFL makes a payment provided in the settlement agreement, Viva's rights to distribute the Film will terminate. If DFL does not make the payment provided in the settlement agreement within the time provided therein, then Viva will have the right to resume its efforts to distribute the Film. In either event, I sincerely hope that the Film reaches its intended audience and earns the critical and commercial success that it deserves.

Sincerely,

Victor Elizalde



Exhibit M

## MOTION PICTURE DISTRIBUTION AGREEMENT

### "DOWN FOR LIFE"

This Motion Picture Distribution Agreement ("Agreement") is made as of December 19, 2014:

Between:      POR VIDA PRODUCTIONS, LLC and
DFL RELEASING, LLC
2290 Waltonia Drive, #1
Montrose, CA 91020
Tel/Fax: 310-623-7448/818-249-5807
Attn: Alan Jacobs; Email: ajacobs@archer-eg.com

Courtesy Copy to: Chris Brown
Tel: (617) 697-8212; Email: cbrown@brownrosen.com

("Licensor")

And:      PHASE 4 FILMS (USA), LLC
22 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 484-1000 / Fax (516) 484-4588

("Phase 4")

And confirms the terms and conditions of the agreement reached between Licensor and Phase 4 in connection with the acquisition by Phase 4 of certain distribution rights in the motion picture currently entitled "Down For Life" (the "Picture").

### DEAL TERMS

1. <u>Conditions Precedent.</u>  Phase 4 will have no obligation under this Agreement unless and until Licensor has satisfied the following conditions precedent:

   a) Delivery of executed originals of this Agreement;

   b) Delivery of chain of title documentation acceptable to Phase 4;

   c) Delivery of a copy of an errors and omissions insurance policy covering the Picture for at least the first three (3) years of the Term;

   d) Delivery, as part of chain of title, of underlying talent agreements including with Snoop Dog;

   e) Delivery of non-disturbance letters, in a form satisfactory to Phase 4, from all parties holding any security interest in the Picture or having any rights in connection with the Picture that could

impair or interfere with the Rights granted to Phase 4 in this Agreement.

These conditions precedent to the Agreement are for the sole benefit of Phase 4. In the event that any of them is not satisfied within forty-five (45) days the parties' execution of this Agreement, and Phase 4 does not provide a waiver in writing in its sole discretion, this Agreement will be null and void and Licensor will refund to Phase 4 any and all monies paid and actual out of pocket expenses incurred by Phase 4 pursuant to this Agreement:

2. Picture. The feature-length motion picture currently entitled "Down For Life," written and directed by Alan Jacobs, starring Danny Glover, Jessica Romero, and Snoop Dogg, shot in color in the English language on super 16mm film and delivered in HDCAM SR 4:4:4, capable of being projected with an aspect ratio of 1:1:85 with no hard matte, with a running time of 92 minutes (inclusive of main and end titles), and capable of receiving an MPAA rating no more restrictive than "R" (collectively, the "Specifications").

3. Territory. The universe, in all languages. The Territory will include all diplomatic posts and military and government installations of the countries comprising the Territory, wherever located, all ships principally operating in or serviced from the countries comprising the Territory, and all aircraft and oil rigs flying the flag of the countries comprising the Territory.

4. Term. Commencing on the date of this Agreement and ending fifteen (15) years from Phase 4's initial Video release of the Picture (the "Term"). For a period of six (6) months following the end of the Term, Phase 4 will have the right to continue to sell physical copies of the Picture which are manufactured prior to the end of the Term.

5. Rights. Licensor hereby grants, sells and assigns to Phase 4 the Rights (as defined below) in the Picture throughout the Territory during the Term. "Rights" means the sole and exclusive right under copyright to exhibit, distribute, market, display, project, transmit, broadcast, rebroadcast, perform, advertise, publicize, license, exploit, sell copies of and otherwise communicate the Picture in all media, by all means and methods now known or hereafter devised including, without limitation, by means of Cinematic, Ancillary, Video (Rental and Sell-Through), Newspaper Promotion/Covermount Rights, Partwork Rights, Electronic Rental, Electronic Sell-Through, Pay-Per-View, VOD, SVOD, NVOD, FVOD, AVOD, Pay TV, Free TV, any New Exploitation Methods developed during the Term of this Agreement, and all Allied and Incidental Rights in and to the Picture in the Territory (each as defined on Schedule "A" attached hereto).

6. Minimum Guarantee. Conditional upon Licensor complying with all of its obligations hereunder including, without limitation, Licensor having satisfied the conditions precedent set out in Paragraph 1, Phase 4 agrees to pay Licensor One Hundred and Twenty-five Thousand Dollars ($125,000) as a recoupable minimum guarantee (the "Minimum Guarantee"), payable  one hundred percent (100%) within thirty (30) days of Delivery, but in no event earlier than the Delivery Date, and recoupable from all monies otherwise payable to Licensor. Payment of any installment of the Minimum Guarantee requires submission of an invoice and any necessary tax forms to Phase 4at least two weeks before the payment is due If applicable, Phase 4 shall be entitled to deduct non-resident withholding tax on any amounts due and payable to Licensor. If Phase 4 decides to have a Cinematic/theatrical release on over 300 screens simultaneously, Licensor shall be paid an additional One Hundred and Twenty-Five Thousand Dollars ($125,000) due upon notifying Licensor of Phase 4's intention to have such a Cinematic release. Marketing expenses shall be capped at $200,000.00 on DVD marketing. Any marketing expenses thereafter shall be approved in writing by Licensor. There shall not be a cap on marketing any theatrical release.

7. <u>Application of Gross Receipts & Net Proceeds.</u> "Net Proceeds" with respect to the Picture will be defined, calculated, determined and paid as follows:

   a) From all Gross Receipts, Phase 4 first will be entitled to deduct and retain for its own account on a continuing and cumulative basis a distribution fee equal to thirty percent (30%) of Gross Receipts (as defined herein) (the "Distribution Fee").

   b) From the sum remaining, Phase 4 will be entitled to deduct and retain for its own account, on a continuing and cumulative basis, a sum equal to all Distribution Expenses.

   c) From the sum remaining, if any, Phase 4 will be entitled to deduct and retain for its own account, a sum equal to the Minimum Guarantee., plus Interest on such sum.

   d) The sum remaining, if any, will be considered "Net Proceeds" and will be payable to Licensor, subject to and in accordance with the terms hereof.

8. <u>Reserve Against Returns.</u> Phase 4 shall be entitled to establish and maintain a reserve against returns in an amount equal to twenty-five percent (25%) of Gross Receipts derived from the sale of Video Devices, provided that such reserves shall be liquidated within twelve (12) months of its establishment. Notwithstanding the foregoing, Phase 4 reserves the right to adjust the reserve for returns upward from time to time if Phase 4, in its good faith business judgment, believes that actual returns in a given reporting period will be significantly higher based on return authorization requests or otherwise.

9. <u>Access to Materials.</u> Licensor will provide Phase 4 with access to any marketing or bonus materials owned or controlled by Licensor at no cost to Phase 4 other than the cost of duplication, if required.

10. <u>Residuals.</u> Licensor shall deliver to Phase 4 no later than the Delivery Date, the following: (i) name and complete contact information of the payroll company used in the production of the Picture, (ii) written authorization, signed by such payroll company, providing Phase 4 with access to all relevant information concerning the Picture maintained by the payroll company and waiving any confidentiality with respect to such information, and (iii) the completed Residual Worksheet, as set forth in Schedule B ("Delivery Schedule") of this Agreement. For the avoidance of doubt, the Residual Worksheet is for information purposes only and Licensor is solely and exclusively responsible for any and all union or guild payments resulting from Phase 4's exploitation of the rights granted herein.

11. <u>Pre-Approval of Images.</u> Notwithstanding anything in this Agreement to the contrary, all images and likenesses of talent delivered by Licensor to Distributor pursuant to this Agreement are fully-cleared, pre-approved, and available for use by Distributor on the Video Device box and packaging with no restrictions whatsoever.

12. <u>French and Spanish Language Materials.</u> Licensor agrees that Phase 4 will have free access to any existing French-language and Spanish-language versions of the Picture and French-language and Spanish-language materials relating thereto, it being understood that Phase 4 will bear all duplication and shipping costs.

13. <u>Delivery Date.</u> Licensor will complete Delivery to Phase 4, in the manner set forth in Schedule "B", attached hereto, by no later than sixty (60) days following the parties' execution of this Agreement, unless extended by mutual agreement of the parties (the "Delivery Date").

These Deal Terms and the attached Schedules "A" (Standard Terms), "B" (Delivery Materials), "C" (E&O Protocol), "D" (Certificate of Authorship), "E" (Image Approval and Photo Credit), "F" (General Fact Sheet), and "G" (Distribution Expense Schedule), all of which are attached hereto and incorporated by reference constitute the Agreement between the parties. The provisions of these Deal Terms will govern and control over any conflicting provisions contained in any of the Schedules attached hereto. All capitalized terms used but not defined in the Deal Terms will have the meanings set forth in Schedule "A" or elsewhere in this Agreement.

**ACCEPTED AND AGREED TO:**

**POR VIDA PRODUCTIONS, LLC**

By: _Alan Jacobs_

Its:  Managing Director

Name:  Alan Jacobs

**DFL RELEASING LLC**

By: _Alan Jacobs_

Its:  Managing Director

Name:  Alan Jacobs

**ACCEPTED AND AGREED TO:**

**PHASE 4 FILMS (USA), LLC**

By: _____

Its: _____

Name: _____

PHASE 4 FILMS
Berry Meyerowitz
President & CEO

## SCHEDULE "A" – STANDARD TERMS

1. Definitions. All capitalized terms are specifically defined terms and are used as defined where they appear within quotation marks or otherwise as defined below:

"Advertiser Funded Video on Demand" or "AVOD" means the communication of the Picture to the public where viewer's right to view the Picture at a time selected by the viewer for each viewing is funded by advertising.

"Allied and Incidental Rights" means the rights set out in Paragraph 2 of these Standard Terms.

"Ancillary" means the exploitation of the Picture or part thereof by airlines, ships, hotels, as clips, as re-transmissions or by such other means that are ancillary to the primary means of exploitation as set out in these Standard Terms, including without limitation distributed as premiums or bundled (in both physical and digital formats) in any and all markets (including so-called "alternative markets")..

"Cinematic" means Theatrical, Non-Theatrical and Public Video exploitation of the Picture.

"Delivery" means delivery to and acceptance by Phase 4 of all items and materials specified in Schedule "B", all of which will be delivered at Licensor's sole cost and expense and in accordance with the Specifications.

"Distribution Expenses" means the aggregate of all costs and expenses paid or incurred or caused to be paid or incurred in connection with the distribution of the Picture in all applicable media, and any materials, marketing, publicity, promotion and advertising costs including without limitation MDF and coop advertising costs related thereto, and all applicable taxes actually paid in connection therewith. Notwithstanding the foregoing, an agreed fee schedule for certain Distribution Expenses relating to, manufacturing and fulfillment with respect to the US Territory is attached hereto as Schedule G. These Distribution Expenses are fully recoupable by Phase 4 in addition to those set forth above. Distribution Expenses shall also include those services that would traditionally be handled by a third party but are handled by an in-house department (such as graphic services), but shall exclude any overhead expenses. The charges for in-house distribution services will not exceed the applicable industry rate as if such services were rendered by an outside third party.

"Electronic Rental" means the communication of the Picture or part thereof to the public by means of transmission of an electronic copy via the Internet or private or virtual private networks (whether with or without an accompanying tangible copy) for the reception and temporary use and enjoyment of the Picture by consumers.

"Electronic Sell-Through" means the communication of the Picture or part thereof to the public by means of transmission of an electronic copy via the Internet or private or virtual private networks (whether with or without an accompanying tangible copy) for the reception and permanent use and enjoyment of the Picture by consumers.

"Free TV" means the communication of the Picture to the public without a charge to the viewer for the privilege of viewing the Picture and includes a circumstance where a viewer pays a fee or other consideration for a separate service or package (whether television, telephony or otherwise) and as a result of which the viewer is automatically entitled to view the Picture without having to pay any additional fee, provided that for this purpose government television assessments or taxes (but not a charge as for Pay Per View or Pay TV) will not be deemed a charge to the viewer.

"Free Video on Demand" or "FVOD" means the communication of the Picture to the public where no charge is made to the viewer for the right to view the Picture at a time selected by the viewer for each viewing.

"Gross Receipts" means all monies actually received by Phase 4 for any right or license to exhibit, broadcast, distribute, perform, communicate to the public (including, the right to broadcast and make available), sell, rent, lend or otherwise exploit the Picture, less account discounts, refunds and returns. Any and all advances paid by the exhibitors or any other party will form part of Gross Receipts when such advances are received by Phase 4, if non-returnable, otherwise when received and earned by Phase 4. Gross Receipts derived from Phase 4's exhibition, distribution and exploitation of the Picture will be apportioned and paid in accordance with the attached Deal Terms. Notwithstanding anything to the contrary contained herein, Gross Receipts derived from the exploitation of the Video rights by eOne's Canadian affiliate, Entertainment One Films Canada ("eOne Canada"), will not be deemed to include monies received by eOne Canada's wholesale distribution affiliate, Entertainment One Distribution Canada, but rather the monies received by eOne Canada *from* Entertainment One Distribution Canada; provided that all transactions between eOne Canada and Entertainment One Distribution Canada will be done as if at arms-length and on market terms.

"Interest" means the annual rate equal to the prime rate from time to time in effect at Phase 4's principal bank prime rate as set from time to time plus two percent (2%), calculated and compounded monthly from the date(s) of advance to the date of recoupment.

"Internet" means the global data network consisting of interconnected facilities and networks which communicate using the international protocol known as TCP/IP (Transmission Control Protocol/Internet Protocol) and related protocols and standards, and includes any derivative or future version thereof.

"Internet Distribution" means the communication of the Picture or part thereof to the public via the Internet (but excluding Electronic Rental, Electronic Sell-Through and Wireless Distribution), provided that such exploitation will be limited to transmission (including residence on, or transmission via, servers) within the Territory to intermediate or ultimate users in the Territory by technical means which are designed to prohibit access (either directly or indirectly) to any person outside the Territory.

"New Exploitation Methods" means new (or changed) technology, uses, media, formats, modes of transmission and methods of distribution, dissemination, exhibition, or performance developed in the future, not specifically enumerated herein, which will offer Phase 4 new opportunities for exploiting the Picture.

"Near Video on Demand" or "NVOD" means the communication of the Picture to the public where a charge is made to the viewer for the right to view the Picture at a time within a short period of the time selected by the viewer for each viewing.

"Newspaper Promotion/Covermount Rights" means the right to distribute or authorize others to distribute the Videograms of the Picture free of charge in connection with newspaper/magazine covermounts and/or redemptions.

"Non-Theatrical" means exploitation of the Picture only for direct exhibition before an audience by and at the facilities of either organizations not primarily engaged in the business of exhibiting motion pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red

Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the Territory.

"Partwork Rights" means the right to create or license others to create magazines and/or other printed material related to the Picture (e.g. trivia about the talent, "behind the scenes" information etc) in order to sell the Videograms of the Picture together with such magazines/printed material. For the avoidance of doubt, Partwork Rights shall exclude novelization rights.

"Pay-Per-View" means the communication of the Picture to the public where a charge is made to the viewer for the right to view the Picture at a time designated by the party that transmits the Picture.

"Pay TV" means the communication of the Picture to the public where a charge is made to the viewer for use of a decoding device to view a linear channel that includes the Picture along with other programming.

"Public Video" means exploitation of the Picture by Video for direct exhibition before an audience in a "mini-theater", an "MTV theater" or like establishment that charges an admission to use the viewing facility or to view the Picture, and that is not licensed as a traditional motion picture theater in the place where the viewing occurs.

"Subscription Video on Demand" or "SVOD" means a subscription VOD service whereby a regular charge is made to the viewer in respect of a certain period, during which period the viewer can view the Picture an unlimited number of times at times selected by the viewer for each viewing.

"Television" means exploitation of the Picture by means of "Free TV," "Pay-Per-View," "Pay TV," and "TV-VOD," as those terms are defined herein.

"Television-Based Video on Demand" or "TV-VOD" means the communication of the Picture to the public where a charge is made to the viewer for the right to view the Picture at a time selected by the viewer for each viewing by means of a cable-, satellite-, or telco-based television system. For the avoidance of doubt, TV-VOD excludes any Internet-based demand viewing services, such as Amazon's non-Prime VOD service, which are included in the definition of Transactional VOD, above.

"Theatrical" means exploitation of the Picture only for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, that are open to the general public on a regularly scheduled basis and that charge an admission fee to view the Picture.

"Video" means the distribution and exploitation of the Picture on any tangible medium (whether now known or hereafter created) including, but not limited to, videocassette, compact disc, DVD, videodisc, Blu-Ray disc, HD-DVD, memory or data card or any other electronic storage device ("Videograms"), whether by sale, rental, lending or otherwise.

"Video Rental" means exploitation of a Video embodying the Picture that is rented to the viewer only for non-public viewing of the embodied Picture in a linear form within a private living place where no admission fee is charged for such viewing (but does not include Electronic Rental or Internet Distribution).

"Video Sell-Through" means exploitation of a Video embodying the Picture that is sold to the viewer only for non-public viewing of the embodied motion picture in a linear form within a private living place where no admission fee is charged for such viewing (but does not include Electronic Sell-

Through or Internet Distribution).

"Video on Demand" or "VOD" means the communication of the Picture to the public where a charge is made to the viewer for the right to view the Picture at a time selected by the viewer for each viewing.

"Wireless Device" means any portable device whose primary purpose is for the connection to and use of mobile telecommunications networks to send and receive voice and data.

"Wireless Distribution" means the transmission of audiovisual content to Wireless Devices (whether such devices are now known or hereafter invented) using mobile telecommunications or broadcast technology but excluding always any fixed wireless or 'last mile' technologies including (without limitation) microwave, UNII, MMDS, LMDS, WiFi, WiMAX or any combination of them.

"Wireless" means the communication of the Picture to the public using Wireless Distribution for reception on a Wireless Device.

2. <u>Allied and Incidental Rights.</u> In addition to the Rights, Licensor hereby grants and licenses during the term to Phase 4 all allied and in connection with the Picture and the advertising, marketing, publicity and promotion thereof, throughout the Territory, for the Term, including, without limitation, the following:

a) <u>Advertising and Publicity.</u> All advertising and publicity rights and the sole and exclusive right to advertise, market, publicize, and promote the Picture in any and all parts of the Territory by any and all methods and means in any and all media including, without limitation, over the Internet and through on-line media. Phase 4 also will have the right to use any advertising, marketing, packaging and promotional material created by Licensor and will have complete discretion with respect to the use of any and all such material or any variation, modification or version thereof.

b) <u>Name and Likeness.</u> The right to use the names, photographs, likenesses, non-photographic likenesses, caricatures, biographies, acts, poses, sound effects and voices of all talent engaged in connection with the Picture, including the director, in connection with the advertising, marketing, promotion, publicity, distribution, exhibition and exploitation of the Picture and in commercial tie-ins and cross-promotions in any and all parts of the Territory in any and all media including, without limitation, over the Internet and through on-line media, it being understood and agreed that Phase 4 will comply with any restrictions contained in third party agreements of which Licensor will give Phase 4 written notice on or before the Delivery Date.

c) <u>Title/Dubbing/Subtitling.</u> The right to select, designate and change the title of the Picture, in Phase 4's sole discretion, and to release the Picture in any or all parts of the Territory under such title as Phase 4 may designate. Phase 4 also will have the right to dub and subtitle the Picture, clips, excerpts and trailer into all languages and the right to use any such clips, excerpts and trailers, including, without limitation, from dubbed and subtitled versions, to advertise and promote the Picture in any and all media, it being understood and agreed that Phase 4 will comply with any dubbing restrictions contained in third party agreements of which Licensor will give Phase 4 written notice on or before the Delivery Date. Phase 4 will have free access to all available language tracks; provided, however, that Phase 4 will pay for the cost of duplication and shipping for any such materials and recoup as a Distribution Expense.

d) <u>Cutting and Editing.</u> The right to cut, edit, time compress, and/or alter the Picture, change the format, insert commercial trailers, added-value material and the like to conform to broadcast

requirements and to comply with legal or ratings restrictions in a territory it being understood and agreed that Phase 4 will comply with any contractual cutting rights accorded to the director of which Licensor will give Phase 4 written notice on or before the Delivery Date.

e) <u>Name and Logo.</u> The right to include Phase 4's (or one or more of Phase 4's or any of Phase 4's affiliates', licensees' or sublicensees') name, logo, trademark, emblem and standard "opening" and "closing" sequences, in such manner, position, form and substance as Phase 4 may determine, in its sole discretion, in connection with Phase 4's exercise of the Rights, and in all advertising and packaging and in promotional and publicity materials for the Picture (including any trailers of the Picture), together with such words as Phase 4 may determine, in its sole discretion, indicating that the Picture is being distributed in the Territory by Phase 4 or any of Phase 4's affiliates, licensees or sublicensees.

f) <u>Retransmission Royalties.</u> The right to collect retransmission royalties payable in connection with exploitation of the Picture in the Territory, it being understood that all such retransmission royalties collected by Phase 4 will be included in Gross Receipts.

g) <u>Music Publishing.</u> The right to administer any and all music, including title, music and lyrics (other than so-called "source music") used in the Picture in the Territory.

h) <u>Enforcement and Protection.</u> The right (but not the obligation) to enforce and protect the rights herein sold and assigned to Phase 4 and to prevent the infringement thereof, including, without limitation, copyright infringement and to collect (and maintain for Phase 4's own account) damages, profits, penalties, and costs in connection with any infringement thereof and to institute or defend any action or maintain litigation in connection therewith. Phase 4 may join Licensor as party plaintiff or defendant in any such action or litigation.

3. <u>Advertising & Bonus Materials.</u> Licensor will deliver to Phase 4 all marketing, advertising, promotional and publicity materials, including promo reels of the Picture, as are available to Licensor. In addition, Licensor will use its best efforts to provide Phase 4 access to all marketing, advertising, promotional and publicity materials created by any other distributor of the Picture without additional payment or fee (except payment for the cost of duplicating such materials and shipping charges). Phase 4 will have the right to manufacture or cause to be manufactured such marketing, advertising, promotional and publicity material as it deems necessary for exhibition, distribution and exploitation of the Picture in the Territory. Phase 4 agrees to provide Phase 4 with any and all special feature, bonus or added-value material, including without limitation, making-of materials created in connection with the Picture, behind-the-scenes footage, b-roll, bloopers and outtakes, cast and/or crew interviews, commentaries, music videos and all other similar materials created in connection with the Picture (the "Bonus Materials") in both a DLT format and separately in a format suitable for DVD authoring. Licensor represents and warrants that it will obtain all required authorizations, consents, releases and/or licenses which may be necessary for the use of the Bonus Materials hereunder in the Territory including, without limitation, authorizations, consents, releases and/or licenses from those who either appear recognizably in the Bonus Materials or the results and proceeds of whose services are utilized in the Bonus Materials; and any unions and guilds, to the extent required under applicable collective bargaining agreements. Licensor is solely responsible for all residuals, royalties, re-use payments and similar amounts owing or which will be owed in respect of the Bonus Materials, if any. Licensor will ensure that the E&O policy provided to Phase 4 in accordance with this Agreement includes coverage of the Bonus Materials, and will provide Phase 4 with evidence of such coverage. Phase 4 will have the right to produce, include and distribute special features, bonus or added-value materials or other promotional material and programs with respect to the Picture (whether created by Phase 4 or acquired by Phase 4 as part of Delivery), it being understood and agreed that Phase 4 will

comply with any restrictions contained in third party agreements of which Licensor will give Phase 4 written notice on or before the Delivery Date.

4. Delivery. Phase 4 will have thirty (30) days from delivery of the delivery materials set forth in Schedule "B" hereto to review such delivery materials and to advise Licensor of any materials which have not been delivered to Phase 4 or of any deficiencies relating thereto, and Licensor will thereafter correct such deficiencies to the satisfaction of Phase 4 within twenty (20) days. If Phase 4 is required to submit materials to its laboratory for quality check more than once, the costs of such additional evaluations shall be deducted from the Minimum Guarantee. In the event Delivery to Phase 4 is not complete by the Delivery Date, Phase 4 will have the option, in its sole discretion, of (i) extending the applicable date, (ii) declaring this Agreement null and void, in which case all amounts paid to Licensor will be repayable to Phase 4 forthwith, with Interest, (iii) creating any items required to complete Delivery and to recoup all of the costs associated therewith as Distribution Expenses or from monies otherwise due to Licensor hereunder. All of the delivery materials will be as near to first generation as reasonably possible and in any event, of first class quality and suitable in all respects for the manufacture of top quality materials therefrom, for the sale, promotion and exploitation of the Picture as permitted hereunder to a high commercial standard. Nothing herein will relieve Licensor of its obligations to deliver the Picture hereunder.

5. Third Party Restrictions. Notwithstanding Phase 4's obligation to comply with certain provisions of certain third party agreements of which Licensor will give Phase 4 written notice on or before the Delivery Date, no casual or inadvertent failure to so comply will be deemed a breach of this Agreement nor entitle Licensor or any third party to injunctive or other equitable relief.

6. Phase 4's Duty. Phase 4 accepts the license herein granted to it and will in good faith endeavor to distribute and exploit the Picture within the Territory with a view to maximizing Net Proceeds however, nothing herein will be construed as a representation of Phase 4, express or implied, as to the amount of Gross Receipts or Net Proceeds to be realized pursuant to its distribution activities or that there will be sums payable to Licensor hereunder. Phase 4 will have sole charge and control concerning the advertising, marketing, distribution and exploitation of the Picture in the Territory, in any manner and media as Phase 4 may determine.

7. Credits.
   a) Phase 4 will be entitled to have its animated logo in first position on screen (i.e. prior to any other logo or credit before the start of the Picture) and a logo credit in all artwork and paid advertising in respect of the Picture.

   b) Phase 4 will be entitled to a sole presentation credit on screen in the main titles of the Picture and a first position presentation credit in the billing block portion of all paid advertising in respect of the Picture.

   c) Phase 4 will not alter or knowingly permit to be deleted any of the credits which appear upon the Picture or which Phase 4 is notified in writing as contractually required to appear in all paid advertising. No casual or inadvertent failure of Phase 4 to comply with the provisions of this Paragraph will constitute a breach of this Agreement. In the event of a failure on the part of Phase 4 or any third party to comply with this Paragraph, Phase 4's sole obligation will be to take all commercially reasonable steps to prospectively cure such failure after receipt from Licensor of notice of such failure following receipt of written notice thereof from Licensor.

8. Cross-Collateralization. Except as may be provided in the Deal Terms or any other agreement between Phase 4 and Licensor, Phase 4 will not cross-collateralize the Gross Receipts and

Distribution Expenses and the Minimum Guarantee related to the Picture with any other television program or film or any works derived therefrom. Phase 4 will be entitled to fully cross-collateralize all revenues and expenses related to the Picture in all media in all parts of the Territory, including all print and advertising and other Distribution Expenses. The allocation of expenses and revenues to the Picture will be made in accordance with Generally Accepted Accounting Principles, consistently applied, without discrimination.

9. <u>E&O Insurance.</u> Licensor agrees to secure and maintain, at its own expense and for the first three (3) years from the Delivery Date, errors and omissions insurance for the Picture on terms approved by Phase 4 (in accordance with the protocol set forth on Schedule "C") (note: policies containing rights period endorsements will not be accepted unless producer is covered for three (3) years under the policy). Licensor will provide to Phase 4 a copy of the policy and a certificate of insurance which will provide that such insurance has a coverage limit of no less than US$1,000,000 per claim and US$3,000,000 in the aggregate with a deductible of no more than US$25,000, with no non-standard exclusions, and including coverage for the title of the Picture and any and all music and/or film clips contained therein, and otherwise in accordance with the protocol set forth on Schedule "C." Upon request by Phase 4, Licensor will promptly cause additional parties who have been licensed rights in the Picture by Phase 4 to be added as Additional Insureds to the policy and provide Phase 4 with a related certificate.

10. <u>Internet Rights.</u> Licensor grants Internet Distribution rights to Phase 4; provided that customary technological protection used in the industry is employed to reasonably limit the Internet Distribution of the Picture to within the Territory and to restrict the unauthorized copying or dissemination of the Picture. Notwithstanding the foregoing, the parties acknowledge and agree that when the Picture is transmitted through the Internet or similar on-line network for broadcast and/or reception in the Territory, there is a possibility that such transmission may be capable of broadcast and/or reception outside of the Territory ("Internet Overspill"). The parties agree that the occurrence of Internet Overspill will not be deemed a breach of this Agreement or entitle Licensor to injunctive or other equitable relief, and, specifically, that the occurrence of Internet Overspill will not require Phase 4 to cease its Internet Distribution of the Picture. Nothing herein will derogate from Phase 4's right to publicize, promote, market and advertise the Picture over the Internet or otherwise.

11. <u>Music.</u> Licensor will ensure that all synchronization and master recording licenses relating to music contained in the Picture and any other material relating to the Picture provided by Licensor (including without limitation trailers, bonus materials and DVD menus) will be cleared for use by Phase 4 in all media in the Territory for the entire Term on a complete buyout basis; provided, however, that if Phase 4 does not use materials provided by Licensor, and instead chooses to create its own materials, the cost of any and all clearances required as a result of their use in the Territory will be considered a Distribution Expense.

12. <u>Subsequent Productions.</u> Licensor hereby grants to Phase 4 the exclusive right of first negotiation and last match to distribute all theatrical motion picture sequels, prequels, remakes, movies of the week, mini-series, television series and any linear or non-linear interactive programs of any kind (including programs on CD-ROM and CD-I, video games, etc.) based on, adapted from or in any way derived from the Picture and/or any underlying rights (to the extent such rights are available) upon which the Picture is based, including the title thereof, (a "Subsequent Production"), in the Territory. In the event Licensor elects to acquire or produce a Subsequent Production, Licensor will notify Phase 4 in writing and Licensor and Phase 4 will, for the thirty (30) business day period following such notice, negotiate in good faith to conclude an agreement under which Phase 4 will acquire distribution rights, in the Territory, in and to such Subsequent Production. If no agreement is reached during such period, Licensor thereafter may negotiate with a third party with respect thereto, subject

to the following: if Licensor receives any third party offer to purchase, license or otherwise acquire rights to the Picture (and Licensor proposes to accept such offer), Licensor will notify Phase 4 in writing of such offer, the name of the offeror, and the proposed terms of such offer. For the fifteen (15) business day period following Phase 4's receipt of such notice, Phase 4 will have the exclusive right to acquire such rights on the same terms as are set forth in such notice. If Phase 4 elects to exercise such right, Phase 4 will notify Licensor in writing within such fifteen (15) business day period. Phase 4 will not be required to meet terms which cannot be as easily met by one (1) person or entity as by another. If Phase 4 fails to notify Licensor within such period, Licensor may accept such third party offer, but only upon the same terms set forth in the notice from Licensor to Phase 4. Phase 4's right, as aforesaid, will revive if no agreement with such third party based upon such terms is consummated within the following sixty (60) day period.

13. <u>Extension / Renewal of the Term.</u> Licensor hereby grants to Phase 4 the exclusive right of first negotiation and last match to renew or extend the Term in the Territory. Such right of first negotiation and last match process will proceed as follows: Phase 4 will have the right, and Licensor will have the obligation, for the thirty (30) business day period preceding the expiration of the Term, to negotiate exclusively and in good faith with respect to an extension of the Term. If no agreement is reached during such period, Licensor thereafter may negotiate with a third party with respect thereto, subject to the following: if Licensor receives any third party offer to purchase, license or otherwise acquire rights to the Picture (and Licensor proposes to accept such offer), Licensor will notify Phase 4 in writing of such offer, the name of the offeror, and the proposed terms of such offer. For the fifteen (15) business day period following Phase 4's receipt of such notice, Phase 4 will have the exclusive right to acquire such rights on the same terms as are set forth in such notice. If Phase 4 elects to exercise such right, Phase 4 will notify Licensor in writing within such fifteen (15) business day period. Phase 4 will not be required to meet terms which cannot be as easily met by one (1) person or entity as by another. If Phase 4 fails to notify Licensor within such period, Licensor may accept such third party offer, but only upon the same terms set forth in the notice from Licensor to Phase 4. Phase 4's right, as aforesaid, will revive if no agreement with such third party based upon such terms is consummated within the following thirty (30) day period.

14. <u>Representations & Warranties.</u> Licensor hereby represents and warrants that:
   a) Licensor is a corporation validly existing and in good standing under the laws of the jurisdiction in which it is located.

   b) Licensor has, and will continue to have throughout the Term, the full right, power, legal capacity and authority to enter into this Agreement and to grant all rights purported to be granted herein. No consent or release of any other person, firm or entity is necessary in order for Licensor to enter into this Agreement and/or grant to Phase 4 the right to exercise the Rights.

   c) Licensor controls, and during the Term will control, without any limitation or restriction (subject to any requirements and/or restrictions imposed by any third party contracts notified in writing to Phase 4 at least four (4) weeks prior to the Delivery Date), or encumbrances of any kind whatsoever (subject to any security interests granted to the Picture's financier(s), completion guarantor, any guild and/or union with proper jurisdiction over the Picture (i.e., SAG, DGA, WGA, IATSE, etc.), and/or any liens taken by laboratories or other service providers performing services on the Picture, which will not, in any event, disturb the Rights granted to Phase 4 hereunder), any and all rights of every kind and character necessary and/or desirable to enable Licensor to grant Phase 4 the right to exercise the Rights granted pursuant to this Agreement (without Phase 4 incurring any obligation or liability to any person or entity), including, but not limited to, all performance rights, distribution and advertising rights and all other rights to enable Phase 4 to exercise the Rights granted to Phase 4 under this Agreement in and to all literary,

dramatic, musical, and other material contained in the Picture. Licensor has secured and obtained, and Licensor will maintain throughout the Term hereof, all necessary licenses, permissions and releases as may be required for the full and unlimited exercise and enjoyment by Phase 4 of the Rights granted herein. The Rights are now and will remain, for the Term, as same may be extended, clear, exclusive, unencumbered and free of any charges or claims, security interests or mortgages.

d) Every musical composition contained in the Picture and every performance of a musical composition contained in such Picture has been licensed for use in and in connection with the Picture for the entire Term on a "flat buy-out basis" for the Territory, so that no payment of any kind will be required (whether based on home video sales or otherwise) other than the one-time fixed fee provided in the applicable license, all of which fees have been fully paid; and in particular, no residuals, royalties, reuse fees, mechanical rights fees or any other fees or costs of any kind will be required for use of any such performance or composition as contemplated herein.

e) With respect to each musical composition in the Picture, the non-dramatic public performance rights necessary for exhibition and exploitation of the Picture hereunder are: (A) controlled by American Society of Composers, Authors and Publishers, Broadcast Music, Inc., SESAC or SOCAN or its affiliates, (B) in the public domain, or (C) owned by or licensed to Licensor, so that no additional clearance of, or payment with respect to, such rights is required for use in the Picture.

f) All costs of production and all obligations and amounts payable with respect to the production of the Picture, including, without limitation, all compensation, salaries, royalties, license fees, service charges, laboratory charges, union obligations and the like have been and will be fully paid and satisfied by Licensor prior to Delivery of the Picture (except for those laboratory or service charges incurred directly by Phase 4 for its own account).

g) Licensor will be responsible and will timely pay when due, and Phase 4 will under no circumstances have any responsibility or obligations with respect to, any and all fees, payments, costs, and charges associated with the production of the Picture, (including, without limitation, all salaries, fees, payments, costs or charges payable to any producer, director, writer, actor, performer, artist, talent, composer, lyricist, musician, and/or any other person who performed services or furnished material in connection with the Picture; and any and all fees, charges, costs and amounts payable to any guild, union, performing rights society, publisher or owner of master recordings) and/or to any other person or entity by reason of the exercise by Phase 4 of any of the Rights granted to it hereunder. Without limiting the generality of the foregoing, Licensor will be solely responsible for all clearances, residuals, royalties, new use, re-use, profit participations, and other third party payments relating to or arising from the production, distribution or other exploitation of the Picture.

h) All advertising, marketing, packaging and promotional material supplied by Licensor to Phase 4 hereunder including, without limitation, material supplied by Licensor to Phase 4 for Phase 4's creation of Bonus Materials, as well as Bonus Materials which are created by Licensor and supplied to Phase 4, is clear and free of any charges or claims and will not violate or infringe any rights of any kind or nature of any person or entity.

i) There is no action, suit or proceeding relating to the Picture pending or threatened before any court, or administrative or governmental body which might adversely affect any of Phase 4's rights hereunder.

j)   There are no defects in the chain-of-title to the Picture, and/or any other literary, musical or
     dramatic material upon which the Picture is based, which might adversely affect any of Phase 4's
     rights hereunder.

k)   Licensor has not itself nor has or will it authorize any third party to exploit the Picture in any
     media in the Territory during the Term of this Agreement and Licensor has not granted and will
     not grant any rights to any third parties which are or might be inconsistent with or derogate from
     the exclusive rights granted or purported to be granted to Phase 4 herein.

l)   All persons furnishing services or granting rights in the Picture will have authorized the use of
     their name, likeness and biographical data (pursuant to binding agreements which are assignable
     to Phase 4) in the advertising and promotion of the Picture and Licensor has obtained all of the
     necessary consents, clearances, agreements and documentation required in order for to be
     permitted to employ the names and likenesses of all persons or entities appearing in a
     recognizable way in the Picture in all of the publicity, promotion, marketing and advertising
     related to the Picture in the Territory.

m)   Licensor has complied with all credit obligations, whether they arise contractually or through
     provisions of a union, collective or guild agreement and there are no unusual restrictions affecting
     the Picture, the exploitation, publicizing or advertising thereof of which Phase 4 has not been
     notified in writing prior to the Delivery Date.

n)   The Picture is protected or is capable of being protected by copyright in the Territory, and the
     Picture will not fall into the public domain anywhere in the Territory prior to the expiration of the
     Term.

o)   The Picture and the screenplay (including the plot, characters, title, action, dialogue, music,
     design, and the content thereof) will not violate or infringe, nor will the exploitation of the Rights
     by Phase 4 pursuant to this Agreement violate or infringe, upon the trademark, trade name,
     copyright, patent or any other similar right, or defame or violate any rights of privacy or
     publicity, moral rights or any other rights of any kind or nature of any person or entity.

p)   No actual sexually explicit conduct ("ASEC"), lascivious exhibition of genitalia ("LEG"), or
     simulated sexually explicit conduct ("SSEC"), as described in 18 USC §§ 2256 et seq. and 28
     C.F.R §§75.1 et seq, (popularly known as the "Pence Amendment"), and recorded during the
     applicable effective dates described therein, is contained in any footage delivered to Phase 4
     pursuant to this Agreement; provided, however, that if Phase 4 determines (in its sole discretion)
     that such conduct is contained in the footage delivered, then, upon written notification provided to
     Licensor of such determination, Licensor shall promptly provide to Phase 4 (or if applicable,
     promptly procure from the producer of the Picture and provide to Phase 4): (i) records
     establishing that the footage in question was recorded before the applicable effective date; (ii) if
     the footage in question contains LEG or SSEC only, rather than ASEC, a signed copy of the
     certification to the Attorney General of the United States as provided by 18 U. S.C. § 2257A and
     28 C.F.R. § 75.9 (the "Certification") in a form acceptable to Phase 4; or (iii) if no Certification
     for LEG or SSEC is available, or the footage contains ASEC, copies of any and all records
     required to be kept under the record-keeping and other reporting and labeling obligations set forth
     in the Pence Amendment, including without limitation the following information for each person
     who appears in the Picture: (A) all names ever used by each performer (including, but not limited
     to, maiden name, alias, nickname, stage name or professional name) and each performer's address
     and (B) a legible photocopy of each performer's government-issued identification card, such as a
     driver's license or passport, which contains a recent and recognizable photograph of the

performer. In addition, if the delivered footage contains either (a) ASEC, or (b) LEG or SSEC for which no Certification is available, then Licensor shall ensure that each copy of the footage, and the end credits provided to Phase 4, contain the statement required pursuant to U. S.C. § 2257 and 28 C.F.R. § 75.6.

q) eOne may register eOne's rights in the film  with the U.S. Copyright Office.

15. <u>Phase 4 Representations and Warranties.</u> Phase 4 represents and warrants to Licensor that Phase 4 has all the rights, capacity and authority necessary to enter into this Agreement and to perform all of its obligations hereunder.

16. <u>Indemnity.</u>
    a) Licensor will at all times, and at its own cost and expense, defend, indemnify and hold harmless Phase 4, its parent, subsidiary and affiliated companies, and their respective successors, licensees, exhibitors, broadcasters, distributors, and assigns and their respective officers, directors, shareholders, employees, attorneys, agents and other representatives from and against any and all claims, actions, suits, judgments, obligations, damages, losses, penalties, liabilities, costs and expenses (including, without limitation, court costs and reasonable attorney fees and disbursements) of whatsoever kind and nature imposed on, incurred by, or asserted against Phase 4 in any demand, action, suit, claim or proceeding between Phase 4 and any third party or otherwise, arising out of or in connection with the exercise of any of the Rights granted herein or out of any breach by Licensor of any representation, warranty, covenant or other provision set forth in this Agreement.

    b) Phase 4 will at all times, and at its own cost and expense, defend, indemnify and hold Licensor harmless from and against any and all claims, actions, suits, judgments, obligations, damages, losses, penalties, liabilities, costs and expenses (including, without limitation, court costs and reasonable attorney fees and disbursements) of whatsoever kind and nature imposed on, incurred by, or asserted against Licensor in any demand, action, suit, claim or proceeding between Licensor and any third party, arising out of or in connection with any breach by Phase 4 of any representation, warranty, covenant or other provision set forth in this Agreement. Phase 4 will honor this indemnity in the event of any sublicense of the Rights or appointment of an agent.

17. <u>Accounting Records.</u> Phase 4 will keep and maintain at its offices complete, detailed, and accurate books of account and other records relating to the exhibition, distribution and exploitation of the Picture. During the Term and for a period of two (2) years after the expiration thereof, Licensor will at its own expense (through an independent Certified Public Accountant) experienced in film audits (who will not be employed on a contingency basis) have access (no more frequently than once per year) on reasonable written notice and during customary business hours to all said books and records insofar as they relate to the Picture and the exhibition, distribution and exploitation thereof. It is a precondition of any claim that Licensor supplies Phase 4 with a copy of the relevant audit report within sixty (60) days of completion of the inspection.

18. <u>Accounting Reports.</u> Phase 4 will make and deliver to Licensor reports ("Report" or "Reports") relating to the Picture in which there will be set forth statements of all Gross Receipts and Distribution Expenses in connection with the Picture. Each such Report will be delivered to Licensor no later than sixty (60) days following the accounting period for which the same relates and each statement will be followed by a remittance to Licensor of the amount due and payable to Licensor pursuant to the terms of this Agreement upon Phase 4's receipt of Licensor's invoice. Such Reports will be delivered quarterly for the first 2 years following Delivery and semi-annually thereafter. Phase

4 will have the right to withhold from any payment to be made hereunder, such taxes as may be prescribed under the laws of the United States as modified by the Territory or any part thereof. Any objection of Licensor to any item or information in any Report must be delivered in writing to Phase 4 within two (2) years of the date of such Report or be thereafter barred, including any action or proceeding based thereon. If an objection is not resolved amicably, Licensor may institute an action with respect to such objection, provided that such action is commenced within six (6) months after the expiration of said two (2) year period. The inclusion in any Report of transactions or items which have appeared in a previous Report will not renew or extend the time for objections or the time within which an action based on such transaction or item can be brought. Phase 4's books of account and all supporting documents need not be retained or preserved and Licensor will not have access to all said books and records beyond said two (2) year period unless Licensor has timely objected and instituted an action.

19. <u>Withholding Taxes.</u> Any portion of receipts from distribution not received due to withholding tax or similar taxes of any jurisdiction shall not be included in Gross Receipts and shall not be treated as a Distribution Expense. If neither Phase 4 nor Licensor can take the benefit of a tax credit resulting from the withholding tax, then the amount withheld shall not at any time be included in Gross Receipts. If Phase 4 can take the benefit of a tax credit, then the credit amount shall be added to Gross Receipts and Phase 4 shall be entitled to its Distribution Fee on such receipts. If Licensor takes the benefit of the tax credit, then the amount of that credit shall be added to Gross Receipts and Phase 4 shall be entitled to a Distribution Fee on such amount.

20. <u>Residuals.</u> Licensor shall be solely responsible for payment of any union or guild residuals required to be paid based on Phase 4's exploitation of the Rights pursuant to this Agreement. Licensor shall deliver to Phase 4 written documentation evidencing the timely payment of residuals to a payroll company administering residuals in connection with the Picture, or directly to the guild(s) or to the relevant individual(s), failing which Phase 4 shall be entitled to deduct from monies otherwise payable to Licensor (i) a reserve in the amount of the anticipated Residual Payment amounts ("Residual Reserve") such Residual Reserve to be liquidated as and when Residual Payments are made in a timely manner as and when such Residual Payments are due to the guilds, and (ii) any direct, actual, out-of-pocket costs or expenses associated with the payment or calculation of the Residual Payments, including but not limited to, the use of payment or payroll processing services and all Residual Payments shall be recoupable as a Distribution Expense. Phase 4 will calculate the Residual Payments based upon the accounting statements rendered by Phase 4 to Licensor pursuant to this Agreement and based upon the information given to Phase 4 as part of Delivery.

21. <u>Censorship.</u> This Agreement is subject to and it is a condition precedent that the relevant censorship board in the Territory issue, without undue delay, both theatrical and video classification certificates for exploitation of the Picture in the Territory no more restrictive than the rating set out in the Deal Terms and Phase 4 obtaining equivalent certification from the relevant certifying bodies in all the countries comprising all or any part of the Territory. In the event that for either theatrical or video release, the Picture is banned or restricted as determined by such relevant certifying body, and cuts or alterations cannot make the Picture suitable for commercial exploitation in respect of any part or parts of the Territory as determined in Phase 4's good faith business judgment, or if no certificate for theatrical and/or video release has been issued within two (2) months from submission, then Phase 4 will be entitled to terminate this Agreement as a whole, or with respect to any such affected part or territory only, if this is practical to do so, and if as to a part only, Phase 4 will at any time thereafter (unless Minimum Guarantee and Distribution Expenses are recouped) be entitled to a refund of a portion of the payments made hereunder in proportion to the weight the affected part bears to the whole, less any recoupment, or if as to the whole, to a complete refund. Pending the receipt of such refund by Phase 4 (which Licensor will ensure is made within thirty (30) days of termination

hereunder), Phase 4 may set-off an equivalent amount against such sums (if any) as are payable by Phase 4 to Licensor pursuant to this Agreement.

22. Force Majeure. Neither Phase 4 nor Licensor will be deemed to be in default hereunder for any delay or failure of performance on the part of any or either of them due to strikes not reasonably foreseeable, labor disturbances, failure or delay of transportation facilities, failure of transmission facilities, satellite failure, acts of God, act of government, war or other similar events which could not reasonably be foreseen and which are not reasonably within the control of Phase 4 or Licensor ("Force Majeure Event").

23. Notices. Any and all notices which any party will desire or be required to give to the other hereunder will be in writing and must be personally delivered or be sent by registered or certified mail, postage prepaid, by courier and/or by fax at the addresses set out in the Agreement, or to such other address as any party may designate by written notice to the other during the Term. Any such notice will be deemed to have been delivered: (a) immediately in the case of personal delivery; (b) in the case of postal delivery on the second business day following the date of posting (the fifth business day if posted to another country) or on acknowledgement of receipt if earlier; or (c) in the case of email the date of the sender's read receipt (only if a read receipt is available).

24. Confidentiality. Neither party will disclose to any third party (other than their respective employees, in their capacity as such) any information with respect to the financial terms of this Agreement except: (a) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction; (b) as part of its normal reporting or review procedure to its parent or subsidiary company, its partners, its auditors and its attorneys; and (c) in order to enforce or defend its rights pursuant to this Agreement in a legal proceeding. Phase 4 and Licensor will mutually review and approve any press release in respect of the Picture in the Territory.

25. Successors and Assigns. This Agreement will inure to the benefit of and be binding upon Licensor and its successors and assigns and upon Phase 4 and its successors and assigns. Notwithstanding the foregoing, Licensor may not make any assignment of any of its rights or obligations under this Agreement, unless it has obtained the prior written consent of Phase 4. Phase 4 may assign this Agreement or any or all of its rights hereunder to any person or entity at any time.

26. Breach/Cure. No failure by either party to fulfill any of its obligations hereunder shall constitute a breach of this Agreement by such party unless and until the non-breaching party has provided the breaching party with written notice specifying such failure(s) and the breaching party has failed to cure such breach within thirty (30) days after receipt of such notice, provided, however, that the foregoing cure period shall not apply (and there shall be no cure period with respect to) Licensor's Delivery obligations pursuant to this Agreement.

27. Licensor Bankruptcy. In the event of Licensor's bankruptcy, Licensor and Phase 4 acknowledge and agree that (i) the Rights granted hereunder are fundamentally in the nature of "intellectual property" as defined in the Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor statute (the "Bankruptcy Code"); (ii) that Phase 4's continued enjoyment of all of the Rights granted is of the essence of this Agreement and fundamental to the Rights granted hereunder; and therefore all of the Rights granted shall be deemed intellectual property subject to Phase 4's election under Section 365(n)(1)(B) of the Bankruptcy Code.

28. Entire Agreement. This Agreement supersedes and cancels all prior negotiations and understandings between the parties and contains all of the terms, conditions and agreements of the parties with respect to the transactions contemplated herein and no warranties, representations or agreements have

been made between the parties except as herein expressly set forth. This Agreement may not be amended or modified except by a writing signed by both Licensor and Phase 4 or their duly authorized representatives. If the terms of any other agreement between the parties hereto conflict with this Agreement, the terms of this Agreement will prevail.

29. <u>Additional Documents.</u> Licensor agrees to execute such reasonable additional documents as may be necessary or desirable for Phase 4 to enforce its rights hereunder and hereby irrevocably authorizes Phase 4 to proceed, whether in Phase 4's name or Licensor's name, with any appropriate action necessary to enforce such rights hereunder. In addition, upon reasonable request, Phase 4 will execute and deliver such additional documents or instruments as are necessary by Licensor to evidence, effectuate or confirm this Agreement.

30. <u>Severability.</u> If any provision of this Agreement is adjudged by a court to be void or unenforceable, that provision will in no way affect any other provision of this Agreement, the application of that provision in any other circumstance, or the validity or enforceability of this Agreement. Such provision may be amended or modified only to the extent necessary to bring it within legal requirements.

31. <u>Dispute Resolution; Governing Law; Forum.</u> In the event of any dispute relating to the subject matter of this Agreement, Licensor will be limited to its remedies at law for monetary damages, if any, actually sustained by Licensor. In no event will Licensor be entitled by reason of breach or default to revoke, terminate, or rescind or alter this Agreement or to enjoin or restrain Phase 4's distribution or advertising of the Picture or Phase 4's exploitation of the Rights, or to seek, accept, apply for or obtain any equitable remedies whatsoever against Phase 4. This Agreement will be governed by and interpreted in accordance with the laws of the State of New York and be subject to the exclusive jurisdiction by the Southern District Courts of New York, New York.

32. <u>Miscellaneous.</u> Nothing in this Agreement will be deemed to constitute a partnership, joint venture or the relation of principal and agent between the parties. Except as expressly provided in this Agreement, no term of this Agreement is enforceable by any person who is not a party to it and nothing in this Agreement will create or confer any rights or other benefits on or in favor of any person who is not a party to this Agreement. The titles and captions in this Agreement are inserted for reference and convenience only and in no way define, limit or describe the scope of this Agreement or intent of any provision. No waiver by either party of any breach or default of this Agreement will be deemed a waiver of any preceding or succeeding breach hereof. No waiver of any term or condition of this Agreement is effective, unless it is contained in a record authenticated by the party making the waiver. This Agreement may be signed in counterparts and each such counterpart will constitute an original document, and all such counterparts, taken together, will constitute one and the same instrument. Counterparts delivered by fax or by scanned PDF will have the same force and effect as an original. Neither of the parties hereto will hold itself out contrary to the terms of this provision, by advertising or otherwise.

<u>**SCHEDULE "B" – DELIVERY SCHEDULE**</u>

All materials must be delivered at Licensor's cost and must be cleared for Distributor's use.

<u>Unless otherwise directed, all elements and documents should be shipped to:</u>

Jason Viteritti, Director Production
Phase 4 Films (USA), LLC
22 Harbor Park Drive | Port Washington, NY 11050
p: 516-484-1000 X129 | c: 917-609-6184 | f: 516-484-4746
jviteritti@entonegroup.com | www.eonehomevideo.com
All legal and publicity documents must be delivered via DVD, CD or Hard Drive.

<u>Section I -   Video & Audio Elements</u>

Textless Background Elements at the tail of each cassette.

a) Formatting:
Black  00:57:30:00
Bars/tone  00:58:00:00
Slate 00:59:30:00
Black 00:59:40:00
Program 01:00:00:00
Black  min 60 secs
Textless elements for head and tail credits, all shots with original language text.
Black  min 60 seconds

b) All materials shall be clearly labeled to include
1. Title (and version if applicable)
2. Timecode type and standard
3. Audio track layout
4. Reel number
5. Aspect ratio
6. Running time
7. Date
8. Lab name and client name

High Definition Video Specifications:
Speed:  23.98 fps
Resolution:  1920 x 1080
Video Luminence: min 630, max 714
Black Level: min -14mV, max 14 mV
Horizontal Blanking: min 11.1 µsec, max 11.2 µsec
Vertical Blanking: max 23 lines
Audio Levels:  suggested max peak +14 dB (-7 dBFS) *
Suggested max sustained level: + 13 dB (-9 dBFS) *

*please discuss with Phase 4 before limiting or compressing or legalizing

NOTE: Licensor will not deliver their only master but will retain a master video tape under their control for safe keeping.

## 1.  HDCAM SR HIGH DEFINITION DIGITAL VIDEO MASTER – OAR

One (1) High Definition Digital Video Master in 16:9, OAR, 23.98fps, manufactured from the 35mm Interpositive, including 5.1 and LT/RT original language audio and 2.0 M&E.

## 2.  HDCAM SR HIGH DEFINITION DIGITAL VIDEO MASTER -- FULL FRAME

One (1) High Definition Digital Video Master in 16:9, 178.1, 23.98fps, manufactured from the 35mm Interpositive, including 5.1 and LT/RT original language audio and 2.0 M&E.

Standard Definition Video Specifications for NTSC:
Time code: NTSC must be recorded in SMPTE non-drop format.
VITC: NTSC lines 16 & 18
Video Luminance: min 630 mV, max 714 mV
Black Level: NTSC min -14mV, max 14 mV
Chroma composite Y/C:  max 120 IRE / 931 mV
Horizontal blanking:  NTSC min 10.1 μsec, max 11.2 μsec
Vertical blanking:  NTSC min 18 lines, max 21 lines
Audio Levels:  suggested max peak +14 dB (-7 dBFS) *
Suggested max sustained level: + 13 dB (-9 dBFS) *

*please discuss with Phase 4 before limiting or compressing or legalizing

## 3.  NTSC STANDARD DEFINITION DIGITAL VIDEO MASTER 16:9

One (1) Digital Betacam in NTSC 16:9 OAR manufactured from the Interpositive or down-converted from the High Definition 16:9 anamorphic master. including  LT/RT original language audio and 2.0 M&E.

Audio configurations:

a) All BROADCAST WAV FILES or DA 88. DA 88's must be delivered in NTSC.

b) Every reel must have accurate reference and alignment tones at the head of each reel, including but not limited to, Pink Noise and 1kHz tone, in proper phase relationship to the program.

c) Each reel must have a Sync Beep (2 POP) located at the head and tail, in the appropriate placement as is required for synchronization.

d) All materials shall be clearly labelled to include
1. Title (and version if applicable)
2. Timecode type and Film Speed
3. Track layout
4. Reel number
5. Sampling Frequency
6. Date
7. Lab name and client name

## 1.  SIX (6) TRACK AND TWO (2) TRACK PRINTMASTER

One (1) BROADCAST WAV FILE or DA88 of the 6-track discrete (5.1) Original Language Printmaster and the 2-track Lt Rt Original Language Printmaster in the configuration listed below.  The tail of each

reel shall contain a pull-up (overlap) of no less than 48 frames.

Channel 1: left
Channel 2: center
Channel 3: right
Channel 4: left surround
Channel 5: right surround
Channel 6 : subwoofer
Channel 7: left total
Channel 8: right total

## 2. SIX (6) TRACK AND TWO (2) TRACK PRINTMASTER MUSIC AND EFFECTS

One (1) BROADCAST WAV FILE or DA 88 of the 6-track discrete (5.1) Music and fully filled Effects Master with a Dialogue Guide track and Alternative or Additional or Optional Materials track (containing any discernable original language in Walla, radio, public address system etc.) in the following configuration:

Channel 1: left
Channel 2: center
Channel 3: right
Channel 4: left surround
Channel 5: right surround
Channel 6 : subwoofer
Channel 7: alternatives/options
Channel 8: dialogue guide

The Effects, Foley and Backgournd tracks will be fully filled to International standards.

## 3. STEREO DME

One (1) BROADCAST WAV FILE or DA 88 of separate Stereo Dialogue tracks, Stereo Music tracks, Stereo Effects tracks (fully filled), and Mono Narration track (if applicable). All elements must be fully synchronized with the Picture and able to be used for full Stereo Layback so that, when all tracks are used together, the result is the full and complete Stereo Mix of the Picture.

## 4. MUSIC SCORE AND SOURCE CUES

DVD of the uncut music score as delivered by the composer, and all source cues. A music log must accompany this DVD.

## Section I — Documentation

## 1. MUSIC CUE LIST

One (1) electronic copy of the music cue sheet in a format approved by Phase 4 detailing all music contained in the Picture, including the title of each composition, the names of the composers, publishers, and copyright owners, the form of usage (i.e. visual, background, instrumental, vocal etc.), the place and number of such uses in the Picture, in/out cues and running time for each cue showing film footage and timecode, the performance rights society involved and any other information customarily set forth in music cue sheets. The cue sheet shall indicate whether a master use license is required on each outside cue listed in the cue sheet and its source (i.e. record company name).

**2.  FEATURE DIALOGUE/SPOTTING/CONTINUITY LIST**
One (1) Microsoft Word file of a complete original language dialogue/spotting/continuity list of the Picture, and including cut-by-cut feet/frame counts (or timecodes, as appropriate) of all dialogue, scene descriptions, music starts and stops, song lyrics (if any) and translations of all dialogue spoken in any language other than English.  For 35mm productions, footages for this list should be calculated using theatrical 2,000 foot AB reels, conforming to the final release print version of the Picture.

**3.  ENGLISH SUBTITLE DISKETTE**
If applicable, one (1) diskette containing the English language subtitles and the full and proper spotting of such subtitles, being foot/frame counts (&/or timecodes, as appropriate).

**4.  ENGLISH LANGUAGE CLOSED CAPTION DISKETTE**
One diskette containing the English closed caption titles (in ".scc – pop-up" format) and the full and proper spotting of such titles being timecodes matching the NTSC standard definition video masters of the Picture and conformed in all respects to the action and dialogue contained in the Picture.

**5.  FINAL HEAD & TAIL CREDITS**
One typewritten copy and one electronic copy in Microsoft Word of the main and end screen credits as they appear in the final Picture

**6.  MUSIC LICENSES**
One copy of fully executed synchronization and master recording use licenses covering each musical composition featured in the Picture in electronic form (PDF). The minimum term for any music license is perpetuity for worldwide free and pay TV, homevideo and DVD, theatrical and non-theatrical and internet usage. Proof of payment is also required in the form of cancelled check or proof of wire transfer.

If any composition or recording is asserted to be in the Public Domain, proof of such should be provided.

**7.  SUMMARY OF MUSIC RIGHTS AND OPTIONS**
A list of all the songs used in the Picture against which the rights granted, term of license, media to which rights apply, details of the options for extending or exercising certain rights or terms, where Distributor's standard contract has not been used - shortfalls in the rights granted, etc. should be shown.  NOTE: The minimum license for any music license is World Wide Free & Pay TV, All Video and Theatrical in perpetuity.  Any reduced license must be accepted by the Distributor prior to execution.

**8.  STOCK FOOTAGE STATEMENT**
A list of all stock footage used in the Picture against which the rights granted, term of license, media to which rights apply.

**9.  STOCK FOOTAGE LICENSES**
One copy of fully executed stock footage or clip licenses in electronic form (PDF) covering any and all audio visual elements featured in the Picture and not filmed or produced for the Picture.  The minimum term for any stock footage or clip license is perpetuity for worldwide free and pay TV, homevideo and DVD, theatrical and non-theatrical and internet usage. Proof of payment is also required in the form of cancelled check or proof of wire transfer.

If any footage or clip is asserted to be in the Public Domain, proof of such should be provided.

*** If not applicable, a signed statement to this effect

**10. DUBBING, SUBTITLING & CUTTING RESTRICTIONS**

Statement of all restrictions relating to dubbing, subtitling or cutting the Picture in electronic form or, if there are no restrictions, a signed statement to that effect.

## 11. E & O INSURANCE
E & O INSURANCE in electronic form (PDF) shall be US $1 million per claim, US $3 million in aggregate; deductible of $25,000, for a term of three (3) years commencing on the first day of the license period of the Picture naming Distributor and its respective officers, directors, and employees as an additional insured. The policy must have no exclusions and shall include coverage for the title and music and must include all the language on the E&O Protocol attached in Schedule "C".

## 12. LABORATORY ACCESS LETTERS
The Laboratory Access Letters should be set out in a manner that gives the distributor unrestricted access to all the relevant elements. (see Schedule "D", attached).

## 13. CREDIT STATEMENT
A signed STATEMENT in electronic form (PDF) of contractual screen credits paid advertising credits, names/likeness obligations and talent approvals applicable to the Picture. The statement should include each credit in one column and summaries of the credit obligation in the adjacent columns for: on-screen and paid ad obligations, including form, placement, type size and exclusions; and names/likeness obligations and approval obligations, indicating any contractual approval entitlements or other names/likeness obligations.  If there is no obligation to accord a certain credit, which has been accorded on screen or is included in the billing block or the Head Credits, the "obligation" should be stated as "Producer's Discretion."  The Distributor must be informed as soon as possible of any significant approvals required on Key Art, Photography, etc.

## 14. BILLING BLOCK
Final BILLING BLOCKS in Microsoft Word for posters, video packaging, paid advertising, sales materials and trailers, approved by all parties as well as, camera-ready black & white stats of all the logos Producer requires be included in the billing block.

## 15. CAST/TALENT/PERSONNEL AGREEMENTS
Copies of fully executed cast & crew agreements in electronic form (PDF) for the principal talent employed for the Picture including (but not limited to) the director, producer(s), composer, director of photography, editor and principal cast members, as well as any others whose names are accorded on-screen credit in the main titles of the Picture and/or in paid advertising and/or in the Billing Block. Copies of any other cast, crew or supplier agreements as may reasonably be required to be supplied on request.

## 16. CHAIN OF TITLE
A summary page outlining all Chain of Title documents, in chronological order, as well as all documents evidencing proof of ownership and all documents evidencing proof of payment in connection with any transfer of rights, including but not limited to:

Certificate of Authorship in a form provided by Phase 4 as outlined in Schedule E

A filed United States COPYRIGHT REGISTRATION FORM for the screenplay
A filed United States COPYRIGHT REGISTRATION FORM for the Production

Both should include proof of filing and payment

One (1) copy of a current COPYRIGHT SEARCH (not more than 3 months old)

One (1) copy of TITLE SEARCH (not more than 3 months old)
Summary of Chain of Title signed by producer

## 17. CERTIFICATE OF ORIGIN
Six (6) original notarized Certificates of Origin.

## 18. STATEMENT OF ASPECT RATIO
A statement specifying the Original Aspect Ratio of the theatrical projection of the Picture, as appropriate.

## 19. STATEMENT OF FINAL FOOTAGE AND RUNNING TIME
A statement specifying the footage counts with NTSC timecodes of the Picture.  For 35mm productions, footages counts and the equivalent running times should reference the individual theatrical 2,000 foot AB reels, conforming to the final release print version of the Picture.

## 20. CAVCO OR CRTC CERTIFICATES
If applicable, certificates in electronic form (PDF) must be delivered, applications are not acceptable.

## 21. MPAA RATING CERTIFICATE
A paid rating certificate from the Motion Picture Code and Rating Administration of America Inc. with a restriction not greater than "R".

## 22. IRS FORM W-8BEN
If Producer is a non-resident alien, or foreign individual, corporation, partnership or other entity, an original executed IRS form W-8GEB must be provided.  If such executed IRS Form W-8GED is not returned to Phase 4, Phase 4 will be obligated to withhold 30% of any monies owed to Producer.

## 23. RESIDUAL WORKSHEET
One (1) Residual Worksheet along with the production payroll records (showing the respective social security numbers, addresses, compensation and evidence of payment in full, and the number of days worked), all talent and crew agreement for those cast and crew members who are entitled to payment of residuals, and all other information and documentation required under the Residual Worksheet. Phase 4 shall provide Producer with the Residual Worksheet to be completed by Producer.

## 24. PRESALES
If applicable, delivery of all Presale agreements and Assignments to Distributor

## 25. FINAL COST STATEMENT
A statement prepared by either a certified public accounting firm or the production company accountant stating forth final actual negative cost of the Picture.

## 26. FINANCING PLAN
Financial plan should include the nationalities of it's investors.

## 27. DOLBY OR ANALOGOUS LICENSE
A copy of the executed License Agreement in electronic form (PDF) in full force and effect between the Producer and Dolby laboratories, Inc. in connection with the Picture.

## 28. QC REPORT
A copy of a full QC report from a recognized lab.

## SECTION II - PUBLICITY MATERIALS

GENERAL GUIDELINES
- All photographic materials are to be no less than first generation, reproducible and high resolution quality. (Minimum 300 dpi) Prints are to be 8 x 10 in size. No less than 50% of the key set is to be "action-oriented" photography.
- All photographic selections must include corresponding photo credits and cut lines.
- All original photography including negatives and contact sheets for review and/or duping purposes will be available to Distributor on a request basis
- All photographs should accompany a statement confirming the Photographer's credit -- Schedule F
- All photographs should accompany a statement confirming that all photographs are cleared and approved. -- Schedule F

## 1. PHOTOGRAPHY
A full, varied and representative selection of approved stills in JPG format, comprising of a minimum of:
   a. Unit photography: One hundred and fifty (150) including 20 selects
   b. Gallery photography: Six (6) images of each key cast member
   c. Behind the scenes photography: Ten (10) images
   d. Stills Photography to be delivered on CD-ROM or DVD as high resolution, JPG files at size of 2 MB to 6 MB min of 300 DPI. Images must be fully cleared by cast and crew (as appropriate but must include an approved shot of the director), of high quality and free of dirt. Each must include a caption sheet identifying each cast/crew member and photo credit.

## 2. PRESS KIT MATERIAL
Microsoft Word files with fully edited, approved and composite press kit, including (but not limited to): -
   a. Synopsis (long [1 page], short [1/2 page] and one-sentence log-line);
   b. Biographies of principal cast and crew members;
   c. Complete cast and crew list.
   d. Production Notes, Running time, and origin;

## 3. PUBLICITY WRAP UP REPORT:
A comprehensive summary of unit publicity activity as well as any media conducted post production, including but not limited to, festival appearances and junkets in North America and Internationally.

## 4. ELECTRONIC PRESS KIT, CLIPS, PROMOS, TRAILER, DVD BONUS MATERIALS
One (1) Electronic Press Kit on NTSC D-Beta and DVD with a minimum of 3 clips, Promo, Trailer, and Fully edited DVD Bonus materials, with clearances from the participants that appear in the foregoing, allowing Distributor to use such materials for the purpose of creating a DVD of the Picture. The tape label should include a list of tape contents.

## 5. PRESS CLIPPINGS
If available, high quality digital scans of any press articles or other media reports published on the Picture and/or key talent at the time of production.

## 6. KEY ART - TEXTLESS

One (1) copy of digital key art on CD-R or equivalent, in high resolution vector based files (Adobe Photoshop preferred) suitable for commercial printing, containing both texted and textless versions, fonts and logos and J-Peg of flat artwork for reference. Distributor also requires free access to the US Distributor's key art. Any and all artwork provided by Licensor or its designees to Distributor, shall be cleared in the Territory during the Term.

### 6.  TITLE ART
One (1) copy of the Title treatment in digital format (preferably EPS).

### Section III - B – Trailer Video & Audio Elements

GENERAL GUIDELINES:

DROP FRAME TIMECODE
All video masters must have continuous Drop Frame Timecode with the Picture starting at 1:00:00:00.

All master video tapes must have one (1) minute of Colour Bars and 1000 Hz tone, ten (10) seconds of slate indicating the name and date of the production, the running time. Technically, the Picture must adhere to SMPTE specifications.

The MASTER VIDEO TAPES should not use Dolby or any comparative noise reduction. Surround Sound encoding is acceptable.

### 1. HIGH DEFINITION TRAILER VIDEO MASTER – 16x9
One (1) Full Frame (16 x9) Component Digital HD (24P/1080) video tape transferred from the Interpositive. This tape must be fully colour corrected and Titled with a full English mix in Stereo and Stereo M&E configured as follows:

| | |
|---|---|
| Channel 1: | FULL MIX LEFT (LT) |
| Channel 2: | FULL MIX RIGHT (RT) |
| Channel 3: | M & E LEFT (LT) |
| Channel 4: | M & E RIGHT (RT) |

### 2. NTSC ANAMORPHIC TRAILER VIDEO MASTER – 16 x 9
One (1) Digital Betacam NTSC video tape of the Anamorphic Master 16 x 9, with the stereo mix on channels 1 & 2 and the M & E on channels 3 & 4.

### Section III- C – Trailer Documentation Material

### 1.  MUSIC CUE LIST
One (1) copy of the final Music Cue Sheet, indicating title, composer, publisher, copyright owner(s), usage, performing rights society, as well as film footage and running time, for each composition of the Picture., indicating background, feature, instrumental or vocal. The Licensor will not register any cue sheets with any performing rights society without Distributor's written approval.

### 2.  AS PRODUCED ACTION & DIALOGUE CONTINUITY AND SPOTTING  LIST
One (1) Action & Dialogue Continuity and Spotting List containing all dialogue and scene descriptions of the final Trailer and including full master subtitle and spotting footage information in Word or Excel format.

### 3.  MUSIC LICENCES

One (1) copy of all synchronization, master recording and performing licenses for all music, incidental songs and instrumental music licensed for use in the Trailer.  All synchronization and master recording licences shall, at a minimum, include universal, perpetual rights for all theatrical and broadcast media, now or hereafter known, including without limitation, the rights for Videogram, DVD use and in any transportation device in the context of the Trailer as well as for use in other trailer, featurettes and commercial spots for the Picture (including out of context usage), and the right to assign said licence.

## 4.  STOCK FOOTAGE LICENCES
One (1) copy of all Stock Footage Licences along with a report stipulating the period and territories included within the license agreement.
 ***If not applicable a statement to this effect.

## SCHEDULE "C" – E&O PROTOCOL

### Protocol for Adding Phase 4 Films (USA), LLC on E&O

Use the following language to add our company as an additional insured:

"Phase 4 Films (USA), LLC ("Phase 4"), its parent, its subsidiaries and all associated, affiliated and related entities (including without limitation Entertainment One Ltd. and its affiliates ("eOne")), their successors, licensees, sub-distributors, sub-licensees and assigns and the officers, directors, shareholders, attorneys, agents and employees of each of the foregoing."

Please include the following language on the certificate:

1. Coverage is primary and not contributing to or in excess of any such insurance maintained by Phase 4 and/or eOne
2. Policy does not contain any non-standard endorsements, exclusions or restrictions in coverage. (We need this on the certificate, and if it's not stated on the certificate, then we require a copy of the entire policy.)
3. Certificate should provide thirty (30) days prior written notice via registered mail of any cancellation or material change in coverage.

The insurance policy must be in place for at least three (3) years from the first day of the license period.

With limits of no less than US$1,000,000 per claim and US$3,000,000 in the aggregate with a deductible of no more than US$25,000

Policy must include and certificate must state:

1. coverage for the title (and any aka name, if applicable)
2. coverage for the music
3. coverage for the Bonus Materials
4. coverage for Films Clips and images
5. coverage for all media

## SCHEDULE "E" – CERTIFICATE OF AUTHORSHIP

**FORM OF AUTHOR CERTIFICATE**
*Certificat d'Auteur*

The Undersigned Certifies:
*Le Soussigné certifie:*

1. The Undersigned, whose main address is located at _____ is the
writer or/ and the director of the original motion picture entitled " *TITLE* "

*Le Soussigné, domicilié à l'adresse                                        est l'auteur et*
*le réalisateur du film de long métrage intitulé « TITRE ».*

2. Pursuant to an agreement dated as of _____, the Undersigned has exclusively
authorized *PRODUCER*, which registered address is located at _____
___ to make, produce, and exploit in all media throughout the world the motion picture entitled "
*TITLE* "

*Selon une déclaration des droits d'auteur daté du _____ le Soussigné a autorisé*
*exclusivement PRODUCTEUR, domiciliée au _____*
*___, à réaliser, produire et exploiter par tous les médias dans le monde entier, un film de long métrage*
*intitulé «TITRE».*

3. The term of this authorization is perpetuity.
*Cette autorisation est valable à perpétuité*

The Undersigned certifies under penalty of perjury that all the above is true and correct as of the
Undersigned's own personal knowledge. If called as a witness the undersigned could and would
testify competently to all of it.

*Le Soussigné certifie sous peine de parjure que tout ce qui précède est véridique et correct à la*
*connaissance personnelle du Soussigné. S'il était cité comme témoin, le Soussigné pourrait donner, et*
*accepterait de donner, son témoignage compétent sur tout ce qui précède.*

In Witness Whereof the Undersigned has executed this Author Certificate as of [date] in
_____.
*En foi de quoi, le Soussigné a signé ce Certificat de réalisateur en date du _____,*
*à*

[Undersigned's signature]
Print Name:_____
Domicile:_____

## SCHEDULE "E" – IMAGE APPROVAL AND PHOTO CREDIT

### CERTIFICATE OF IMAGE APPROVAL AND PHOTO CREDIT

RE: _____ (the "Picture")

To Whom It May Concern:

Pursuant to the Distribution Agreement between Phase 4 Films (USA), LLC ("Distributor") and _____ ("Licensor") regarding the Picture (the "Agreement"), we the Licensor hereby certify that, in connection with all of the photographs delivered to Distributor, all necessary clearances and approvals have been obtained from all parties who have the right to approve such photographs and all such photographs are cleared for all uses by Distributor in accordance with the Agreement and the delivered Credit Statement and the appropriate photo credit should be:

_____

Sincerely,

LICENSOR


By: _____

       Print Name: _____

       Title: _____

Date Signed: _____

**SCHEDULE F**

**GENERAL FACT SHEET FOR "_____"**

Questionnaire Completed by: _____ Date: _____

Production Company (or Licensor): _____

Telephone No.: _____ Fax No: _____

Original Program Title: _____

Alternate Title (if any): _____

Foreign Language Title (if any): _____

Language of Original Version: _____

Original Capture Format: Film _____ (mm) HD video _____ (fps) SD video _____(fps)

Existing Picture Formats: Film _____ HD video _____ SD video _____ DCP _____

Existing Sound Formats:  Dolby SR_____ Dolby E ____Dolby SRD ____SDDS ____DTS _____

If original Language is not English – is Overlay available? _____ and which lab was used to for Laser Etching? _____

Is Program Subtitled? ____ In What Language(s)? _____

Is EST or FST IN available?_____

Is Program Dubbed? _____ In What Language(s)? _____

What Accessability formats are available?

For Non-Digital Formats (ie: 35MM):

.       MOPIX – a form of Captioning.

.       RWC/DVS – That stands for REAR WINDOW CAPTIONING and DECRIBED VIDEO

.       RWC Only

For Digital 2D Formats (ie: DCP):

.       Digital Captioning Files

.       Closed Captioning (English)

.       Closed Captioning (French)

.       Descriptive Narration (English)

.       Descriptive Narration (French)

Color or B&W? _____   Main & End Titles Over Black? _____

Number of Reels: _____   Length of Film in Feet: _____

Running Time in Minutes: _____   Film Stock Used (Kodak, etc.): _____

Aspect Ratio: _____ Super 35? _____ If Yes, Common Center or Top? _____

Additional video / audio Materials: (Please list any additional materials that already exist, or are being produced that may be of use for the creation of the DVD, or for promotion of the film – *ex. Interviews, Commentaries, Deleted Scenes, Featurettes / Behind The Scenes Footage, Existing Trailers, or EPK's* . .
.

_____

Element: _____   Existing Format: _____
Element: _____   Existing Format: _____
Element: _____   Existing Format: _____
Element: _____   Existing Format: _____

Copyright Notice in U.S.? _____   Year of Production: _____

Date of First Lawful Availability to Public (if previously distributed): _____

Date & Location of First Public Screening (if previously distributed): _____

Foreign Release Dates (if previously distributed):

| Country | Date |
|---------|------|
|         |      |
|         |      |
|         |      |

**SCHEDULE G**

**DISTRIBUTION EXPENSE SCHEDULE**

I.   **MANUFACTURING:**  $1.50 per disc (SD); $2.00 per disc (BD).

II.  **FULFILLMENT/RETURNS PROCESSING:**  Fifty cents ($0.50) per unit shipped; thirty-five cents ($0.35) per unit returned.

1

**PROOF OF SERVICE BY MAIL**
(California Code of Civil Procedure, §§1013a, 2015.5)

2

3    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

4         I am a resident of the county aforesaid; I am over the age of eighteen years and not a party
5    to the within entitled action; my business address is 15233 Ventura Blvd., Suite 250, Sherman
     Oaks, CA 91403.

6         I am readily familiar with the business practices at my place of business for collection and
7    processing of correspondence for mailing with the United States Postal Service. Correspondence
8    so collected and processed is deposited with the United States Postal Service that same day in the
     regular course of business.

9         On May 16, 2016, I served the within **FIRST AMENDED COMPLAINT**, on the
10   interested parties in said action.

11   [ xxx ]  By placing a true copy thereof enclosed in a sealed envelope with postage thereon fully
12   prepaid, in the United States mail at Sherman Oaks, California, addressed as follows:

13   **SEE ATTACHED SERVICE LIST**

14   [  ]   I caused such envelope to be transmitted by facsimile and placed in an envelope with
15   postage thereon fully prepaid in the United States mail at Los Angeles, California addressed as
     follows:
16        I declare, under penalty of perjury under the laws of the State of California that the
     foregoing is true and correct.

17

18        Executed on May 16, 2016, at Sherman Oaks, California.

19

20    Yamilet Escobar                    _____
     (Print Name)                          (Signature)

21

22

23

24

25

26

27

28

1
PROOF OF SERVICE

1
2
3
4

**<u>Agent for Service of Process for</u>**
**<u>Defendant, VIVA Productions, LLC</u>**
Victor Elizalde
1539 Westwood Blvd
Los Angeles, CA 90024

5
6
7
8

**<u>Agent for Service of Process for</u>**
**<u>Defendant, XENON PICTURES, LLC</u>**
Samuel Leigh Savidge
3521 Jack Northrop Ave
Hawthorne, CA 90250

9
10
11

Lawrence Segal
9595 Wilshire Boulevard, Suite 201
Beverly Hills, California 90212-2504
Tel. 310.550.4840
Fax 310.550.4848

12
13
14
15

Andrew S. Hoffmann, Esq.
Hoffmann & Associates
450 Seventh Avenue, Suite 1400
New York, New York 10123
212 679-0400 (phone)
212 679-1080 (fax)

16
17
18
19
20
21
22
23
24
25
26
27
28

PROOF OF SERVICE

# EXHIBIT 2

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE (the "Settlement Agreement" or "Agreement") is made and entered into as of November _____, 2016 (the "Effective Date"), by and between Robert Setari et al ("Creditors") and Viva Pictures, LLC ("Viva") and Xenon Pictures, LLC ("Xenon") (Viva and Xenon each individually are referenced as a "Distributor Party," or collectively, as the "Distributor Parties") regarding the production and distribution of the film known as "Down for Life" or "Por Vida" (hereinafter "the Subject Film."

### RECITALS

A.    WHEREAS, on January 6, 2011, Distributor Parties filed a related action in Los Angeles Superior Court, known as Los Angeles Superior Court case number BC452585, which case was resolved by settlement whereby Distributor Parties obtained all rights to distribute the Subject Film (the "Related Action");

B.    WHEREAS, on April 28, 2015 Distributor Party Xenon entered into an agreement with the Screen Actors Guild – American Federation of Television and Radio resolving certain claims concerning monies due in connection with the production of the Subject Film (hereinafter the "Xenon-SAG Agreement"). A copy of the Xenon-SAG Agreement is annexed hereto as Exhibit "A" and is incorporated herein.

C.    WHERAS, on February 8, 2016, the investors and creditors ("Creditors") of the Subject Film filed a complaint against the Distributor Parties, which case has been designated Los Angeles Superior Court case number BC 609628 (the "Subject Action"), alleging, among other things, negligent and intentional interference with contract and economic advantage against Distributor Parties, based on their failure to distribute the Subject Film. Said case is currently pending.

D.    WHEREAS, it is now the desire and intention of the Distributor Parties, on the one hand, and the Creditors, on the other hand (collectively, the "Parties"), to settle and resolve all disputes, differences and claims asserted in the Subject Action.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and of the mutual covenants, terms and conditions hereinafter set forth, it is agreed as follows:

### TERMS AND CONDITIONS

1.    The settlement is made pursuant to California Code of Civil Procedure section 664.6. The Parties hereby request that the court retain jurisdiction to enforce the terms of this Settlement Agreement. Further, the Parties agree to perform such acts as reasonably necessary to obtain a Court order to that effect.

*1*

2.    Any and all rights to distribute the Subject Film obtained by the Distributor Parties in the Related Action, or through any and all agreements with and any and all third parties or entities, are hereby assigned, transferred and conveyed in their entirety, and without limitation whatsoever, to the Creditors.

3.    Creditors shall pay Distributor Party Xenon the sum of One Hundred and Seventy-Five Thousand Dollars ($175,000.00) for said rights to distribute. Payment shall be made simultaneous with the execution of this Agreement by the Distributor Parties.

4.    Creditors agree to be fully bound by the terms of the Xenon-SAG Agreement and to assume all obligations and responsibilities of Xenon thereunder. Each of said Creditors shall execute a separate Distributor's Assumption Agreement concerning said Xenon-SAG Agreement in the form annexed hereto as Exhibit "B" hereto as a condition of this Agreement.

5.    Creditors agree to indemnify and defend Distributor Parties in the event of any future claims made against them by purported creditors of the Subject Film.

6.    The Creditor Parties hereby forever discharge and release Distributor Parties, and Distributor Parties hereby forever discharge and release the Creditor Parties from all actions, causes of actions, suits, claims, demands, liens, interests, debts, contracts, obligations, liabilities, damages, losses, costs and expenses, including, without limitation, attorneys' fees and costs of any nature whatsoever, at law or in equity, whether or not such claims are presently known or unknown by reason of any matter, cause or thing whatsoever from the beginning of the world through the date hereof, including but not limited to, any claims regarding the Subject Film, and the Subject Action(the "Released Claims"). It is the intention of all Parties that this Settlement Agreement shall be effective as a final release of the Released Claims. In furtherance thereof the Parties acknowledge that they have been advised by legal counsel of their own choosing concerning, and are familiar with, the provisions of California Civil Code section 1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release which if known by him or her must have materially affected his or her settlement with the debtor.**

The Parties hereby expressly waive any and all rights under said code section and similar code sections in other jurisdictions where the Parties allege they suffered harm. The Parties further acknowledge that facts in addition to, or different from those which are now known or believed to be true with respect to the subject matter of the Action, this Settlement Agreement and the Released Claims may later be discovered, but that notwithstanding the foregoing, it is the Parties' intention hereby to fully, completely and forever settle each and every one of the Released Claims. Therefore, in furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of the Released Claims, notwithstanding the discovery or existence of any such different or additional facts.

7.    The Creditors forever discharge and release the Distributor Parties, and the Distributor Parties forever discharge and release the Creditor Parties and each of them, and their

affiliates, parent and subsidiary companies, predecessors-in-interest, successors-in-interest, together with their respective officers, directors, employees, agents, managers, consultants and attorneys (the "Distributor Released Parties"), from all actions, causes of actions, suits, claims, demands, liens, interests, debts, contracts, obligations, liabilities, damages, losses, costs and expenses, including, without limitation, attorneys' fees and costs of any nature whatsoever, at law or in equity, whether or not such claims are presently known or unknown by reason of any matter, cause or thing whatsoever from the beginning of the world through the date hereof, including but not limited to, any claims regarding the Subject Film and Subject Action (the "Released Claims"). It is the intention of the Parties that this Settlement Agreement shall be effective as a final release of the Released Claims. In furtherance thereof the Parties acknowledge that they have been advised by legal counsel of their own choosing concerning, and are familiar with, the provisions of California Civil Code section 1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release which if known by him or her must have materially affected his or her settlement with the debtor.**

The Parties hereby expressly waive any and all rights under said code section and similar code sections in other jurisdictions where the Parties allege they suffered harm. The Parties further acknowledge that facts in addition to, or different from those which are now known or believed to be true with respect to the subject matter of the Action, this Settlement Agreement and the Released Claims may later be discovered, but that notwithstanding the foregoing, it is the Parties' intention hereby to fully, completely and forever settle each and every one of the Released Claims. Therefore, in furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of the Released Claims, notwithstanding the discovery or existence of any such different or additional facts.

8.    The parties represent and warrant that the transactions covered by the settlement documents constitute a contemporaneous exchange of promises and obligations, and that such transactions, including the creation and perfection of the security interests contemplated thereby, are intended to be a contemporaneous exchange of value as a "going forward" resolution of disputes between the parties.

9.    This Agreement embodies the complete and only agreement between the parties and supersedes and cancels any and all previous understandings, agreements, negotiations, commitments and any other writings or communications pertaining to its subject matter, whether written or oral.

10.    This Agreement may not be modified or amended, nor may any right or obligation set forth herein be waived, except in a writing signed by the parties with at least the same formalities as are observed herein. A waiver as to any particular term shall not operate as a waiver as to any other terms.

11.    In the event any provision of this Agreement shall be held to be invalid or unenforceable in any respect or for any reason, such holding shall not impair the validity and

enforceability of the remaining provisions of this Agreement, which shall continue to be given full force and effect.

12.　Each party to this Agreement acknowledges that it has been represented by legal counsel of its own choice throughout all the negotiations that preceded the execution of this Agreement and that it has executed this Agreement with the consent and on the advice of such legal counsel. Each party further acknowledges that it and its counsel have had adequate opportunity to make whatever investigation or inquiry they may deem necessary or desirable in connection with the subject matter of this Agreement prior to the execution hereof and the delivery and acceptance of the consideration specified herein.

13.　This Agreement shall be construed and interpreted in accordance with the laws of the State of California. The language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against either of the parties. In the event suit is filed by either party involving a dispute concerning the construction, interpretation, enforcement, or breach of this Agreement, the parties agree to submit to personal jurisdiction and venue of the Los Angeles Superior Court.

14.　This Agreement may be executed in counterparts, and transmitted by email, facsimile, or U.S. mail, which, taken together, shall constitute one and the same agreement and shall be effective as of the date first written thereon.

15.　Captions and paragraph headings used in this Agreement are for convenience and shall not be used to govern, construe, or interpret this Agreement.

16.　In the event of any alleged breach of this Agreement, the party alleging the breach shall give written notice of such breach as provided in this Paragraph, and the party(s) alleged to have breached this Agreement shall have a period of five (5) business days to cure the alleged breach, during which time, no liability shall accrue. Any notice required to be given under or in connection with this Agreement or the subject matter hereof, shall be sent by certified mail, postage prepaid, or by facsimile and addressed as follows:

To the Distributor Parties:

　　Viva Pictures, LLC
　　1539 Westwood Blvd
　　Los Angeles, CA 90024
　　Attn: Victor Elizalde

　　Xenon Pictures, LLC
　　3521 Jack Northrup Avenue
　　Hawthorne, CA 90250
　　Attn: Leigh Savidge

　　Hoffmann & Associates
　　450 Seventh Avenue, Suite 1400

4

New York, NY 10123
Attn: Andrew Hoffmann

To the Creditors:

Monica Blut
Partner
Simon Resnik Hayes LLP
15233 Ventura Blvd., Suite 250
Sherman Oaks, CA 91403

16.     Each of the parties to this Agreement warrants and represents to the other that it has the power to enter into this Agreement and that the person executing this Agreement on its behalf has been authorized to do so by any and all appropriate corporate bodies.  Each of the undersigned represents and warrants that he or she has the authority and capacity to act on behalf of the entity on behalf of whom he or she signed this Agreement and bind them to the terms and conditions of this Agreement.  All the terms and conditions of this Settlement Agreement shall be binding upon and inure to the benefit of the parties' respective subsidiaries, predecessors, successors, assigns, distributors, and licensees.

17.     Each of the parties to this Agreement warrants and represents to the other that it has not assigned any of the claims released herein.

18.     The provisions of this Agreement shall be binding upon the Parties, their respective heirs, members, managers, directors, officers, shareholders, employees, predecessors, affiliates, former and present, successors, and  assigns, and all persons acting by, through, under, or in concert with any of them, including any independent contractors hired by any of them.

IN WITNESS WHEREOF, the Parties hereto have executed this Settlement Agreement and Mutual Release as of the day and year written below.

DATED: _____, 2016          VIVA PICTURES, LLC


By: _____

Its: _____


DATED: _____, 2016          XENON PICTURES, LLC

By: _____

Its: _____


DATED: _____, 2016          ROBERT SETARI

By: _____


DATED: _____, 2016          DOUG VANCE

By: _____


DATED: _____, 2016          MICHAEL LEVINE

By: _____


DATED: _____, 2016          CHRIS BROWN

By: _____

Its:


DATED: _____, 2016          PAUL STEWART

By:_____

6

DATED: _____2016          NEELY DINKINS

                                    By:_____


DATED:_____2016           VITO COLAPIETRO

                                    By:_____

DATED:_____2016           GREGORY FLORES

                                    By:_____

DATED:_____2016           RUBEN CORTEZ

                                    By:_____

The Parties below hereby consent to the aforementioned Settlement Agreement and Mutual
Release.

DATED: _____, 2016          SCREEN ACTOR'S GUILD


                                    By: _____

                                    Its:

7

New York, NY 10123
Attn: Andrew Hoffmann

To the Creditors:

Monica Blut
Partner
Simon Resnik Hayes LLP
15233 Ventura Blvd., Suite 250
Sherman Oaks, CA 91403

16.     Each of the parties to this Agreement warrants and represents to the other that it has the power to enter into this Agreement and that the person executing this Agreement on its behalf has been authorized to do so by any and all appropriate corporate bodies.  Each of the undersigned represents and warrants that he or she has the authority and capacity to act on behalf of the entity on behalf of whom he or she signed this Agreement and bind them to the terms and conditions of this Agreement.  All the terms and conditions of this Settlement Agreement shall be binding upon and inure to the benefit of the parties' respective subsidiaries, predecessors, successors, assigns, distributors, and licensees.

17.     Each of the parties to this Agreement warrants and represents to the other that it has not assigned any of the claims released herein.

18.     The provisions of this Agreement shall be binding upon the Parties, their respective heirs, members, managers, directors, officers, shareholders, employees, predecessors, affiliates, former and present, successors, and  assigns, and all persons acting by, through, under, or in concert with any of them, including any independent contractors hired by any of them.

IN WITNESS WHEREOF, the Parties hereto have executed this Settlement Agreement and Mutual Release as of the day and year written below.

DATED: Nov 25 , 2016          VIVA PICTURES, LLC

                              By: _Victor Elizalde_
                              Its: _President_
                              Victor Elizalde

DATED: NOV 25 , 2016          XENON PICTURES, LLC

5

By: _____

Its: _____

S. LEIGH SAVIDGE

DATED: _____, 2016          ROBERT SETARI

By: _____

DATED: _____, 2016          DOUG VANCE

By: _____

DATED: _____, 2016          MICHAEL LEVINE

By: _____

DATED: _____, 2016          CHRIS BROWN

By: _____

Its: _____

DATED: _____, 2016          PAUL STEWART

By: _____

6

9

By:

Its:

DATED   __11/29_____, 2016            ROBERT SETARI By

*Robert Setari*

DATED _____, 2016

DOUG VANCE By

DATED: _____, 2016

MICHAEL LEVINE By

DATED _____, 2016

CHRIS BROWN By: Its

DATED _____ 2016              PAUL STEWART
                                       By _____

10

By:

Its:

DATED: _____, 2016        ROBERT SETARI By:

DATED: _Nov. 17___, 2016        _Doug Vance_

                                   DOUG VANCE By:

DATED: _____ 2016

                                   MICHAEL LEVINE By:

DATED: _____, 2016

                                   CHRIS BROWN By: Its:

DATED: _____ 2016

                                   PAUL STEWART
                                   By:_____

11

By:

Its:

DATED: _____, 2016        ROBERT SETARI By:

DATED: _____, 2016

DOUG VANCE By:

DATED: Nov. 16, 2016

MICHAEL LEVINE By: *Michael Slevins*

DATED: _____, 2016

CHRIS BROWN By: Its:

DATED: _____, 2016        PAUL STEWART
                             By: _____

12

By:

Its:

DATED: _____, 2016         ROBERT SETARI By:

DATED: _____, 2016

DOUG VANCE By:

DATED: _____, 2016

MICHAEL LEVINE By:

DATED: _____, 2016

CHRIS BROWN By: Its:

DATED: _____ 2016

PAUL STEWART
By:_____

13

By:

Its:

DATED: _____, 2016          ROBERT SETARI By:

DATED: _____, 2016

DOUG VANCE By:

DATED: _____, 2016

MICHAEL LEVINE By:

DATED: _____, 2016

CHRIS BROWN By: Its

DATED: 11/11/2016

PAUL STEWART By:

14

DATED: _11/21_ 2016   NEELY DINKINS By: _____

DATED: _11/21_ 2016   VITO COLAPIETRO By: _____ Vito Colapietro

DATED: _____ 2016   GREGORY FLORES By: _____

DATED: _____ 2016   RUBEN CORTEZ By: _____

DATED: _____ 2016   MARC NOVAK

By: _____

The Parties below hereby consent to the aforementioned Settlement Agreement and Mutual Release.

DATED: _____, 2016   SCREEN ACTOR'S GUILD

By:

Its:

15

DATED: _____2016     NEELY DINKINS

By:_____


DATED: _____2016     VITO COLAPIETRO

By:_____

DATED:    11/15    2016     GREGORY FLORES

By:_____

DATED:_____2016     RUBEN CORTEZ

By:_____

The Parties below hereby consent to the aforementioned Settlement Agreement and Mutual Release.

DATED: _____, 2016     SCREEN ACTOR'S GUILD


By:

Its:

16

11/19/2016                              lawyer agreement law suit 001.jpg

DATED:_____,2016   NEELY DINKINS By:_____

DATED:_____,2016   VITO COLAPIETRO By:_____

DATED:_____,2016   GREGORY FLORES By:_____

DATED: _ii_·_17_,2016   RUBEN CORTEZ By: _____

DATED:_____,2016   MARC NOVAK

By:_____

The Parties below hereby consent to the aforementioned Settlement Agreement and
Mutual Release.

DATED: _____, 2016   SCREEN ACTOR'S GUILD

By:

Its:

17

DATED: _____2016     NEELY DINKINS

By:_____


DATED: _____2016   ·   VITO COLAPIETRO

By:_____


DATED:_____2016     GREGORY FLORES

By:_____


DATED:_____2016     RUBEN CORTEZ

By:_____


DATED: 11/16_____2016     MARC NOVAK

By: _Mischovreh_____


The Parties below hereby consent to the aforementioned Settlement Agreement and Mutual Release.

DATED: _____, 2016     SCREEN ACTOR'S GUILD




By:

Its:

18

# Exhibit "A"

## AGREEMENT

This Agreement is made as of this $\underline{28}$ day of April 2015 by and between Xenon Pictures, Inc. (hereinafter referred to as "**Xenon**") and the Screen Actors Guild-American Federation of Television and Radio Artists (hereinafter referred to as "**SAG-AFTRA**") as successor-in-interest to Screen Actors Guild, Inc.

**WHEREAS** Por Vida Productions, LLC and its principals, Alan Jacobs and Scott Alvarez (hereinafter collectively referred to as "the **Producers**") are the producers and owners of a certain motion picture known as "*Down For Life*" (hereinafter referred to as "the **Movie**"); and

**WHEREAS** the Producers were a signatory to the 1995 Codified Basic Agreement for Independent Producers with SAG-AFTRA (hereinafter referred to as "the **CBA**") which governed the terms and conditions of the production of the Movie; and

**WHEREAS** in connection with the production of the Movie, the Producers failed to pay certain compensation, pension and health benefits and liquidated late payment damages due to SAG-AFTRA, its members and benefit funds as required by the CBA (hereafter referred to as "the **SAG-AFTRA Deficiency**"); and

**WHEREAS** on or about February 20, 2009, the Producers entered into a Voluntary Assignment of Accounts Receivable Agreement with SAG-AFTRA whereby the Producers assigned their right to collect monies from the sale, distribution and/or exploitation of the Movie until the SAG-AFTRA Deficiency was fully satisfied. A copy of the Voluntary Assignment of Accounts Receivable Agreement is annexed hereto as Exhibit "A" and its terms are expressly incorporated herein; and

**WHEREAS** SAG-AFTRA subsequently initiated arbitration proceedings pursuant to the terms of the CBA to enforce and collect the SAG-AFTRA Deficiency from the Producers; and

**WHEREAS** by Award dated October 6, 2009, Arbitrator Sara Adler determined and ruled that the Producers were liable to SAG-AFTRA on the SAG-AFTRA Deficiency in the amount of $179,514.19 and granted SAG-AFTRA an irrevocable assignment of the accounts receivable of the Producers from the worldwide exploitation, distribution, exhibition or other use of the Movie until the balance of the SAG-AFTRA Deficiency is satisfied in full. A copy of said Arbitration Award is annexed hereto as Exhibit "B" and its terms are expressly incorporated herein; and

**WHEREAS** by agreement dated October 5, 2010, Viva Pictures, LLC (hereinafter referred to as "Viva") acquired exclusive distribution rights in the Movie from the Producers (hereinafter referred to as "the **Distribution Agreement**"). A copy of the Distribution Agreement is annexed hereto as Exhibit "C" and its terms are expressly incorporated herein; and

**WHEREAS** pursuant to a settlement agreement dated July 12, 2012, the Producers and Viva agreed that Viva would relinquish its distribution rights to the Movie to the Producers if the Producers made certain payments to Viva within a defined time period, and that if such payment was not made by the Producers, Viva would continue to retain such distribution rights in perpetuity (hereinafter referred to as "the **Settlement Agreement**"). A copy of said Settlement Agreement is annexed hereto as Exhibit "D" and its terms are expressly incorporated herein; and

**WHEREAS** the Producers subsequently failed to make the payments required pursuant to the Settlement Agreement and defaulted on its terms, and thus Viva retained all distribution rights to the Movie in perpetuity; and

**WHEREAS** by agreement dated February 27, 2014, Viva transferred all of its right, title and interest in the Movie to Xenon (hereinafter referred to as "the **Assignment Agreement**"). A copy of said Assignment Agreement is annexed hereto as Exhibit "E" and its terms are expressly incorporated herein.

**WHEREAS** SAG-AFTRA has asserted and perfected a lien on the Movie to secure its right and interest in the accounts receivable from the worldwide distribution, exploitation, exhibition or other use in the Movie until the balance of the SAG-AFTRA Deficiency is paid in full; and

**WHEREAS** Xenon seeks to distribute the Movie throughout the world and for all media while fully acknowledging and complying with SAG-AFTRA's lien; and

**WHEREAS** SAG-AFTRA and Xenon wish to agree to the terms and conditions pursuant to which Xenon can immediately distribute the Movie throughout the world and for all media and pursuant to which all revenues from such distribution of the Movie by Xenon will be accounted for and paid out.

**WHEREAS** SAG-AFTRA and Xenon wish to agree to terms and conditions whereby Xenon will assume responsibility for the future obligation for additional compensation that may arise pursuant to the CBA.

2

IT IS HEREBY AGREED AS FOLLOWS:

1. Based on the terms, conditions and covenants set forth herein, SAG-AFTRA hereby agrees that Xenon shall be entitled to immediately distribute the Movie throughout the world and for all media.

2.     (a)    The parties agree that revenues received from such distribution of the Movie shall be distributed as set forth in subsection (c) hereto

(b) For the purposes of this paragraph, the following terms shall be defined and have the meanings set forth below:

    (i)    "Gross Receipts" shall be defined as all revenues, sums, compensations, monies and other forms of consideration actually received by Xenon through exploitation of the Movie prior to the deduction of Recoverable Distribution Expenses.

    (ii)    "Recoverable Distribution Expenses" shall be defined as monies that Xenon spends following the execution of this Agreement in order to effectuate the actual distribution of the Movie. This includes monies which will have to be spent to "finish" the preparation of the master copy of the Movie for replication, such as close captioning, mastering and any work required to finish the final film element. It also includes Xenon's costs to actually replicate DVDs for sale and monies Xenon will have to spend to advertise and market the Movie for distribution.

    (iii)    "Residuals" shall be defined as additional compensation required, thereby, if any, and the pension and health contributions required, if any, with respect to territories, media, and term referred to above as provided in the applicable Sections of the CBA as set out below:

        1. Section 5 thereof, pertaining to additional compensation payable to perfoemrs when theatrical motion pictures, the principal photography of which commenced after October 6, 1980 and which covered by said Section, are released to free television, and Section 34 pertaining to applicable

3

pension and health contributions, if any are required.

2. Section 5.2 thereof, pertaining to additional compensation payable to performers when theatrical motion pictures, the principal photography of which commenced after July 1, 1984 and which covered by said Section, are released to Supplemental Markets, and Section 34 pertaining to applicable pension and health contributions, if any are required.Sideletter 22 thereof, pertaining to additional compensation payable to performers when theatrical motion pictures, the principal photography of which commenced after July 1, 1971 and which covered by said Section, are released in New Media, and Section 34 pertaining to applicable pension and health contributions, if any are required.

(c) Gross Receipts shall be distributed as follows:

(i) First, to Xenon as reimbursement for its Recoverable Distribution Expenses up to a maximum of $100,000. Xenon agrees to account to SAG-AFTRA for such Recoverable Distribution Expenses on a monthly basis.

4

(ii) Any Gross Receipts available to be distributed after reimbursement of Xenon's Recoverable Distribution Expenses as provided in subsection (i) above shall be paid in equal fifty (50%) percent shares to Xenon and SAG-AFTRA until SAG-AFTRA has been paid an amount equal to the SAG-AFTRA Deficiency.

(iii) All Gross Receipts available to be distributed after SAG-AFTRA has received an amount equal to the SAG-AFTRA Deficiency shall be retained by Xenon.

3.  Xenon shall make and provide accountings to SAG-AFTRA of all Gross Receipts revenues received from distribution of the Movie and any payments due to SAG-AFTRA as provided in section 2(c) herein on a monthly basis until the SAG-AFTRA Deficiency is paid in full. Thereafter on a quarterly basis within sixty (60) days after the end of each calendar quarter for residuals payment calculations.

4.  Xenon agrees, expressly for the benefit of SAG-AFTRA when the Movie is telecast on free television, or exhibited in Supplemental Markets and New Media (as applicable), to make residuals payments required, if any.

5.  Within a reasonable time after the expiration of each calendar quarter, but not exceeding sixty (60) days, Xenon will furnish or cause to be furnished to SAG-AFTRA a written report showing the gross receipts during the preceding quarter from the distribution of the Movie by Xenon on free television, supplemental markets, or New Media (as applicable), with respect to which Xenon is required to make payments hereunder (whether distributed by Xenon or another Distributor), and showing the date of the first exhibition on television, Supplemental Markets, or New Media (as applicable).

6.  In the event of any sale, assignment or transfer of any or all of Xenon's distribution or exhibition rights in the Movie, Xenon shall remain liable for Residuals relating to those rights unless Xenon obtains a separate, executed Distributor's Assumption Agreement from each such purchaser assignee or transferee (collectively, each "transferee") and SAG-AFTRA approves each transferee's financial responsibility in writing. SAG-AFTRA agrees that it will not reasonably withhold its approval of the financial responsibility of any transferee.

7.  It is understood that SAG-AFTRA has made no warranties or representation to Xenon concerning the Movie or Xenon's rights therein.

8.  Xenon agrees to indemnify, defend and hold SAG-AFTRA harmless in the event of any claim made by the Producers or Viva concerning Xenon's

distribution of the Movie or otherwise concerning the terms and conditions agreed to by SAG-AFTRA in this Agreement.

9. SAG-AFTRA agrees to execute any further documents required by Xenon to obtain possession of the Movie and all film elements associated therewith or to otherwise effectuate the distribution of the Movie notwithstanding SAG-AFTRA's lien previously imposed thereon.

10. Any dispute between Xenon and SAG-AFTRA concerning the interpretation or enforcement of this Agreement or otherwise concerning Xenon's distribution of the Movie shall be submitted to final and binding Arbitration to the American Arbitration Association before a single arbitrator in Los Angeles.

11. Nothing herein shall release Producers of its obligations under the CBA or any other agreement between the Producers and SAG-AFTRA.

SIGNED AS AN AGREEMENT:

Xenon Pictures, Inc.                    Screen Actors Guild-American Federation
                                        of Television and Radio Artists

By: _____          By: _____
    S. Leigh Savidge, President             Chief Deputy General Counsel

6

# Exhibit "B"

**SAG·AFTRA.**   **DISTRIBUTOR'S ASSUMPTION AGREEMENT
THEATRICAL**

In   consideration   of   the   execution   of   a   DISTRIBUTION   AGREEMENT   between
XENON / VIVA   ("Producer") and the undersigned Distributor, Distributor agrees that
the motion picture presently entitled " DOWN FOR LIFE " (the "Picture") is subject to the
current SAG-AFTRA Agreement for Independent Producers of Theatrical Motion Pictures, or its
predecessor agreement, as applicable, as either may be amended, supplemented, or replaced ("Basic
Agreement") covering theatrical motion pictures and particularly to the provisions of (strike those of the
following clauses (1), (2) or (3) which are not applicable):

(1)     Section 5 thereof, pertaining to additional compensation payable to performers when
theatrical motion pictures, the principal photography of which commenced after October 6, 1980 or
which are covered by said Section, are released to free television, and Section 34 pertaining to applicable
pension and health contributions, if any are required;

(2)     Section 5.1 thereof, pertaining to additional compensation payable to performers when
theatrical motion pictures, the principal photography of which commenced after June 30, 1971 but prior to
July 1, 1984 and which are covered by said Section, are released in Supplemental Markets and Section
34 pertaining to applicable pension and health contributions, if any are required;

(3)     Section 5.2 thereof, pertaining to additional compensation payable to performers when
theatrical motion pictures, the principal photography of which commenced after July 1, 1984 and which
are covered by said Section, are released in Supplemental Markets and Section 34 pertaining to
applicable pension and health contributions, if any are required.

(4)     Sideletter 22 thereof, pertaining to additional compensation payable to performers when
theatrical motion pictures, the principal photography of which commenced on or after July 1, 1971, and
which are covered by said Section, are released in New Media and Section 34 pertaining to applicable
pension and health contributions, if any are required.

Distributor is distributing or licensing the Picture for distribution (select one)

_____     In perpetuity (*i.e.*, for the period of copyright and any renewals thereof)

_____     for a limited term of _____ years in the following territories and media
(indicate those that are applicable):

**Territory:**

_____     Domestic (the U.S. and Canada, and their respective possessions and
territories)

_____     Foreign (the world excluding the U.S. and Canada and their respective
possessions and territories)

_____     Other (please describe):

**Media:**

_____     All

_____     Home Video/DVD

_____     Pay Television

_____     Free Television

_____     New Media

_____     Other (please describe):

_____     See description attached hereto as Exhibit "A" and incorporated herein
by reference.

Distributor hereby agrees, expressly for the benefit of the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA"), as representative of the performers whose services are included in the Picture, when the Picture is telecast on free television or exhibited in Supplemental Markets or New Media (as applicable), to make the additional compensation payments required thereby, if any, and the pension and health contributions required thereby, if any, with respect to the territories, media and term referred to above as provided in the applicable Sections referred to hereinabove (all such payments are collectively hereinafter referred to as "Residuals"). Distributor, for and on behalf of the Producer, shall make all Social Security, withholding, unemployment insurance and disability insurance payments required by law with respect to the additional compensation referred to in the preceding sentence.

It is expressly understood that the right of Distributor to license the Picture for exhibition on free television, Supplemental Markets, or New Media (as applicable), or to exhibit or cause or permit the Picture to be exhibited on free television, Supplemental Markets, or New Media (as applicable), shall be subject to and conditioned upon the prompt payment of Residuals with respect to the territories, media and term referred to above in accordance with said applicable Sections. It is agreed that SAG-AFTRA, in addition to all other remedies, shall be entitled to injunctive relief against Distributor in the event such payments are not made.

To the extent that Producer has executed a security agreement and financing statement in SAG-AFTRA's favor in the Picture and related collateral as defined in the SAG-AFTRA-Producer Security Agreement ("SAG-AFTRA Security Interest"), Distributor agrees and acknowledges that Distributor's rights in the Picture acquired pursuant to the Distribution Agreement (to the extent those rights are included in the collateral covered by the Security Agreement) are subject and subordinate to the SAG-AFTRA Security Interest. SAG-AFTRA agrees that so long as Residuals with respect to the Picture for the territories, media and term referred to above are timely paid in accordance with said applicable Sections that SAG-AFTRA will not exercise any rights under the SAG-AFTRA Security Interest which would in any way interfere with the rights of the Distributor to distribute the Picture and receive all revenues from such distribution.

SAG-AFTRA further agrees that if it exercises its rights as a secured party, it will dispose of collateral which encompasses any of Distributor's rights or interests in, or physical items relating to, the Picture, only to a transferee which agrees in writing to be bound by SAG-AFTRA's obligations under this Assumption Agreement.

Within a reasonable time after the expiration of each calendar quarter, but not exceeding sixty (60) days, Distributor will furnish or cause to be furnished to SAG-AFTRA a written report showing the gross receipts during the preceding quarter from the distribution of the Picture by Distributor on free television, Supplemental Markets, or New Media (as applicable), with respect to which Distributor is required to make payments hereunder, (whether distributed by the Distributor or through another distributor), and showing the date of the first exhibition on television, Supplemental Markets, or New Media (as applicable), and whether such exhibition was on network television and, if so, whether in prime time.

Distributor shall also make available for inspection by SAG-AFTRA all Distributor's statements delivered to Producer insofar as they relate to such gross receipts. SAG-AFTRA shall have the right at reasonable times and on reasonable notice to examine the books and records of Distributor as to such gross receipts pertaining to such distribution on free television, Supplemental Markets, or New Media (as applicable) of the Picture. If Distributor shall fail to make such payments as and when due and payable, Distributor shall pay late payment damages as specified in Section 5, 5.1 or 5.2, whichever is applicable, of the Basic Agreement.

In the event of any sale, assignment or transfer of any or all of Distributor's distribution or exhibition rights in the Picture, Distributor shall remain liable for the Residuals relating to those rights unless Distributor obtains a separate, executed Distributor's Assumption Agreement in this form from each such purchaser, assignee or transferee (collectively, each "transferee") and SAG-AFTRA approves each transferee's financial responsibility in writing. Distributor agrees to obtain from each transferee a separate written agreement in this form. SAG-AFTRA agrees that it will not unreasonably withhold its approval of the financial responsibility of any transferee. In the event SAG-AFTRA is notified that such transferee is a Qualified Distributor, then the financial responsibility of that transferee shall be deemed automatically approved on the date SAG-AFTRA receives written notice of the assumption of obligations

2 of 4

Distributors Assumption Agreement Theatrical 3.7

hereunder by the Qualified Distributor. Nothing herein shall release Producer of its obligations under the Basic Agreement or any other agreement between Producer and SAG-AFTRA.

If SAG-AFTRA does not approve the financial responsibility of any transferee in writing, this DISTRIBUTOR'S ASSUMPTION AGREEMENT shall remain effective and binding upon Distributor with respect to any such transferred rights, and Distributor shall be obligated to pay Residuals which accrue during the term for those territories and media for which it was granted distribution rights and all extensions and renewals. Such obligations shall be subject to Section 6.C. of the Basic Agreement. The Distributor shall have the right, at its election, to cause to be immediately submitted to arbitration, pursuant to the applicable provisions of the Basic Agreement, the issue of whether SAG-AFTRA has unreasonably withheld the approval of the financial responsibility of any transferee for payments due hereunder.

Distributor and SAG-AFTRA hereby agree that all disputes based upon, arising out of or relating to this Assumption Agreement, other than SAG-AFTRA's entitlement to injunctive or other equitable relief, shall be submitted to final and binding arbitration in accordance with the arbitration provisions contained in the Basic Agreement. If Distributor fails or refuses to substantially comply with its obligations to report and pay compensation as required under this Assumption Agreement, the Guild may, in any grievance and arbitration relating to such failure or refusal, elect to either (a) enforce the relevant portions of the Basic Agreement relating to such reporting and payment by ascertaining sums owed from license agreements, distributors' statements, and other documents evidencing the revenue derived from the distribution or other exploitation of the Picture, or (b) request and obtain an award for payment of Residuals due under the relevant provisions of the Basic Agreement as estimated by the Guild in good faith. The arbitrator selected in accordance with the applicable provisions of the Basic Agreement is expressly authorized to issue an award for Residuals compensation based upon the Guild's good faith estimate. Notwithstanding the foregoing, Distributor agrees and acknowledges that SAG-AFTRA is not precluded by this or any other provision of this Assumption Agreement from obtaining from a court injunctive relief or any other legal remedy at any time prior to arbitration or issuance of an arbitration award. The right to obtain injunctive relief from a court shall be applicable whether an arbitration proceeding has or has not been initiated, and further, without limitation, shall be applicable in conjunction with a proceeding to confirm and enforce an arbitration award against Distributor.

THIS DISTRIBUTOR'S ASSUMPTION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA AND THE UNITED STATES, AS THE SAME WOULD BE APPLIED BY A FEDERAL COURT IN CALIFORNIA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. SAG-AFTRA and Distributor agree that any arbitration or legal action or proceeding brought to interpret or enforce the provisions of this Distributor's Assumption Agreement (including an action to compel arbitration or a petition to vacate an arbitration award) shall be held or brought, in the Guild's sole discretion, in Los Angeles County, California or in New York County, New York. Distributor irrevocably submits to the jurisdiction of the federal and state courts therein. Distributor irrevocably waives any objection which it may now or hereafter have to the venue of any suit, action or proceeding, arising out of or relating to the Assumption Agreement brought in the State of California or in the State of New York and hereby irrevocably waives any claim that any such suit, action or proceeding in the State of California or in the State of New York has been brought in an inconvenient forum. All arbitrations shall be held in the Guild's office in Los Angeles, unless the parties otherwise agree, except that they shall be held in the Guild's New York office if the production was based in New York and a majority of the witnesses required for the hearing reside regularly in or around the New York area. If a dispute arises concerning the proper situs for the arbitration hearing(s), an arbitrator in Los Angeles shall determine that issue. The same arbitrator shall hear the merits of the matter, if he or she is available and determines that Los Angeles is the appropriate situs for the arbitration hearings(s). Notwithstanding the foregoing, SAG-AFTRA, at its option, may bring a legal action or proceeding in the courts of any country or place where Distributor or any of its assets may be found and, by execution and delivery of this Assumption Agreement, Distributor irrevocably submits to the jurisdiction of the courts of such places. All notices required or permitted under this Assumption Agreement shall be in writing and must be given by (a) personal delivery, (b) certified mail, return receipt requested, (c) first class mail, or (d) telecopy with a copy sent by first class mail addressed to the receiving party at its address as specified in this Assumption Agreement. In the case of notices sent to the Guild, the notice must also include "Attention: General Counsel." Any such notice shall be deemed to have been duly given or made either immediately upon personal delivery, or five (5) calendar days from the date of mailing within the United States, or seven (7) calendar days from the date of mailing across national borders. Notices sent to Distributor at the address given below (or any other address that Distributor may specify in accordance

with this paragraph) shall be deemed effective and adequate under this Assumption Agreement and applicable law. Either party may change its address in accordance with the procedure contained in this paragraph. Distributor consents to service of process by personal delivery or by certified or registered mail, return receipt requested, to Distributor's general counsel or to Distributor's representative identified below or by first class mail to Distributor when Distributor has not designated a representative or a general counsel, or by any other method permitted by law. SAG-AFTRA and Distributor agree that signatures to this Agreement transmitted via facsimile or via electronic delivery shall be presumed authentic and deemed originals.

Date: 11/21/16

("Distributor")

Address: 15233 VENTURA BLVD. #250
SHERMAN OAKS, CA 91403

By: _____

MONICA BLUT
(Please print name)

Title: COUNSEL OF RECORD

Distributor's Representative or General Counsel:

_____

ON BEHALF OF ALL DISTRIBUTOR
PARTIES:
ROBERT SETARI
DOUG VANCE
MICHAEL LEVINS
MARC NOVAK
CHRIS BROWN
PAUL STEWART
NEELY DINKINS
VITO COLAPIETRO
GREGORY FLORES
RUBEN CORTEZ

# EXHIBIT 3

# Public Catalog

Copyright Catalog (1978 to present) at DC4
Search Request: Keyword = down for life por vida
Search Results: Displaying 3 of 100003 entries



---

Labeled View

***Down for life & 2 other titles;***

**Relevance:** ■ ■ ■ ■

**Type of Work:** Recorded Document

**Document Number:** V3627D252

**Date of Recordation:** 2013-03-01

**Entire Copyright Document:** V3627 D252 P1-8

**Date of Execution:** effective as of 3May12; date of cert.: 27Feb13

**Title:** Down for life & 2 other titles; motion picture.

**Notes:** Copyright mortgage & assignment.

**Party 1:** DFL Releasing, LLC & Por Vida Productions, LLC.

**Party 2:** Viva Films, LLC.

**Links:** List of Titles

**Names:** DFL Releasing, LLC
Por Vida Productions, LLC.
Viva Films, LLC.



| **Save, Print and Email (Help Page)** | | |
|---|---|---|
| Select Download Format | Full Record | Report 1 | Latin1 MARC |
| Enter your email address: | | |

# EXHIBIT 4

**From:** Scott William Alvarez <swa@cinemarevival.com>
**Sent:** Monday, October 1, 2018 7:49 PM
**To:** Christopher Brown <cbrown@brownrosen.com>; 'Christopher Brown' <brownrosenbrown@pop.powweb.com>
**Cc:** 'Robert Setari' <robertsetari@gmail.com>; 'Alan Jacobs' <ajacobs@archer-eg.com>; 'Peter Holden' <ratbastardceo@gmail.com>
**Subject:** Re: Xenon Summons/Judgement

Jason's clearly in breach and knows that. The only remedy that means anything for Robert and his home at this point is for Jason to cash flow. Jason is pushing for that to happen within the next week to 10 days. He said he will not let Robert lose his home and at this point talk is cheap and he knows that.

Chris, I'm not sure what you mean by "there is no contract"? There is a contract all parties signed: Chris, you on behalf of the plaintiffs as per the Power of Attorney (both are attached). Jason on behalf of WVP to finance the judgment payoff.

Robert suing Jason for breach of contract doesn't stop Robert's house from being sold out from under he and his family. Obviously if Jason doesn't fund soon he knows Robert has no choice but to file suit but again, that's no remedy for Robert.

Robert and his attorney are reviewing the case documents for possible stalling tactics with the Levy but there don't seem to be any obvious ones. The 'exemption' approach is not worth pursuing according to Robert's attorney because there is already a judgment. It only knocks of $26K off the judgment but it doesn't prevent a forced sale of the home.

My understanding is that in some states a primary residence cannot be part of a judgment enforcement, which is probably why Xenon didn't go after plaintiffs in the other states. In CA it seems that a primary residence can be forcibly sold, which is probably why Xenon went after Robert. The other CA plaintiffs perhaps didn't have assets that were immediately traceable to the individual plaintiff. In any case they went after Robert. His attorney is going to stall.

Again the only remedy is for Jason to fund, and quickly. Alan and I are also meeting with an investor as a backup and Chris, I encourage you to do the same if you have any leads. Until you have that money in escrow to pay the judgment, let's keep pushing.

On 10/1/18 2:21 PM, Christopher Brown wrote:
Scott:

You do realize that Jason is in breach and there is no enforceable contract .

Thanks
Chris

**From:** Scott William Alvarez [mailto:swa@cinemarevival.com]
**Sent:** Monday, October 1, 2018 2:59 PM

Regards,
Robert

\<Xenon Lawsuit.pdf\>

# EXHIBIT 5

# TERM SHEET

# FOR

# MOTION PICTURE PRODUCTION FINANCING

EFFECTIVE DATE: *DECEMBER* 22ND 2017 (THE "EFFECTIVE DATE")

THIS TERM SHEET ("TERM SHEET") IS ENTERED INTO IN CONNECTION WITH THE ANTICIPATED ACQUISITION FINANCING OF FEATURE MOTION PICTURE PROJECT CURRENTLY TITLED "DOWN FOR LIFE" (THE "PICTURE"). THIS TERM SHEET SHALL BE BINDING UPON THE PARTIES UPON ITS FULL EXECUTION AND DELIVERY BY THE PARTIES, HOWEVER, VARIOUS OBLIGATIONS OF THE PARTIES ARE CONDITIONED UPON SATISFACTION OF ADDITIONAL CONDITIONS PRECEDENT. ALL AMOUNTS STATED HEREIN ARE IN U.S. DOLLARS.

| | |
|---|---|
| **1. Parties** | WeatherVane Productions, Inc. ("WV"); and<br><br>DFL Plaintiffs / Creditors ("Producer"); and<br><br>LATS Holdings, LLC. on behalf of Creditors ("Film Producer")..<br><br>WV, Producer and Film Producer sometimes are referred to herein jointly as the "Parties" or separately as a "Party". |
| **2. Investment Amount** | The aggregate amount of the WV equity is Two Hundred Seventy Five Thousand United States Dollars ($275,000.00) (the "Investment Amount").<br><br>The current acquisition budget is One Hundred Seventy Five Thousand United States Dollars ($175,000.00) (the "Acquisition Budget.") The full negative cost including acquisition budget, production delivery budget and all finance fees: Two Hundred Seventy Five Thousand United States Dollars ($275,000.00) (the "Negative Cost").<br><br>WV is also committed to bringing between Two Hundred Seventy Five Thousand United States Dollars ($275,000.00) and Three Hundred and Fifty Thousand United States Dollars ($350,000.00) for Prints and Advertising (the "P&A Amount"). This allocation will be decided after delivery of the film. |
| **3. Background and Nature of Transaction** | Parties shall pay the acquisition budget to Xenon Pictures, LLC to have full ownership and control of the Picture. WV will be assigned the title rights to the PICTURE and will utilize the same to distribute or utilize its funds to help market and distribute said Picture. The Parties have discussed, and WV is interested in financing the total budget of Two Hundred Seventy Five Thousand United States Dollars ($275,000.00), as set forth herein. The provision of production / acquisition financing from WV is summarized in this Term Sheet, however, WV shall not have any obligation to fund any amounts unless and until the Conditions Precedent set forth herein are satisfied.<br><br>If delivery of the film is done in a timely manor and according to the standards of the producers, production producers and WV, WV will allocate the P&A Amount |

| | |
|---|---|
| | to aid in a full release of the film. |
| | The Parties acknowledge and agree that WV shall be a member of Production LLCs and will be provided with a yearly K-1 commencing with the calendar year that Producer irrevocably receives the Investment Amount. |
| **4. Conditions Precedent** | The Picture shall be acquired and all of WV's obligations to fund the Investment Amount for the Picture shall be conditioned upon satisfaction of each of the following conditions precedent (collectively, the "<u>Conditions Precedent</u>"): <br><br> A.  Full execution of this Term Sheet; <br> B.  Full execution of the DFL assign and power of attorney, and attached hereto as exhibit A and. <br> C.  Full drawn down of the WV line of credit from the finance bank, subject only to bank requirements with respect to the exact date on which such full draw down occurs. As of 11-01-17 the Line of Credit is set and will be available for draw with a two (2) week notice. |
| **5. Picture Specifications and Approvals** | WV and Film Producer shall mutually approve each of the following as set forth below for each film: <br><br> A.  Final acquisition contract with Xenon Pictures, LLC.; <br> B.  Final all-in going in marketing budget; <br> C.  Verification by WV that the Picture is set for full theatrical distribution and has all appropriate mixes, color correction, addition of new credits, et. all, etc. as is industry standard for delivery to any studio for distribution; <br> D.  Customary production-related insurance, including errors and omission insurance (set for post production / delivery), including all in amounts and with deductibles, with additional insured certificates issued to WV pursuant to which WV is named as an additional insured with the right to 30 days notice of cancellation; <br> E.  The domestic distributor and international sales agent for the Picture, provided that in the event of a disagreement the decision of WV shall control the determination such domestic distributor and the international sales agent; <br> F.  Completion and execution of a collection account management agreement ("CAMA") to which WV and Producer are a party; Fintage House and Freeway are deemed approved as collection agent; |
| **6. Transaction Documents** | The Parties shall enter into definitive financing documents concerning the Investment Amount, each of which shall be subject to the approval of WV and Producer (the "<u>Transaction Documents</u>").  The Transaction Documents shall include, the following: (a) this Term Sheet; (b) assignment of full title rights to WV as set forth in this Term Sheet. |
| **7. Nature and Use of Investment Amount;** | The Investment Amount shall be used for acquisition and financing the delivery expenses for the Pictures, only, i.e., the funding by WV shall be used solely to defray the acquisition and delivery expenses to produce and deliver the Picture. <br><br> If WV elects to invest the P&A Investment then those funds will be used to market and distribute the Picture. |

| | |
|---|---|
| **8. WV Film Credits** | WV and its designees shall be accorded the following film credits in connection with the Picture(s):<br><br>A. A Company credit for WV or an affiliate of WV (as designated by WV);<br>B. A Logo credit of the same (animated on screen in beginning of the Picture and static / bug elsewhere);<br>C. Three (3) Executive Producer credits. Executive Producer credits shall be in first position among Executive Producer credits, WVP will be allotted one (1) single card; with Jason Van Eman or as WV assigns and one (1) shared card credits; with Ben McConley and David Van Eman or as WV's assigns.<br><br>Each of the foregoing credits shall appear in the main titles of the Picture (provided, the Executive Producer credits may appear in main-on-end titles if all Executive Producer credits appear in main-on-end credits), shall appear in the full billing block for the Picture wherever such full billing block appears if any other credits of the same class (i.e., producer or executive producer) appear in such full billing block (except for the applicable distributors' customary exceptions and exclusions, provided, all credits are tied to credits of a similar class regarding exclusions), and shall be tied to credits of the same class with respect to grouping, size, duration and brilliance.<br><br>The Logo credit shall be on a single card in no less than third position, behind only the distributor's and Producer's logo credits; the Company credit shall be in no less than third position behind only the company credit accorded to Producer. |
| **9. Matching Funds Costs: WV Executive Producer Fees; WV Expenses and WV Budget Entitlements** | WV shall be entitled to charge and receive each of the following which will be included as line items in the Production Budget: (a) <u>Matching Funds Costs</u> of Fifty Thousand United Sates Dollars ($50,000.00) ("<u>Matching Funds Costs</u>"); (c) allocations for at least two WV designees to attend festival screenings and the celebrity premieres of the Picture(s) (if such screenings or premiere occur), which allocations shall be for two (2) first class airline tickets from continental U.S. location(s) to the set of principal photography of any of the Picture(s), two (2) rooms in a hotel , one (1) rental car, and producer per diems (for clarity, WV designees shall not be provided with travel, accommodations or transportation from the Production Budget that are more favorable than that accorded to the lead producers) (the "<u>WV Travel Allocations</u>"). The Matching Funds Costs, and the WV Travel Allocations shall be included in the production budget for Picture and, at the sole discretion of WV, may be deducted from the Investment Amount prior to the Net Funding. |
| **10. Interest, Preferred Return and Backend Participation and rights** | The Investment Amount shall receive a preferred return equal to twenty five percent (25%) of the Investment Amount actually and irrevocably received by Producer.<br><br>The P&A Investment Amount shall receive a preferred return equal to twenty five percent (25%) of the Investment Amount actually and irrevocably spent and verified by Film Producer.<br><br>In addition, WV will be entitled to receive 5% of 100% of the "Net Profits" derived from the Picture. WV must approve additional third party investors, and the terms and conditions of the investment provided by any such additional third party investors shall be in accordance with this Term Sheet. |

WV holds worldwide sales agency rights with sales fee of 15%.

WV is open to a buyout from any future investors. WV would be repaid the investment(s) plus 25% and would retain; credits, 5% equity in the film, and the sales agent fee would be converted to packaging agent fee of 10% vs. 15%.

WV has the right and ability, to have a third party bring in debt to take out exposure of the equity investment once the Picture has been acquired and set for delivery.

For clarity, distribution of revenues shall be as follows:
Distribution / sales agent fees, WV to approve, then WV shall receive one hundred percent (100%) of its Investment Amount(s) in the Picture plus an additional twenty five percent (25%) as a preferred return on the Investment Amount(s), from "Gross Revenue" first monies received by Film Producer / CAMA in connection with the worldwide exploitation of the Picture, only after payment of the following:

1. Collection account fees and expenses, if any;
2. Applicable residuals and/or any other applicable union payments, if any;
3. Fees and costs to agents, representatives, accountants and/or attorneys who represent the Picture, to the extent such fees and/or costs are not deducted off the top prior to Producer's receipt of Gross Revenue (or a reasonable reserve with respect to accountant and legal fees);

"Gross Revenue" shall be defined as all monies received by or credited to the Producer (and its affiliated and related entities from the exploitation of the Picture and all ancillary, soundtracks and subsidiary rights therein (including from merchandising, but not including any income from the exploitation of sequel, remake or other subsequent production rights). So-called "soft monies; tax incentives / credits, product placement, minimum guarantees, etc.," shall be paid or directed to WV before being deemed "Gross Revenues" and shall not be subject to any fees or discounts by sales agents, distributors or Producer.

Once WV is fully repaid as set forth above, the balance of the Gross Revenue ("Net Profits") shall be distributed in accordance with listed parties percentage of equity investment and interest in the Picture. A schedule of the distribution of revenues, and all definitions, shall be set forth in the appropriate CAMA, negotiated in good faith between Film Producer and WV.

| | |
|---|---|
| **11. Other Rights** | WV shall be entitled access to information regarding production, all financial reports, contracts and documents when available, and all other approval rights set forth herein above. With respect to the final cut / delivery of the Picture, Film Producer / WV will review the current cut and discuss if any changes or additions need to be made, WV and Film Producer shall mutually approve the changes and the final cut will be deemed the "locked" final cut of the Picture (provided that WV and Film Producer acknowledge and agree that additional edits may be required by the distributor of the Picture. |
| **12. Matching Funds, Costs and Net Funding** | Producer acknowledges that the WV funding of production financing for the Picture in accordance with this Term Sheet requires, among other things; fees, |

|  | costs, expenses, interest and other amounts will be incurred in connection with the Matching Funds (the "Matching Funds Costs") and the Matching Funds Costs shall be charged against the Investment Amount and shall reduce the net amount of the Investment Amount funded from WV for the Picture and shall be included in the production budget for the Picture as a financing expense.  For clarity, Matching Funds Costs will be capped at Fifty Thousand United Sates Dollars ($50,000.00) for each funding, (Fifty Thousand United Sates Dollars ($50,000.00) for the Investment Amount and Fifty Thousand United Sates Dollars ($50,000.00) for the P&A amount (if WV elects to invest the P&A)).

The Investment Amount less the Matching Funds Costs are referred to as the "Net Funding".  Within five (5) business days of receipt of the Net Funding by WV, WV shall place the funds for acquisition into a bank account in the name of Producer and or specifically to Xenon Pictures, LLC. (at the Producers direction) paying the acquisition costs for the Picture.  Producer shall have full access and permissions with respect to such account and acknowledge and agree that Producer will at all times comply with the Production Budget. Upon receipt and acceptance of any funds from WV Producer agrees that all credits listed in paragraph 8 are hereby earned and will stand in perpetuity.

For avoidance of doubt and for illustration purposes only, if the Investment Amount is $3 million and the Matching Funds Costs are $400,000, then the Net Funding for the Picture would be $2.6 million and the $400,000 in Matching Funds Costs for the Picture is deemed a financing expense included in the production budget for the Picture and is part of the negative cost owed back to WV. |
| **13.  Expiry** | This Term Sheet shall terminate if not fully executed by 11/__/2017 (the "Termination Date") subject to earlier termination in accordance with Section 17 of this Term Sheet. |
| **14. Exclusive Right** | Upon full execution of this Term Sheet, WV will be granted the exclusive right to provide the Acquisition and P&A Investments for the Picture as set forth in this Term Sheet unless this Term Sheet is terminated in accordance with its provisions. |
| **15.  Conditions Precedent to Funding Obligations** | WV shall not have any obligation to fund any portion of the Investment Amount and shall not have any obligations with respect to the Picture unless and until all of the Conditions Precedent have been satisfied. |
| **16. Representations and Warranties** | Each Party (to the extent applicable) hereby represents, warrants and agrees on its own behalf that (a) it is duly organized validly existing and in good standing under the laws of the applicable jurisdiction in which it is organized; (b) it has all necessary power and authority to carry on its business as now being conducted; (c) it has the necessary power and authority to execute, deliver and perform under this Term Sheet and the execution, delivery and performance of this Term Sheet has been duly and validly authorized by all necessary action on the part of such Party; (d) this Term Sheet constitutes the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws and equitable principles relating to or limiting creditors' rights generally; and (e) the execution, delivery and performance of this |

| | |
|---|---|
| | Term Sheet and any related agreements by such party will not violate or constitute a breach or default (whether upon lapse of time and/or the occurrence of any act or event or otherwise) under (i) the constitutive documents of such Party; (ii) any law to which such Party is subject; or (iii) any contract to which such Party is a Party that is material to the financial condition, results of operations or conduct of the business of such Party. |
| **17.  Termination** | Irrespective of any other provision of this Term Sheet, either Party may terminate this Term Sheet if any of the following occurs and remains uncured within ten (10) business days following receipt of notice to cure the same (if capable to be cured): |
| | 1.  <u>Insolvency</u>. The other Party becomes insolvent or is the subject of any bankruptcy, reorganization or insolvency proceeding, including an assignment for the benefit of creditors; and |
| | 2.  <u>Representations and Warranties</u>. Any of the representations and warranties contained herein are or become false or incorrect in any material respect. |
| | In the event of a material breach of this Term Sheet by WV, all of WV's rights herein shall terminate immediately, and Producer shall be free to seek alternative financing sources without any continuing obligation to WV whatsoever.  For clarity, failure by WV to fund the Investment Amount if the Conditions Precedent are not satisfied will not be deemed a material breach. |
| **18.  Law, Jurisdiction and Binding Arbitration** | This Term Sheet shall be governed, construed and interpreted pursuant to the laws of the State of Florida, USA. Any and All disputes, claims or controversies arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by binding arbitration in Miami, Florida before one arbitrator experienced in entertainment law. The arbitration shall be administered by JAMS pursuant to its JAMS' Comprehensive Arbitration Rules and Procedures. The Parties agree to confidential arbitration and any disclosure of said arbitration or the parameters of the terms of the dispute, claims or controversy constitutes an automatically forfeiture of the breaching parties claim. |
| | The Parties to this agreement acknowledge that several individuals have acted as representatives for the Parties in various capacities and each of the Parties hereto agree to waive any rights that they may have to bring a claim against any such individuals as a part any dispute, claim or controversy arising out of or relating to this agreement, or the breach, termination, enforcement of this agreement. Any dispute, claims or controversies resulting from this Agreement covered by this Section shall be limited to the companies executing this agreement.  For avoidance of doubt, all legal actions and remedies shall only be between the corporate entities listed in this agreement and not the individuals of those organizations. |
| **19.  Miscellaneous** | This Term Sheet consists of the entire agreement between the Parties and supersedes any prior or contemporaneous agreements relating to the subject matter hereof and may not be modified or amended except by a writing executed by the Parties.  This Term Sheet may be executed in one or more counterparts |

|  | and electronic signatures shall have the same force and effect as original signatures. The Parties acknowledge that no party or other person made any representation, promise or warranty not expressly set forth in this Term Sheet. This Term Sheet is not assignable by either Party without the written consent of the non-assigning Party, which consent shall not be unreasonably withheld or delayed. Capitalized terms in the left column, which are not otherwise defined in this Term Sheet, shall be defined by the language in the corresponding right column. |
|---|---|

(Remainder of Page Left Blank Intentionally; Signatures on Following Page)

# TERM SHEET
## FOR
## ACQUISITION FINANCING DFL - WV
### Signature Page

LATS Holdings, LLC

By: _____
Name: Scott Alvarez
Title: Managing Member

WEATHERVANE PRODUCTIONS, INC.

By: _____
Name: Jason Van Eman
Title: President


Parties who own DFL;

By: _____
Name: *Chris Brown


\* Has the authority to sign on behalf of all DFL parties as per the fully executed Power of Attorney, attached hereto.



(Notary page to follow)



ROBERT S HAWLEY
Notary Public
Commonwealth of Massachusetts
My Commission Expires 6/1/2018

**TERM SHEET**
**FOR**
**ACQUISITION FINANCING DFL - WV**

**Signature Page**

LATS Holdings, LLC

By: _____
Name: Scott Alvarez
Title: Managing Member

WEATHERVANE PRODUCTIONS, INC.

By: _____
Name: Jason Van Eman
Title: President


Parties who own DFL;

By: _____
Name: *Chris Brown


\* Has the authority to sign on behalf of all DFL parties as per the fully executed Power of Attorney, attached hereto.


(Notary page to follow)


ROBERT S HAWLEY
Notary Public
Commonwealth of Massachusetts
My Commission Expires 6/4/2018

**TERM SHEET**

**FOR**

**ACQUISITION FINANCING DFL - WV**

**Notary Page**

STATE OF OKLAHOMA )
                                        ):ss
COUNTY OF WASHINGTON )

Before me, the undersigned, a Notary Public in and for said County and State, on this __th day of December, 2017, appeared personally Jason Van Eman to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

_____
Notary Public
My Commission Expires:_____ (Seal)

STATE OF NEW YORK )
                                   ):ss
COUNTY OF )

*See previous page for Chris Brown notary*

Before me, the undersigned, a Notary Public in and for said County and State, on this __th day of December, 2017, appeared personally Chris Brown to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

_____
Notary Public
My Commission Expires:_____ (Seal)

STATE OF CALIFORNIA )
                                     ):ss
COUNTY OF Los Angeles )

Before me, the undersigned, a Notary Public in and for said County and State, on this _6_th day of ~~December, 20~~ Jan 8, appeared personally Scott Alvarez to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

_____
Notary Public
My Commission Expires: Aug 27, 2021 (Seal)

*See attached*

# TERM SHEET
## FOR
## ACQUISITION FINANCING DFL - WV

### Notary Page

STATE OF OKLAHOMA        )
                                :ss

COUNTY OF WASHINGTON   )

Before me, the undersigned, a Notary Public in and for said County and State, on this 11th day of ~~December, 2017~~ *Jan 2018*, appeared personally Jason Van Eman to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

> BEVERLY S. SWINFORD
> Notary Public – State of Oklahoma
> Commission Number 01005837
> My Commission Expires Apr 5, 2021

Beverly S. Swinford
Notary Public
My Commission Expires: 4-5-2021 (Seal)

STATE OF NEW YORK        )
                               ss

COUNTY OF                )

*See previous page for Chris Brown notary*

Before me, the undersigned, a Notary Public in and for said County and State, on this __th day of December, 2017, appeared personally Chris Brown to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

Notary Public
My Commission Expires: _____ (Seal)

STATE OF CALIFORNIA      )
                              :ss

COUNTY OF *Los Angeles*   )

Before me, the undersigned, a Notary Public in and for said County and State, on this 10 day of ~~December, 2017~~ *Jan 8*, appeared personally Scott Alvarez to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

Notary Public
My Commission Expires: _____ (Seal)

*See attached*

EXHIBIT A.

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**     CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of     Los Angeles          }

On _Jan. 10, 2018_ before me, _____ J.M. Arambula, Notary Public _____,
　　　　*Date*　　　　　　　　　　　　*Here Insert Name and Title of the Officer*

personally appeared _Scott Alvarez_
　　　　　　　　　　　　　　　*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

J. M. ARAMBULA
Notary Public – California
Los Angeles County
Commission # 2211668
My Comm. Expires Aug 27, 2021

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _J. M. Arambula_
　　　　　　*Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

─────────────────── **OPTIONAL** ───────────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual　　　　☐ Attorney in Fact
☐ Trustee　　　　　☐ Guardian of Conservator
☐ Other: _____
Signer is Representing: _____

Signer's Name: _____
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual　　　　☐ Attorney in Fact
☐ Trustee　　　　　☐ Guardian of Conservator
☐ Other: _____
Signer is Representing: _____

©2017 National Notary Association